# Exhibit 1

**AMERICAN ARBITRATION ASSOCIATION**
**INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION**
**Case No. 01-18-0001-0115**

**(1) Precision Castparts Corp.,**

**(2) PCC Germany Holdings GmbH,**

**Claimants,**

**v.**

**(3) Schulz Holding GmbH & Co. KG,**

**(4) Schulz Extruded Products Beteiligungs GmbH & Co. KG,**

**(5) Schulz Extruded Products Verwaltungs GmbH,**

**Respondents.**

———————————————————————

**Final Award**

———————————————————————

**The Tribunal**

**Ms. Jean E. Kalicki**
**Dr. Wolfgang Peter**
**Mr. Elliot E. Polebaum (Chair)**

**April 9, 2020**

# TABLE OF CONTENTS

**LIST OF CERTAIN DEFINED TERMS** ..................................................................................................... **4**

**I.        INTRODUCTION** .................................................................................................... **6**

  A.        The Parties ....................................................................................................... 6

  B.        Legal Representatives of the Parties ............................................................... 7

  C.        Background of the Dispute .............................................................................. 7

  D.        The Arbitration Agreement and Governing Law ............................................ 8

  E.        The Tribunal .................................................................................................... 9

**II.       PROCEDURAL HISTORY** ..................................................................................... **10**

**III.      THE FACTS** ............................................................................................................ **16**

**IV.       RELIEF REQUESTED** ........................................................................................... **34**

  A.        PCC's Requested Relief .................................................................................. 34

  B.        Schulz's Requested Relief .............................................................................. 35

**V.        THE PARTIES' PRINCIPAL CONTENTIONS** ...................................................... **36**

  A.        PCC's Position on Liability ............................................................................. 36

    1.        Fraudulent Inducement ................................................................................... 36

    2.        Breach of Warranty ......................................................................................... 42

      a.        Schulz's Alleged Falsified Financial Statements ............................................ 42

      b.        Schulz's Failure to Disclose Alleged Liquidity Crisis ................................... 43

      c.        Inventory That Was Not Usable and Saleable ................................................ 43

      d.        Damages ........................................................................................................... 44

  B.        Schulz's Position on Liability ......................................................................... 44

    1.        Fraudulent Inducement ................................................................................... 44

    2.        Breach of Warranty ......................................................................................... 50

      a.        Alleged Breach of Section 2.2. ....................................................................... 50

      b.        Alleged Breach of Section 2.4 of the SPA ..................................................... 50

      c.        Alleged Breach of Section 2.5 of the SPA ..................................................... 51

      d.        Alleged Breach of Section 2.19 of the SPA ................................................... 51

      e.        Alleged Breach of Section 2.20 of the SPA ................................................... 52

      f.        Alleged Breach of Section 2.21 of the SPA ................................................... 52

3.     The Relevance of Sections 4.5(a) and (c) of the SPA...................................................52

C.     PCC's Position on Damages..................................................................................................53

D.     Schulz's Position on Damages.............................................................................................59

**VI.     THE TRIBUNAL'S ANALYSIS ........................................................................... 64**

A.     Overview................................................................................................................................ 64

B.     PCC's Fraud Claim.............................................................................................................. 65

1.     Section 4.5............................................................................................................................ 66

2.     Relevant Time Period ........................................................................................................ 68

3.     Whether Respondents Made Fraudulent Misrepresentations and Omissions ...................70

4.     Whether Respondents Knew Their Misrepresentations Were False ................................95

5.     Whether Respondents Intended for PCC to Act on the Misrepresented Information .....96

6.     Whether PCC Reasonably Relied on Sellers' Misrepresentations...................................99

7.     Whether PCC Suffered Damages as a Result of the Fraud............................................ 101

8.     Respondents' Bootstrapping and Rehash Defenses Under Delaware Law.................... 102

C.     PCC's Contract Claims.................................................................................................... 102

D.     Respondents' Bootstrapping and Rehash Defenses ....................................................... 108

E.     Damages ............................................................................................................................. 115

1.     Respondents' Synergies Analysis .................................................................................... 116

2.     PCC's Claim for €800 Million in Damages.................................................................... 119

3.     PCC's Alternative Claim for €643 Million in Damages................................................ 122

4.     Punitive Damages ............................................................................................................. 126

5.     Interest ............................................................................................................................... 128

F.     Costs ................................................................................................................................... 129

**VII.     DISPOSITIONS AND AWARD ........................................................................... 130**

## LIST OF CERTAIN DEFINED TERMS

| | |
|---|---|
| **Acquired Companies** | WSG, SXP, and CRA-OCTG |
| **Claimants** | Precision Castparts and PCC Germany |
| **CPHB** | Claimants' Post-Hearing Opening Brief |
| **CPHRB** | Claimants' Reply to Respondents' Post-Hearing Brief |
| **Commercial Rules** | Commercial Arbitration Rules of the American Arbitration Association, including the Procedures for Large Complex Commercial Disputes. |
| **CRA-OCTG** | SXP CRA-OCTG, Inc. |
| **DFB** | Deutsche Factoring Bank |
| **EKTRA** | Management & Diligence Services Pte Ltd. |
| **Fox** | FCF Fox Corporate Finance GmbH |
| **PCC** | Precision Castparts Corp. and PCC Germany |
| **PCC Germany** | PCC Germany Holdings GmbH |
| **Precision Castparts** | Precision Castparts Corp |
| **Rejoinder** | Respondents' Rejoinder |
| **Reply** | Claimants' Reply in Support of Statement of Claim |
| **Respondents** | Schulz |
| **RPHB** | Respondents' Post-Hearing Brief |
| **RPHRB** | Respondents' Reply to Claimants' Post-Hearing Opening Brief |
| **Schulz** | Schulz Holding GmbH & Co. KG, Schulz Extruded Products Beteiligungs GmbH & Co. KG, and Schulz Extruded Products Verwaltungs GmbH |
| **Schulz Beteiligungs** | Schulz Extruded Products Beteiligungs GmbH & Co. KG |

| | |
|---|---|
| **Schulz Holding** | Schulz Holding GmbH & Co. KG |
| **Schulz Verwaltungs** | Schulz Extruded Products Verwaltungs GmbH |
| **SF Holding** | Schulz SF Holding GmbH |
| **SFE** | Schulz (Far East), Pte., Ltd. |
| **SOC** | Claimants' Statement of Claim |
| **SOD** | Respondents' Statement of Defense |
| **SPA** | Securities Purchase Agreement dated December 28, 2016, among Claimants, Respondents, CRA-OCTG, SXP, Schulz Investment Corp., and Wilhelm Schulz GmbH |
| **SXP** | SXP Xtruded Products LP |
| **WSG** | Wilhelm Schulz GmbH |

We, the undersigned Arbitrators, having been designated in accordance with the arbitration agreement as set forth in the Securities Purchase Agreement, dated December 28, 2016, among the above-named Parties and others identified below, and having been duly sworn and having heard the proofs and allegations of the Parties, hereby award as follows:

## I.   INTRODUCTION

### A.   <u>The Parties</u>

1.      The first Claimant in this arbitration is Precision Castparts Corp., an Oregon corporation with its corporate headquarters in Portland, Oregon ("**Precision Castparts**").

2.      The second Claimant in this arbitration is PCC Germany Holdings GmbH, a German limited liability company headquartered in Krefeld, Germany ("**PCC Germany**").

3.      The Claimants are sometimes referred to collectively as "**PCC**" unless the context otherwise requires.

4.      The first Respondent is Schulz Holding GmbH & Co. KG, a German limited liability company headquartered in Krefeld, Germany ("**Schulz Holding**").

5.      The second Respondent is Schulz Extruded Products Beteiligungs GmbH & Co. KG, a German limited liability company headquartered in Krefeld, Germany ("**Schulz Beteiligungs**").

6.      The third Respondent is Schulz Extruded Products Verwaltungs GmbH, a German limited liability company headquartered in Krefeld, Germany ("**Schulz Verwaltungs**").

7.      The Respondents are sometimes referred to collectively as "**Schulz**" unless the context otherwise requires.

8.     Claimants and Respondents are each sometimes referred to as a "**Party**" or collectively as the "**Parties**."

**B.      Legal Representatives of the Parties**

9.     Claimants are represented in these proceedings by Stoel Rives LLP as follows:

> Mr. Joel A. Mullin
> Mr. B. John Casey
> Ms. Samantha K. Sondag
> Ms. Taryn K. Williams
> STOEL RIVES LLP
> 760 SW 9th Avenue, Suite 300
> Portland, Oregon  97205
> USA

10.     Respondents are represented in these proceedings by Jones Day as follows:

> Mr. Scott N. Cowan
> Mr. Jonathan L. Marsh
> JONES DAY
> 717 Texas Street, Suite 300
> Houston, Texas  77002
> USA
>
> and
>
> Ms. Katie L. Wall
> JONES DAY
> 2727 N. Harwood Street, Suite 600
> Dallas, Texas  75201
> USA

**C.      Background of the Dispute**

11.     A dispute has arisen between PCC and Schulz out of or related to a Securities Purchase Agreement dated December 28, 2016 among PCC, Schulz, SXP CRA-OCTG, Inc., SXP Schulz Xtruded Products LP, Schulz Investment Corp., and Wilhelm Schulz GmbH (the "**SPA**").

12.　　In general terms, Claimants allege that Respondents fraudulently induced Claimants to enter into the SPA and to close the transactions contemplated by the SPA and that Respondents breached multiple representations and warranties set forth in the SPA. Claimants contend that they have been damaged in the amount of the €800 million purchase price that they paid to acquire three operating companies owned by Respondents, Wilhelm Schulz GmbH ("**WSG**"), SXP Xtruded Products LP ("**SXP**"), and SXP CPA-OCTG, Inc. ("**CRA-OCTG**") (collectively the "**Acquired Companies**").

## D.　　The Arbitration Agreement and Governing Law

13.　　The Parties' agreement to arbitrate is found in Article 10.9 of the SPA, which states as follows:

> **10.9 Arbitration**.  Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.[1]

14.　　Pursuant to Article 10.8 of the SPA, the Parties agreed that:

> This Agreement shall be governed by, and construed in accordance with, the Law of the State of Delaware, without regard to any conflict of laws principles thereof that would cause the application of the Law of any jurisdiction other than the State of Delaware.[2]

15.　　The Commercial Arbitration Rules of the American Arbitration Association, including the Procedures for Large Complex Commercial Disputes, ("**Commercial Rules**") apply to this proceeding.[3]

---

[1]　　CX-001, § 10.9.  Exhibits submitted by PCC are referred to as "CX."  Exhibits submitted by Schulz are referred to as "RX."  Legal Authorities submitted by PCC are referred to as "CLA."  Legal Authorities submitted by Schulz are referred to as "RLA."  References to "Tr." are to the transcript of the hearings in this case between June 24, 2019 and July 1, 2019 and on October 16, 2019.

[2]　　CX-001, § 10.8

[3]　　CX-001, § 10.9; Procedural Order Number 1, dated May 25, 2018.

**E.**     **The Tribunal**

16.     By correspondence dated April 17, 2018, the International Centre for Dispute Resolution ("**ICDR**"), a division of the American Arbitration Association, advised the Parties that Ms. Jean E. Kalicki, Dr. Wolfgang Peter and Mr. Elliot E. Polebaum were invited to serve as arbitrators in this matter.  Following disclosures by each of the invitees, the ICDR reaffirmed their appointments and the Tribunal was fully constituted, with Mr. Polebaum designated to serve as Tribunal Chair.  The contact details of the members of the Tribunal are as follows:

> Ms. Jean E. Kalicki
> ARBITRATION CHAMBERS
> 142 West 57th Street, 11th Floor
> New York, NY 10019
> USA
> Tel:  +1.646.828.9292
> Email: jean.kalicki@kalicki-arbitration.com
>
> Dr. Wolfgang Peter
> Peter & Kim Ltd.
> Avenue de Champel 8C
> P.O. Box 71
> 1211 Geneva 12
> Switzerland
> Tel:  +41.58.317.70.70
> Email:  wpeter@peterandpartners.com
>
> Mr. Elliot E. Polebaum
> POLEBAUM ARBITRATION
> 801 17th Street N.W., Suite 600
> Washington, DC  20006
> U.S.A.
> Tel:  +1.202.297.9057
> Email: elliot.polebaum@polebaumarbitration.com

## II.   PROCEDURAL HISTORY

17.    On March 5, 2018, Claimants submitted their "Demand for Arbitration and Statement of Claim."

18.    On April 20, 2018, Respondents submitted their "Answer to Claimants' Demand for Arbitration and Statement of Claim."

19.    As noted above at paragraph 16, the ICDR constituted the Tribunal following disclosures made by each of the Members of the Tribunal.

20.    On May 23, 2018, the Tribunal convened a case management conference by telephone with the Parties.

21.    Thereafter, on May 25, 2018, the Tribunal issued Procedural Order Number 1, which set forth various procedural rules for the conduct of the proceedings and an Agreed Procedural Timetable.

22.    On July 29, 2018, the Tribunal issued the Parties' Stipulated Protective Order.

23.    During the period through August 24, 2018, the Parties engaged in a process of document disclosure.

24.    In accordance with Procedural Order Number 1, on September 17, 2018, Claimants submitted their Statement of Claim ("**SOC**"), accompanied by the Witness Statements of the following fact witnesses:

> Kirk Pulley
> Scott Freeman
> Tudor Lupea
> Dennis Webb
> Melissa Mire
> Mihaela Fantaziu
> Teresa Scallorn
> Cindy Reagan
> Gail Adams

> Ilona Stuhr
> Mei Choo Chang
> Jason Dalton
> Mike Lamb
> Sean Moore

Claimants also submitted reports of the following expert witnesses:

> Dominik Wördehoff
> Alexander Demuth
> Raphael Kiess
> James Spencer
> Gary Heustis

In addition, Claimants submitted numerous Exhibits and Legal Authorities.

25.    On November 16, 2018, Respondents submitted their Statement of Defense ("**SOD**"), accompanied by the Witness Statements of the following fact witnesses:

> Lucas Schulz
> Rainer Flöth
> W. Gregory Hudspeth
> Sebastian Leclerc
> Iris Rommerskirchen

Respondents also submitted the reports of the following expert witnesses:

> Stephanie S. Anderson
> Richard Bergin
> Alexander T. Deligtisch
> Mark E. Zmijewski

In addition, Respondents submitted numerous Exhibits and Legal Authorities.

26.    Thereafter, the Parties engaged in a second round of document disclosure, the period for which the Tribunal extended through April 15, 2019, upon the request of the Parties dated February 24, 2019, and further extended through April 17, 2019, upon the request of the Parties dated April 15, 2019, and extended a final time through April 26, 2019, upon the request of the Parties dated April 17, 2019.

27.    On March 15, 2019, Claimants submitted Claimants' Reply In Support of Statement of Claim ("**Reply**") accompanied by the following Witness Statements of fact witnesses:

> Jay Khetani
> Thomas Koertge
> Todd Mesick
> Ashraf Mohammad
> Kirk Pulley (Second Statement)
> Paul Turnes

Claimants also submitted a first Expert Report of Neil Beaton and second reports of the following expert witnesses:

> Alexander Demuth
> Raphael Kiess
> Dominik Wördehoff

In addition, Claimants submitted further Exhibits and Legal Authorities.

28.    Along with their March 15, 2019 Reply and supporting materials, Claimants also submitted, by agreement among Counsel, an unsigned Witness Statement of an additional fact witness in a sealed envelope, with the envelope not to be opened until the witness signed the statement and objections to its presentation to the Tribunal were resolved, Respondents having reserved all of their rights to object.

29.    On May 16, 2019, Respondents filed a "Combined Motion for a Temporary Stay and to Modify the Stipulated Protective Order," requesting, *inter alia*, a stay of the proceedings and a delay of the final hearing on the merits then scheduled to begin on June 24, 2019.    Claimants submitted a Response to the Motion on May 23, 2019, Respondents submitted a Reply on May 28, 2019, and Claimants Submitted a Rejoinder on May 30, 2019.    The principal underlying basis for the requested stay of proceedings, which

Respondents proffered, was the unwillingness of certain witnesses to provide witness statements in connection with Respondents' Rejoinder due on May 17, 2019 as a result of criminal investigations pending in Germany in relation to the fraud allegations that Claimants have made in these proceedings and otherwise brought to the attention of the German authorities.

30.     On May 17, 2019, Respondents submitted their Rejoinder along with second expert reports of Stephanie S. Anderson, Richard Bergin and Mark E. Zmijewski, and additional Exhibits and Legal Authorities.

31.     On June 3, 2019, the Tribunal convened a previously scheduled conference call with the Parties to address certain procedural and logistical matters in connection with the hearing slated to begin on June 24, 2019.  In addition, the Tribunal heard Counsel at length on the subject of Respondents' pending Motion.

32.     On June 4, 2019, the Tribunal issued Procedural Order Number 2.  With respect to Respondents' pending Motion, the Tribunal decided to proceed with the hearing on June 24, 2019, but scheduled a resumption of the hearing to be held during the period October 15-17, 2019 to provide Respondents with a further period to try to obtain witness statements from various witnesses.  The Tribunal further ruled that Respondents could submit such Witness Statements by September 20, 2019.  Other details of the Tribunal's decision are set forth in Procedural Order Number 2, which also addressed certain procedural and logistical matters associated with the hearing on the merits.

33.     On June 6, 2019, Claimants submitted the signed Witness Statement of Mathias van Gemmern, the witness whose unsigned statement was previously submitted to the Tribunal in a sealed envelope.

34.     The hearing on the merits opened on June 24, 2019.

35.     At the hearing on the merits, Counsel made opening statements.  Thereafter
the following witnesses testified in order at the hearing:

> Kirk Pulley
> Scott Freeman
> Jason Dalton
> Mathias van Gemmern
> Mihaela Fantaziu
> Melissa Mire
> Teresa Scallorn
> Jay Khetani
> Tudor Lupea
> Thomas Koertge
> Iris Rommerskirchen
> James Spencer
> Dominik Wördehoff
> Raphael Kiess
> Paul Turnes
> Alexander Demuth
> Neil Beaton
> Alexander Deligtisch
> Stephanie Anderson
> Mark Zmijewski
> Richard Bergin

36.     The hearing adjourned on July 1, 2019.  At the conclusion of the hearing on
July 1, 2019, the Tribunal scheduled a conference call with the Parties to be held on
September 23, 2019 in anticipation of the resumption of the hearing on October 15, 2019.
These arrangements are reflected in Procedural Number 3, dated July 3, 2019,

37.     On September 20, 2019, Counsel for Respondents advised the Tribunal that
Respondents were unable to obtain additional witness statements for submission to the
Tribunal.  During the September 23, 2019 conference call between the Parties and the Chair
of the Tribunal (as agreed by the Parties and the two co-arbitrators and reflected in
Procedural Order Number 3), Counsel for Respondent confirmed that Respondents would not
be submitting additional witness statements.  Counsel made no request for a further stay of
the proceedings.  Whereupon, it was agreed that the Parties would present closing oral

arguments to the Tribunal at a hearing in New York to be held on October 16, 2019. The procedural details of the October 16, 2019 hearing are memorialized in Procedural Order Number 4, dated September 24, 2019.

38.    In the hearing on October 16, 2019, Counsel for Claimants and Counsel for Respondents presented their closing oral arguments and responded to questions from the Members of the Tribunal. At the conclusion of the hearing, it was left to Counsel to meet and agree upon a schedule for submission of post-hearing briefs.

39.    By email dated October 20, 2019, the Parties proposed to the Tribunal that they submit opening briefs simultaneously on December 6, 2019 and reply briefs simultaneously on January 10, 2020. The Tribunal approved the Parties' proposal, and the Parties made their submissions in accordance with this schedule.

40.    The Tribunal further directed, on November 2, 2019, that the Parties make their opening cost submissions on January 17, 2020 and reply cost submissions on January 24, 2020, with both submissions to be made simultaneously. The Parties thereafter made their cost submissions as aforesaid.

41.    On December 16, 2019, the Tribunal requested Claimants to submit a specific and detailed statement of all the relief Claimants are seeking in this arbitration. Claimants did so on December 19, 2019.

42.    On March 18, 2020, the Tribunal declared the proceedings closed pursuant to Rule 39 of the Commercial Rules. Consistent with the Rules and the Tribunal's declaration, the ICDR calculated the deadline to issue the Final Award as April 17, 2020.

## III. THE FACTS

43.     The Parties entered into the SPA, which is the subject of their dispute, as of December 28, 2016.  The purchase of the Acquired Companies contemplated by the SPA closed on February 16, 2017.[4]

44.     The availability for purchase of what became the Acquired Companies first came to the attention of PCC in July 2016.  On July 4, 2016, PCC's corporate parent received an inquiry from FCF Fox Corporate Finance GmbH ("**Fox**") to see whether PCC might be interested in the acquisition of certain companies owned by Schulz Holding GmbH & Co. KG.[5]  The communication from Fox "described the Schulz Group as having a 'growing market' that was 'unaffected by current oil & gas price developments.'"[6]  The Fox communication showed revenues in the to-be-Acquired Companies of €161.5 million, EBITDA of €47.3 million and an EBITDA margin of 38.2% for 2014.  For 2015, the Fox communication showed revenues of €199.6 million, EBITDA of €76.2 million and an EBITDA margin of 37.1%.[7]  For 2016, the Fox communication stated that estimated EBITDA was €96 million on estimated revenues of €258.4 million with an estimated EBITDA margin of 37.1%.[8]  The Fox communication showed a proposed acquisition price of €850-900 million, calculated on the basis of "9.0 x EBITDA 2016."[9]

---

[4]     First Witness Statement of Kirk Pulley ("**Pulley WS-1**"), ¶16.

[5]     Pulley WS-1, ¶10.

[6]     Pulley WS-1, ¶10; CX-004.

[7]     Pulley WS-1, ¶10; CX-004.

[8]     Pulley WS-1, ¶10; CX-004.

[9]     Pulley WS-1, ¶11; CX-004.

45.     PCC signed a non-disclosure agreement on July 6, 2016, and thereafter received a presentation prepared by Schulz management and a financial model that reflected the figures shown in the Fox communication and referenced in paragraph 44 above.[10]

46.     Following entry into the non-disclosure agreement, PCC undertook due diligence that spanned the period July through December 2016.[11]  PCC's due diligence included review of materials that Schulz made available in a virtual data room.[12]  Throughout the period August through December 2016, Rainer Flöth, WSG's Managing Director and CEO of the Schulz Group, provided PCC with various financial statements.  These statements include Consolidated Income Statements for WSG and SXP showing "year-to-date and last-12-month results, as well as an estimate for year-end 2016 performance,"[13] plus various iterations in December 2016 of WSG and SXP forecasts for the year 2016.[14]  As late as December 21, 2016, Mr. Flöth emailed PCC stating that "we are getting very close to the targeted EBITDA" of €94.2 million and that "[o]ur 2017 forecast is nearly unchanged."[15]

47.     During the due diligence process, Schulz also provided to PCC its top customer list and a list of projects for which Schulz had outstanding bids, and indicated that Schulz generally enjoyed a 20% success rate on its bids.[16]  PCC personnel on its acquisition team also met with various Schulz counterparts and visited facilities of the to-be-Acquired Companies.[17]

---

[10]   Pulley WS-1, ¶12; SOC, ¶¶23-24; CX-006; CX-007.
[11]   Pulley WS-1, ¶15; SOC, ¶26.
[12]   Pulley WS-1, ¶16; SOC, ¶27.
[13]   Pulley WS-1, ¶17(a).
[14]   Pulley WS-1, ¶17(g)-(i).
[15]   CX-0019.  *See also* Pulley WS-1, ¶17(k).
[16]   Pulley WS-1, ¶18.
[17]   Pulley WS-1, ¶19.

48.     PCC personnel came away from the due diligence process with the understanding that the to-be-Acquired Companies were successful in the marketplace, financially healthy, on track to meet their projections for 2016, and withstanding a general market downturn in the oil and gas sector and in particular with respect to capital spending in that sector.[18]

49.     In fact, and unbeknownst to PCC, Schulz was in dire financial condition. Schulz was party to a Syndicated Loan Agreement with Commerzbank, dated September 15, 2015, which provided a loan facility in the amount of €325,000.000.[19]  The first payment from Schulz under the facility was due on December 31, 2015.  On December 15, 2015, Schultz requested a waiver of the payment coming due on December 31, 2015 and stated that it was awaiting payment on more than €20 million in receivables from its customer ALSA Engineering & Construction Co. LLC.[20]  On March 21, 2016, Schulz made a further request for an extension of the payment then due on March 31, 2016 to July 31, 2016.[21] Commerzbank granted these requests.[22]

50.     However, in April, 2016, Commerzbank required Schulz to undergo a going concern analysis pursuant to German accounting rule IDW S 6.[23]  Schulz appointed KPMG to undertake the analysis.[24]

---

[18]   *See* Pulley WS-1, ¶21.
[19]   CX-0240.
[20]   CX-0241-0242.
[21]   CX-0245-0246.
[22]   CX-0241-0242; CX-0247-0248.
[23]   CX 1346-1347.
[24]   CX 1346-1347.

51.     On June 8, 2016, Schulz retained Dr. Andreas Ringtsmeier, a bankruptcy lawyer.[25]   On June 21, 2016, Dr. Ringtsmeier opined that WSG was obligated to file an insolvency petition,[26] a position he reiterated on July 4, 2016.[27]

52.     On July 7, 2016, Commerzbank and Schulz executed a Credit Facility Agreement, providing an €8 million line of credit, with a maturity date of September 30, 2016.[28]  In connection with the Credit Facility Agreement, Commerzbank and Schulz agreed that Schulz would execute a trust agreement that authorized the trustee, in the event of default, to sell the shares of the to-be-Acquired Companies and to retain a Chief Restructuring Officer with authority over financial management.[29]  Once Commerzbank and Schulz executed the Credit Facility Agreement, Dr. Ringtsmeier determined that the condition that had led him to conclude an insolvency petition needed to be filed was alleviated.

53.     Thus, by the time the sale process with PCC had begun in July, the financial condition of the to-be-Acquired Companies was precarious and their ability to remain a going concern depended on creditor forbearance and their eventual acquisition by PCC.

54.     On October 31, 2016, Commerzbank and Schulz executed the trust agreement referenced above.[30]   Throughout the balance of 2016, Commerzbank granted further extensions of Schulz's obligations under the Syndicated Loan Agreement while the acquisition process continued.[31]

---

[25]     CX-0249-0250.
[26]     CX-0251-0252.
[27]     CX-0255-0256.
[28]     CX-0257-0258.
[29]     CX-0257-0258.
[30]     CX-0269-0272.
[31]     CX- 0267-0268.

55.     At no time prior to the closing of PCC's purchase of the Acquired Companies did Schulz disclose to PCC either the IDW S 6 going concern analysis, its need to file an insolvency petition for a period of time in June and July 2016, the €8 million Commerzbank bridge loan, or the trust agreement.

56.     Schulz's financial difficulties in 2016 are further highlighted in its dealings with Deutsche Factoring Bank ("**DFB**").  DFB provided financing to Schulz on the basis of Schulz's receivables.  Schulz obtained cash from DFB by tendering "receivables" that rested on transactions whose authenticity is doubtful.   In May 2016, Schulz employee Thomas Füchtjohann emailed Flöth as follows:[32]

> Hello Rainer,
>
> With an utilization of the line of 21.3 million, there are about 1.8 million real Factoring invoices.
> If you would like to have an analysis of the real orders and the associated cash receipts from Factoring, we will do that of course.
> We planned it like this in the beginning, but then we wouldn't have reached until end of May.
> The 14 million Sing Ghee Huat you just told me so.
> Unfortunately, neither Daniel nor Stefan nor I can verify what the "real" amount is.
> I have put KPMG off using a sound excuse until Tuesday.
> Let's just sit together on Tuesday morning and then we'll do the fine tuning.
>
> Regards
>
> Thomas

Schulz was meeting its cash needs by tendering receivables to DBF, which were not based on actual customer orders.

57.     This practice continued during the period of the sale process.  In September 2016, DFB demanded that Schulz produce invoices and proof of delivery for orders in order to obtain financing.[33]  Mr. Füchtjohann, Marcel Sontrop and Stefan Heinrich took customer templates and photoshopped them to create the documentation that DFB was requesting.[34]

---

[32]     CX-1418.

[33]     CX-0208-0209; CX-0474.

[34]     CX-0167-0168; CX-0211A; CX-0216-0219; CPHB, ¶¶214-217.

58.     In parallel with the financial difficulties that Schulz was facing that are described above, its SXP subsidiary was also experiencing substantial financial distress. Throughout 2016, there was a series of communications between SXP personnel (Gregory Hudspeth, Sebastien Leclerc, Pat Sullivan, Bob Putnam) and Schulz personnel in Germany (Flöth and Luca Schulz) that reflected SXP's financial tribulations.  These communications showed:  (i) SXP's low cash levels and pressure from suppliers and customers;[35] (ii) internal proposals to invoice CRA-OCTG in the absence of a "firm Order" in order to "optimize revenue,"[36] and to "sell . . . pipe back to SXP" with SXP to then sell it again to an SXP affiliate (SUSA) to "shift the aging favorably;"[37] and (iii) lawsuits and liens[38] and pressure from SXP's bank with respect to "current losses."[39]  Schulz did not disclose any of these circumstances to PCC during the sale process.

59.     The confluence of Schulz's dire financial condition and the need to sell the Acquired Companies led Schulz personnel to take additional measures to assure that PCC would complete the transaction.

60.     In the period between October 13 and October 18, 2016, there was an outage of Schulz's INFOR enterprise software system.  WSG employee Marcel Sontrop engineered this outage.[40]  During the outage, Schulz personnel went into the system and entered numerous customer orders that were not placed by actual customers.  These orders that were entered by Schulz employees were assigned order create dates years before their entry into the INFOR system in October 2016.  In effect, these purported orders were entered into the

---

[35]     CX-0273-274; CX-0276-0278; CX-0281-0282; CX-0284; CX-0286-0287; CX-0293-0294.

[36]     CX-0275.

[37]     CX-0280.

[38]     CX-0282; CX-0288-0289; CX-0290.

[39]     CX-0237; CX-0295.

[40]     CX-0202-0205; Tr. 766-768 ("Wördehoff").

system in October 2016, but showed up in the system as having been created in 2014 or 2015. So, for example, the INFOR system shows an order creation for ALSA of October 14, 2014 in the amount of €32 million, when in fact this ALSA entry was made between October 13 and October 18, 2016.[41] The evidence established that there were 47 transactions that were entered into the INFOR system at varying points in time and backdated so that it appeared in the INFOR system that these transactions were entered earlier than was in fact the case.

61. Emblematic of the steps being taken by Schulz personnel is an email from Mr. Füchtjohann to Mr. Flöth and Mr. Luca Schulz sent on October 22, 2016, following the INFOR outage:

> Here we urgently need one or more orders for SXP so that we can invoice. We must urgently create the order next week; for the invoicing we will manage from Germany (I hope at least). We will try to enter the orders so that they are not visible in the item account and in the lists (but in the system of course).[42]

62. Of the 47 transactions in question, many of these transactions were entered in October 2016 during the outage, others were entered earlier in 2016, some were entered as early as 2015,[43] and seven transactions were entered after the closing when Schulz personnel were taking steps to ward off discovery of the true condition of the Acquired Companies.[44] Additional details of certain of the transactions in question and their effect on the warranted financial statements of the Acquired Companies are discussed below. It is clear from the evidence that Schulz personnel presented a picture of the financial condition of the Acquired

---

[41] First Expert Report of Dominik Wördehoff ("**Wördehoff-1**"), ¶¶ 49-50; CX-803; Tr. 768-769 (Wördehoff).

[42] CX-391; CX-392.

[43] Wördehoff-1, ¶¶ 131-133; CX-202-205; Tr. 766 (Wördehoff).

[44] Claimants' Post-Hearing Opening Brief ("**CPHB**"), fn. 18; *see also* First Expert Report of Alexander Demuth ("**Demuth-1**"), at 20.

Companies that departed markedly from the true state of affairs. Near the end of the acquisition process, on December 21, 2016, Mr. Flöth emailed Mr. Pulley, stating that "we are getting very close to the targeted EBITDA" of €94.2 million and that "[o]ur 2017 forecast is nearly unchanged."[45] Flöth's statements were false.

63. The Parties, along with the other signatories to the SPA, executed the SPA as of December 28, 2016.[46] The purchase price that PCC agreed to pay for the Acquired Companies was €800 million.[47] As is customary in corporate acquisitions, the SPA contained representations and warranties that ran in favor of the purchaser, PCC. The representations and warranties at issue in these proceedings are set forth in Article 2 of the SPA and include Articles 2.2, 2.4, 2.5, 2.19, 2.20 and 2.21. In Article 2.5, in particular, Schulz represented and warranted that the financial statements in SPA Exhibit 3 were "prepared in conformity with GAAP (as applied to each Acquired Company) consistently applied and present fairly the net assets, financial position and results of operations of the Acquired Companies as of and for the periods ended on such dates."[48] The financial statements set forth in SPA Exhibit 3 included the 2015 Income Statement of CRA-OCTG, the 2015 Income Statement of SXP, the Consolidated 2015 Income Statement for WSG, SXP's Income Statement for the period ended September 30, 2016, and the Consolidated Income Statement for WSG for the period ended September 30, 2016.[49]

64. The transaction closed on February 16, 2017. PCC purchased the Acquired Companies and paid the agreed purchase price of €800 million. It was agreed, and is reflected in the so-called waterfall of the SPA, that €444 million of the purchase price would

---

[45]    CX-0019.

[46]    CX-0001.

[47]    CX-0001, § 1.2.

[48]    CX-0001, § 2.5.

[49]    CX-0001, Exhibit 3.

pay off outstanding debts of the Acquired Companies.[50]   In effect, once the transaction closed and the purchase funds were disbursed, the Acquired Companies were mostly debt free, a point that Respondents have emphasized in these proceedings.

65.    In the period just before and then after the closing of the transaction on February 16, 2017, WSG and SXP employees, who were involved in various activities that misrepresented the actual financial condition of the Acquired Companies, took steps to attempt to prevent discovery of the true condition of the Acquired Companies.  As of the closing, these WSG and SXP employees were employees of PCC by virtue of PCC's ownership of the Acquired Companies.

66.    On February 10, 2017, shortly before the scheduled closing of the transaction, Scott Freeman of PCC contacted Mr. Hudspeth and told him that PCC planned to conduct a physical inventory after closing.[51]   Concerned about a discrepancy between a physical inventory and amounts reflected on SXP's books, Hudspeth advised Flöth of PCC's plans,[52] and on February 15, 2017, Flöth directed that all "prebills" be cancelled and their amounts returned to inventory.[53]   As it turned out, there were approximately 600 prebills subject to this directive, and it took SXP employees until after the closing to accomplish this task.[54] Cancelling the prebills would have the effect of resolving discrepancies between a physical inventory and the values of inventory carried on SXP's books.

67.    In addition, at the same time, Messrs. Flöth and Luca Schulz used some of the proceeds received by Schulz SF Holding GmbH ("**SF Holding**") at the closing to pay certain

---

[50]    CX-0001, p. 889.

[51]    CX-0402.

[52]    CX-403-405.

[53]    CX-0035-0036.  SXP engaged in a practice referred to as "prebilling," which is explained further below.

[54]    SOC ¶336; Witness Statement of Melissa Mire ("**Mire WS**"), ¶15.

receivables shown on the books of the Acquired Companies. In other words, Flöth and Luca Schulz directed that certain amounts of the SPA proceeds were to be used to pay down amounts shown on the books of the Acquired Companies as amounts owed by customers. This plan included payments in respect of Piping Equipment, for example. Thus, immediately after the closing, Flöth arranged for the payment to SXP of $17.7 million in respect of Piping Equipment receivables shown on the books of SXP. To do this, he directed Werner Classen at WSG to have this amount wired from an SF Holding account.[55] In addition, on May 3, 2017, SF Holding made a payment to SXP's account at Commerzbank in the amount of $12,932,794.43 in respect of receivables due from Horizon Energy LLC.[56] Further payments were made to SXP's account at Commerzbank in May 2017 in the amount of $4.563 million in respect of Piping Equipment[57] and $4.026 million in respect of Horizon Energy LLC.[58] The funds for these payments originated from an SF Holding account.[59] The evident purpose of these payments was to disguise the fact that these transactions were not bona fide and to attempt to prevent discovery of that fact.

68. The first rumblings that something was amiss in the Acquired Companies came in the form of an anonymous email dated March 9, 2017 (approximately three weeks after the closing) from an employee in WSG to Mr. Thomas Koertge, a member of the PCC team tasked with integrating WSG after the acquisition.[60] The email stated in part as follows:[61]

---

[55]   CX-0429-0431.

[56]   CX-0456.

[57]   CX-0439; CX-0471.

[58]   CX-0442-0443.

[59]   CX-0439; CX-0442.

[60]   Witness Statement of Thomas Koertge ("**Koertge WS**"), ¶5.

[61]   CX-0025.

```
Dear Mr. Koertge,
we have not met in person so far. I'm working for Wilh. Schulz GmbH in Krefeld and I heard you are the
one responsible for the integration of WS into the PCC.
Since I was loyal with my company over the last years and I want this integration work for both sides on
a fair base I have to get rid of something I witnessed during the past months.
There is a falsification of finance data going on.
Since October a small team enters fake customer orders into our Infor system and into Sun to manipulate
the total order value and by that make our company look much better than we really are.
I regard this as a criminal act and don't want to work for a company which uses such methods any longer
so I hope you will investigate and end this criminal nonsense.
Currently they try to wipe their traces by deleting everything and getting new computers but there still
should be evidences of their acting in our records.

The team was led by Thomas Füchtjohann. Marcel Sontrop created the fake customer orders as documents and
Peter Heimbach (external employee) manipulated the Infor database. Stefan Heinrich was responsible for
Sun.
```

PCC investigated the charges leveled in the anonymous email, but was unable itself to substantiate the allegations and on July 4, 2017 so informed the anonymous author of the email.[62]

69.     During this period, PCC continued to investigate. It both retained outside consultants and undertook internal efforts. The first outside consultant it retained was Dominik Wördehoff, who has appeared in these proceedings as an expert witness on behalf of PCC. PCC asked Mr. Wördehoff to analyze the Acquired Companies' INFOR enterprise software system. Wördehoff is one of a handful of consultants in Germany who specialize in data analytics in the INFOR system that Schulz used to create and track customer orders and to manage and track work in progress.[63] Wördehoff began his work on behalf of PCC in late May 2017.[64]

70.     In the course of his work, Mr. Wördehoff concluded that what showed up as customer orders in the INFOR system with stated "create" dates (*i.e.*, dates when the orders were entered) in 2014, 2015, and 2016 were entered into the INFOR system long after the

---

[62]     RX-0913; SOC, ¶5.

[63]     Wördehoff-1, ¶¶14-17.

[64]     Wördehoff-1, ¶21.

displayed "create" dates, thereby creating orders that were effectively backdated.[65] (These findings are sometimes referred to hereafter as Mr. Wördehoff's "out-of-sequence analysis."). Mr. Wördehoff further determined that much of the backdating had occurred between October 13 and October 18, 2016,[66] during the outage of the INFOR system and when PCC was engaged in due diligence and Schulz was providing financial information to PCC.

71. At around the time Mr. Wördehoff was beginning his investigation, PCC installed Tudor Lupea as acting controller at SXP after learning in May 2017 that SXP's then controller, Gregory Hudspeth, had a prior felony conviction for embezzlement and accordingly terminated him.[67] Mr. Lupea learned from SXP personnel that SXP regularly engaged in a process called "prebilling," by which SXP recognized revenue in respect of product that had not yet been shipped to a customer by entering an invoice into the INFOR system (but not then sending an invoice to the customer).[68] Once product was shipped to the customer, SXP would invoice the customer and issue a credit memo against the prebilled invoice.[69] The effect of this practice was both to reduce the value of inventory that SXP was carrying (thus making it look financially healthier than was the case) and to recognize revenue before the company shipped product to its customer to similar effect.[70] Mr. Lupea also learned that Schulz personnel had taken steps, shortly before the date of the closing, to

---

[65] Wördehoff-1, ¶¶52-53.
[66] Wördehoff-1, ¶31.
[67] Witness Statement of Tudor Lupea ("**Lupea WS**"), ¶3.
[68] Lupea WS, ¶¶4-8.
[69] Lupea WS, ¶¶4-8.
[70] Lupea WS, ¶¶5-7. *See* paragraph 66, above.

begin reversing approximately $12 million in prebillings and to return this amount to work in progress.[71]

72.     In his role as acting controller at SXP, Mr. Lupea also reviewed SXP's 2016 sales by customer and noted that SXP's largest customers in 2016 were shown to be Horizon Energy LLP, ASYN Atyrau, and Piping Equipment Pte. Ltd.  Upon inquiry, Mr. Lupea learned from Ms. Teresa Scallorn, a clerk in SXP's sales department, that she did not "recognize any of the three customers as actual customers at SXP."[72]

73.     It further appears that Ms. Mihaela Fantaziu, an SXP employee with responsibility for order intake and sales documentation, did not affix her name to certain order confirmations and invoices whereas those documents reflected her name on them.[73] Other SXP employees with production and shipping responsibilities confirmed that they did not have records of product being manufactured for, or shipped to, these entities.[74]  The stated dollar value of these transactions is $47.2 million.[75]

74.     These circumstances led PCC to undertake a review of the email accounts of certain SXP employees.  The email review indicated that, for the period January to October 2016, Schulz personnel in Germany were "adding" and "changing" invoices.[76]  Other emails showed that Piping Equipment, the subject of orders entered into INFOR, had been a

---

[71]     Lupea WS, ¶10.

[72]     Lupea WS, ¶9.

[73]     Witness Statement of Mihaela Fantaziu ("**Fantaziu WS**"), , ¶¶15-16.

[74]     Mire WS, ¶¶9-11; Witness Statement of Cindy Reagan ("**Reagan WS**"), ¶10.

[75]     SOC, ¶71; CX-0068-0069; CX-0070-0073; CX-0080-81; CX-0092-0099.

[76]     CX-0113.

dormant company for years. PCC also uncovered indications that Piping Equipment had been used since 2012 to generate invoices that did not reflect actual transactions.[77]

75.    In August 2017, PCC retained the German offices of Alvarez & Marsal ("**A&M**").[78] Raphael Kiess of A&M undertook a review of the email accounts of certain WSG employees. This review indicated that, among other things, there was a series of Excel spreadsheets that appeared to track transactions for which appropriate documentation, such as customer purchase orders, confirmations, purchases of raw material, material test reports, shipping documentation, invoices, and payment receipts, was lacking (the "**Tracking Sheet**").[79] The investigation further revealed that in the September 2016 timeframe, WSG employees Marcel Sontrop, Thomas Füchtjohann, and Stefan Heinrich used photoshop technology to create third-party documents such as purchase orders.[80] So, for example, in response to a request from DFB to provide "[f]or examination purposes" invoices and order confirmations to customers such as Hyundai Engineering & Construction Co. Ltd, Larsen & Toubro Ltd., and Samsung Heavy Industries, Sontrop, Heinrich and Füchtjohann communicated amongst themselves on the need to create purchase orders for these companies.[81]

76.    Based on his review of internal records, employee interviews, and Mr. Wördehoff's out-of-sequence analysis, Mr. Kiess came to the conclusion that 47 transactions identified in the Tracking Sheet were fake and never occurred. With respect to these transactions, Kiess considered whether there was documentation such as purchase orders,

---

[77]    SOC, ¶¶78-89.
[78]    First Expert Report of Raphael Kiess ("**Kiess-1**"), ¶19.
[79]    SOC, ¶¶106-107.
[80]    SOC, ¶¶109-118.
[81]    CX-0167-0168; CX-0206-0209; CX-0214-0219.

order confirmations and records of material purchases, storage and shipping, and whether there was a cash receipt from a customer associated with the recorded transactions.[82]

77.     Alexander Demuth, also of A&M, analyzed the transactions identified in the Tracking Sheet, considered Wördehoff's out-of-sequence analysis, conducted his own search for relevant documents, and interviewed relevant personnel.  He reached the same conclusion that the 47 transactions reflected on the Tracking Sheet were fictitious.  He also analyzed the impact of these transactions on the financial statements of the Acquired Companies.

78.     While the outside consultants – Messrs. Wördehoff, Kiess and Demuth – were conducting their respective investigations, the General Counsel of Precision Castparts began to drill down on the documentation surrounding certain orders on the books of the Acquired Companies.  Following receipt of Mr. van Gemmern's email claiming fraudulent activity at WSG, PCC conducted an initial investigation into his allegations and then retained outside experts to assist in a further investigation.  PCC also became concerned that certain SXP employees could not identify Piping Equipment, Horizon and ASYN as SXP customers,[83] even though payments, originating from SF Holding, in respect of some invoices to these customers, had been made.  As a result, on June 12, 2017, PCC's General Counsel asked for information from Flöth and Luca Schulz with respect to Horizon, Piping Equipment and ASYN:

> 1.     Do we have purchase orders for these sales?  While the "Our order" box on the form has an identifier (*e.g.*, CRA000329) the "Your PO" line is empty.

---

[82]     Demuth-1, ¶¶59, 107-108.
[83]     SOC, ¶255.

2.    Who created these invoices, and why were they created differently than invoices for product shipped from Hernando to Krefeld or Marubeni, for example?

3.    Was this product manufactured in Tunica?   Shipped from Hernando?   Shipped directly to the customer or via an intermediary?

4.    Why were the payments from the customers not made directly to Tunica?[84]

79.    On June 15, 2017, Flöth responded, offering to "collect the PO's and provide them to you."[85]  He further stated that the "invoice shows the employees name who created it" and that the product was not, in fact manufactured at SXP, but was invoiced by SXP in furtherance of a "tax optimization strategy,"[86]  He explained the routing of some payments through SF Holding in the following terms:

> Partially it was made directly to SXP.  Some Payments were made to Germany based on the financing arrangement with Commerzbank. Background here is that Commerzbank financed the whole Schulz-Group but factually didn't want to grant credit facilities direct in the U.S. that's why SXP was only a Guarantor to the facility and not a borrower. Commerzbank always stressed the fact to collect as much of the receivables through Germany as possible.  Commerzbank was in possession of a Global Receivable Assignment of Schulz Group and they believed that from a legal standpoint it would be easier to enforce the Assignment within German jurisdiction/bank account.[87]

80.    Beyer responded the same day and requested the purchase orders, an explanation of where and by whom they were created, and records of the purchases of the product and of customer payments.[88]

---

[84]    CX-0369.
[85]    CX-0369.
[86]    CX-0369.
[87]    CX-0369.
[88]    CX-0370.

81.    On June 26, 2017, Flöth responded as follows:

> We can't trace who created the invoice, the invoice shows the person
> which put the order into the system, which means if a person enters an
> order in 2015 and the job would only be invoiced in 2017, without any
> manual change, the name of the person which entered the order would still
> appear on the invoice.  The reason behind that is that when we established
> the system, we wanted a dedicated person responsible per project, this
> person should be contacted by the customer in case of any question even if
> another person creates an invoice for a partial shipment, say because the
> responsible person is on leave that day, or sick leave.  The customer
> should always contact the same person, that's why the system logic works
> like that.[89]

In the following weeks, PCC continued to request documents that would reflect the
transaction,[90] but the documents that Flöth provided in response to Beyer's queries proved to
be inauthentic.  Flöth had represented that the pipe in question was purchased from
PrimeSourcing International, a Malaysian subsidiary of Petronas.  However, the contract he
furnished to PCC had a discrepancy in dating on the face of the contract when compared with
an original PrimeSourcing contract from 2013.  Flöth took the 2013 PrimeSourcing signature
pages and stamps and changed the date of three signatures to 2015, but neglected to change
the date of the fourth signature to 2015.[91]

82.    Flöth further represented that, after the purchase from PrimeSourcing, the
pipes were shipped to BKB Logistics in Krefeld, Germany for storage and for testing by MT
Laboratories in Meerbusch, Germany.  Flöth provided documents that he said were
certificates of testing,[92] and transportation and storage documents.[93]  During A&M's
investigation, A&M interviewed BKB's Managing Director, who denied knowledge of the

---

[89]    CX-0372.
[90]    CX-0374-0378.
[91]    CX-0377; CX-0381.
[92]    CX-0382-0384.
[93]    CX-0377; CX-0637.

PrimeSourcing transactions, stated that BKB did not have a customer named ASYN, and noted that the documents Flöth had presented to PCC showed a weight that exceeded BKB's maximum load limit and reflected terms that were inconsistent with those required by BKB (Free on Board),[94] and MT's Managing Director, who said the testing certificates were forgeries.[95]

83.     On September 1, 2017, Flöth sent "[t]he 3 missing P.O.'s," for Piping Equipment, ASYN and Horizon.[96]  These documents were inauthentic and based on unsigned purchase orders that, on July 31, 2017, Sontrop had asked van Gemmern to deliver to Luca Schulz and which van Gemmern photographed before making the delivery.[97]  These are the purchase orders that Flöth delivered to PCC, but with signatures added, and in the case of ASYN, the description, quality, price, value and test requirements modified so that the ASYN purchase order appeared different from the ASYN purchase order that Flöth had provided PCC on June 26, 2017.[98]

84.     In October 2017, PCC fired Flöth and Luca Schulz from their positions in WSG.[99]  PCC initiated these proceedings on March 5, 2018.

*          *          *

85.     Additional relevant facts are set forth in connection with the analysis of the legal issues in Part VI below.

---

[94]     CPHB, ¶224; Demuth-1, Appendix AD:  ASYN ¶¶49-57.

[95]     Demuth-1, Appendix AD-0010, 0014, 0015.

[96]     CX-0377.

[97]     Witness Statement of Mathias van Gemmern ("**van Gemmern WS**"), ¶18; CX-0234; CX-0904-0095.

[98]     CPHB, ¶¶226-227.

[99]     CPHB, ¶116.  *See also* Witness Statement of Scott Freeman, ¶9.

## IV.   RELIEF REQUESTED

**A.**   **PCC's Requested Relief**

86.   Pursuant to the Tribunal's request by email dated December 16, 2019, on December 19, 2019, PCC submitted its Statement of Requested Relief.  In its Statement, PCC requested the following relief:[100]

   a.   On PCC's claim for fraudulent inducement by Respondents, an award in PCC's favor of €800 million, with Precision Castparts to recover €500 million and PCC Germany to recover €300 million;

   b.   In the alternative, on PCC's claim for fraudulent inducement by Respondents, an award in PCC's favor of €643 million, with Precision Castparts to recover €401,875,000 and PCC Germany to recover €241,125,000;

   c.   Prejudgment interest on the foregoing amounts at the rate of 6.25% per annum, with interest to run from February 16, 2017;

   d.   Punitive damages in the amount of PCC's attorneys' fees incurred through the date of this award, with 62.5% of such amount to be paid to Precision Castparts and 37.5% to be paid to PCC Germany;

   e.   A declaratory ruling that Respondents are jointly and severally liable for the foregoing amounts;

   f.   In the event the Tribunal determines that PCC has not carried its burden to prove its fraudulent inducement claim, an award in favor of PCC for breach by Respondents of representations and warranties made in the SPA in the amount of €100 million with:

      i.   Precision Castparts to recover €62.5 million;
      ii.   PCC Germany to recover €37.5 million;
      iii.   Schulz Holding to pay €37.5 million;
      iv.   Schulz Beteiligungs to pay €61.94 million; and
      v.   Schulz Verwaltungs to pay €560,000.

   g.   Prejudgment interest on the foregoing amounts at the rate of 6.25% per annum, with interest to run from February 16, 2017; and

---

[100]   The requested dispositions set forth in this paragraph 86 are distilled from PCC's Statement of Requested Relief dated December 19, 2019.

     h.     The costs of these proceedings, with 62.5% of such amount to be paid to Precision Castparts and 37.5% to PCC Germany.

**B.    <u>Schulz's Requested Relief</u>**

87.    Schulz requests relief in the following terms:

    1.    Respondents request that the Tribunal render a final award in this matter dismissing all of Claimants' claims and entering judgment in favor of Respondents, finding and concluding as follows:

        (a)    Claimants have not been damaged because the value of the Acquired Companies as of the Closing Date exceeds the purchase price Claimants paid Respondents.

        (b)    All of Claimants' claims fail as a matter of law because:

            (i)    Claimants have failed to prove damages, which is an essential element of each of Claimants' claims; and

            (ii)    even if Claimants could establish damages, they have not met their burden of proof because the evidence presented by Claimants on the other elements of their fraudulent inducement and breach of contract claims is legally insufficient, based on improper assumptions, impermissible inference stacking, lacks a proper foundation and is unreliable; and

            (iii)    Claimants are not entitled to punitive damages.

        (c)    Claimants shall take nothing from their claims in this matter.

        (d)    All of Claimants' claims against Respondents in this matter are dismissed, with prejudice in favor or Respondents.

        (e)    All costs incurred by all Parties in this matter are assessed against Claimants.[101]

---

[101]    Respondents' Post Hearing Brief ("**RPHB**"), ¶1.

## V. THE PARTIES' PRINCIPAL CONTENTIONS

88.     In this section of the Final Award, we summarize the Parties' principal contentions.  This summary is not intended to be exhaustive, as the Parties' detailed positions are set forth in in their written and oral submissions made over the course of the proceedings. In Part VI below, we address as necessary additional points of argument made by the Parties.

### A.     PCC's Position on Liability

89.     PCC asserts two principal claims in this arbitration.  First, PCC contends that Schulz fraudulently induced it to enter into the SPA and to close the transaction by which it purchased the Acquired Companies at a price of €800 million.  Second, PCC contends that Schulz breached multiple representations and warranties that Schulz made in the SPA.

### 1.     Fraudulent Inducement

90.     The essence of PCC's position is that Schulz deceived PCC into purchasing the Acquired Companies by presenting a fundamentally false depiction of them.  According to PCC, this false depiction took on multiple dimensions.  First, PCC contends that Schulz represented that WSG had consolidated net sales in 2015 of €159.350 million "when in fact consolidated net sales were no more than" €114.395 million and that WSB had consolidated net sales for the period ended September 30, 2016 of €101.8 million "when in fact consolidated net sales were no more than" €66.952 million.[102]  For 2015, PCC states that Schulz represented WSG EBITDA of €34.692 million "when in fact EBITDA was no more than negative" €3.0 million,[103] and EBITDA for the period ending September 30, 2016 of €27 million, "when in fact EBITDA was no more than negative" €7.847 million.[104]  PCC

---

[102]     CPHB, ¶159(f) & (k).
[103]     CPHB, ¶159(g).
[104]     CPHB, ¶159(l).

further alleges that Schulz represented that for 2015 SXP/CRA-OCTG had consolidated net sales of $100.856 million "when in fact net sales were no more than" $45.089 million.[105]  For 2015, PCC claims that Schulz represented that SXP/CRA-OCTG consolidated had EBITDA of $45.684 million, "when in fact SXP/CRA-OCTG consolidated EBITDA was negative" $6.382 million.[106]  For the period through September 30, 2016, Schulz represented that SXP had net sales of $59.982 million "when in fact net sales were no more than" $20.950 million and EBITDA of $46.816 million "when in fact EBITDA was no more than" $6.289 million.[107]

91.     PCC also maintains that as of December 21, 2016, Flöth told Pulley that the Acquired Companies were "getting very close to the targeted EBITDA" of €94.2 million for 2016.[108]

92.     PCC contends that both the financial results that Schulz represented and warranted in the SPA and Flöth's December 21, 2016 averment that the Acquired Companies were "getting very close to the targeted EBITDA" of €94.2 million for the year that would end ten days later were false and based on "fake transactions."  PCC relies on: (i) Wördehoff's out-of-sequence analysis; (ii) Kiess's and Demuth's conclusions that 47 transactions in Schulz's INFOR system were not bona fide,[109] based on the out-of-sequence analysis and on the absence of documentation that would normally support bona fide sales, including purchase orders, order confirmations, material purchases, production costs,

---

[105]   CPHB, ¶159(d).  According to PCC, Consolidated SXP/CRA-OCTG sales are comprised of SXP sales of $92.3 million, CRA-OCTG sales of $53.584 million and intercompany eliminations of $45.037 million. CPHB ¶159(d).

[106]   CPHB, ¶159(e).  Consolidated SXP/CRA-OCTG EBITDA is comprised of SXP EBITDA of $40.935 million from SUN, rather than the higher $41.533 figure Schulz represented, and CRA-OCTG EBITDA of $4.79 million.  CPHB, ¶159(e) & n. 19.

[107]   CPHB, ¶159(i) & (j).

[108]   CX-0019, at 3.

[109]   CPHB, ¶¶177-193.

invoices, and documentation of cash receipts; and (iii) other relevant information compiled by Kiess and Demuth, which is discussed below. PCC points to other evidence as well to support its contention that Schulz's representations of the Acquired Companies' financial performance and condition were false including the INFOR outage in October 2016, when Schulz personnel entered purported orders and backdated them. PCC also references confirmatory evidence that large orders, in the names of ALSA, Piping Equipment, Horizon Energy, and ASYN, among others, were false, and other evidence including: (i) a forged bank statement purporting to show that ALSA had made a €6.456 million payment when it had not;[110] (ii) a purported review by a Singapore based accounting firm, EKTRA Management & Diligence Services Pte Ltd. ("**EKTRA**"), of the annual sales of Schulz (Far East) Pte., Ltd. ("**SFE**") for 2015 when the accounting firm was established by Flöth and SFE personnel in Singapore to undertake the review instead of having SFE's traditional accounting firm do it;[111] (iii) intracompany sales designed to improve the aging profile of inventory;[112] (iv) orders purportedly entered by WSG employees who were no longer employed by WSG at the time the orders were entered into the INFOR system;[113] (v) orders entered at SXP that SXP personnel responsible for order entry did not make and for order tracking that responsible SXP personnel did not recognize;[114] and (vi) forged contracts and purported related shipping and testing documents.[115]

---

[110] CPHB, ¶200.

[111] CPHB, ¶¶201-204.

[112] CX-0280.

[113] CPHB, ¶216.

[114] CPHB, ¶¶219-221.

[115] CPHB, ¶¶222-227.

93.     PCC also contends that Schulz made other fraudulent representations and fraudulently omitted to share material information.  In this regard, PCC alleges that Schulz misrepresented its position as a market leader, particularly in the large diameter CRA-OCTG business.[116]   Here, PCC points to the Fox communication of July 4, 2016 that depicted Schulz as a leader in the market for Corrosion Resistant Alloy-Oil Country Tubular Goods, a market in which it claimed an oligopolistic position with resulting pricing power, and a study carried out by McKinsey & Company to similar effect.[117]   Schulz is said to have repeated comparable false representations in various due diligence meetings with PCC personnel.[118]

94.     In addition, PCC claims that various Schulz representations regarding its 2017 forecast, its customer list, and its outstanding bids and historical success rate on bids were also false.[119]   So, for example, on December 9, 2016, Schulz forecasted sales for 2017 of €260 million with corresponding EBITDA of €130.7million, which in light of actual results then being achieved could never have been met.[120]   And on December 21, 2016, Flöth emailed Pulley, stating that "we are getting very close to the targeted EBITDA" of €94.2 million for 2016, at a time when it would have been impossible to achieve that result.[121]

95.     PCC further maintains that Schulz fraudulently omitted to disclose a severe liquidity crisis it faced throughout 2016.  Here, PCC claims that Schulz failed to disclose its missed payments on its €325 million debt to Commerzbank, KPMG's IDW S 6 restructuring analysis, Dr. Ringtsmeier's insolvency opinion, the €8 million bridge loan from

---

[116]    CPHB, ¶236.
[117]    CPHB, ¶236(a)-(c).
[118]    CPHB, 236(d)-(f).
[119]    CPHB, ¶238.
[120]    CPHB, ¶¶238-240.
[121]    CX-0019.

Commerzbank in July 2016 and the attendant trust arrangements that were a condition of the loan and SXP's comparable inability to meet its financial obligations.[122]

96. Finally, PCC references numerous internal WSG communications which reflect consciousness of wrongdoing and/or efforts by WSG personnel to falsify information.[123] PCC references multiple statements in emails to this effect:

- "How do we get a BS [Balance Sheet] & PL [Profit & Loss] without a TB [Trial Balance]? Get me the BS & PL you have and we can start constructing a TB."[124]

- "Need to get you and Stefan [Heinrich] SXP current YE detailed numbers so that you can get sales where you projected."[125]

- "Here we urgently need one or more orders for SXP so that we can invoice. We must urgently create the orders next week; for the invoicing we will manage it in a way or another from Germany. . . . We will try to enter the orders so that they are not visible in the item account and in the lists (but in the system of course.)"[126]

- Creation of a domain name and email address for a fictional accountant referred to as Raj and described as "a very strict guy . . . ha ha ha."[127]

97. Thus, PCC contends that the evidence overwhelmingly shows that Schulz fraudulently induced PCC to purchase the Acquired Companies. PCC further maintains that Schulz knew its misrepresentations were false. Here PCC points to, among other things, the falsification of the records of the Acquired Companies, and the participation of Flöth and Luca Schulz in "the manipulation of the Acquired Companies' financial records."[128]

---

[122] CPHB, ¶¶242-244.

[123] CPHB, ¶155; CX-0301, CX-0320; CX-0323; CX-0392.

[124] CX-0301.

[125] CX-0320 (email from Hudspeth to Flöth).

[126] CX-0391-0392 (email from Füchtjohann to Flöth and Luca Schulz).

[127] CX-0343-0345 (email from Ganasmoorthy Maniam, the controller at SFE, to Flöth).

[128] CPHB, ¶247.

98.     PCC next contends that Schulz intended for PCC to act on its misrepresentations.  In this regard, PCC references both Schulz's pre-Closing fraudulent activity and efforts by Flöth, Luca Schulz and others to prevent PCC from uncovering the alleged misrepresentations after the Closing.  Here PCC invokes the manipulation of the INFOR system, the establishment of EKTRA, the concealment of Schulz's liquidity crisis, the forgery of the Piping Equipment, Horizon, and ASYN purchase orders, and the use of transaction proceeds to "make multiple post closing 'payments' on fake outstanding receivables."[129]

99.     PCC also asserts that its reliance on Schulz's misrepresentations was reasonable.  On the issue of reasonable reliance, PCC contends that it had no obligation, or indeed ability, to piece together Schulz's fraud in the period prior to the Closing.  PCC notes that, even after receiving information from an anonymous whistleblower, who turned out to be Mr. van Gemmern, PCC was not at first able to confirm his allegations and had to retain an INFOR specialist, Mr. Wördehoff, and forensic accountants from A&M, to learn the true state of affairs.[130]  PCC also points to Section 4.5 of the SPA which specifically recognizes, according to PCC, that the SPA does not preclude claims for fraud based on representations made outside of the SPA.[131]

100.    Finally, PCC contends that it has been damaged by Schulz's fraud.  PCC's principal damages contentions are set forth in Part V.C, below.

---

[129]   CPHB, ¶254.
[130]   CPHB, ¶¶257.
[131]   CX-0001, § 4.5(d).

2. <u>Breach of Warranty</u>

101. PCC also alleges that Schulz breached multiple representations and warranties set forth in the SPA. PCC's claims of breach fall into three categories.

a. <u>Schulz's Alleged Falsified Financial Statements</u>

102. PCC claims that Schulz's warranted financial statements were false and thus in breach of Sections 2.2, 2.5, and 2.19 of the SPA. PCC contends that the warranted financial statements "included millions of dollars of fake sales" and an overstatement of SXP's EBITDA in excess of $40 million for the period ended September 30, 2016.[132]

103. According to PCC, these misstatements breached Section 2.5 of the SPA. In Section 2.5, Schulz represented that the 2013-2016 financial statements attached as Exhibit 3 were "prepared in conformity with GAAP (as applicable to each Acquired Company) consistently applied and present fairly the assets, financial position and results of operations of the Acquired Companies . . . ."[133]

104. PCC further claims that the "inclusion of fake sales" in the Financial Statements breached Schulz's representation in Section 2.19 that "existing accounts receivable . . . constitute valid claims arising from bona fide transactions in the Ordinary Course of Business [and] are collectible.[134]

105. PCC says further that Schulz breached Section 2.4 of the SPA pursuant to which Schulz represented and warranted that Each Acquired Company was (and has been in the prior three years) "in material compliance with all applicable laws."[135] Here PCC

---

[132]   CPHB, ¶¶278-279.
[133]   CPHB, ¶280; CX-0001, § 2.5.
[134]   CPHB, ¶281; CX-0001, § 2.19.
[135]   CPHB, ¶281; CX-0001, § 2.4.

contends that, under applicable law, engaging in a repeated pattern of fraud is non-compliance with applicable law.[136]

### b.    Schulz's Failure to Disclose Alleged Liquidity Crisis

106.    PCC also alleges that Schulz's non-disclosure of its financial difficulties, including its deferral of payments on the Commerzbank Loan and the agreements it entered into to avoid bankruptcy breached Sections 2.2, 2.5, and 2.21 of the SPA.   In PCC's submission, the failure to disclose these difficulties breached (i) the representation in Section 2.21 that "[n]o Acquired Company ha[d] any material liability or obligation required by GAAP to be set forth in a financial statement or in the notes thereto;" and (ii) the representation in Section 2.5 that the financial statements "present fairly the net assets, financial position and results of operations of the Acquired Companies."   PCC says that Schulz breached these representations because Schulz did not disclose the Trust Agreement that resulted from the Credit facility or the Amendment Agreement with Commerzbank that covered a €28.871 million liability resulting from deferred interest and fee payments.[137]  PCC further contends that execution of the Trust Agreement also breached Sections 2.2(b) & (e) of the SPA "which warranted that the equity interests of the Acquired Companies were free of all liens and . . . not subject to any agreement that would permit their sale or transfer."[138]

### c.    Inventory That Was Not Usable and Saleable

107.    Finally, PCC alleges a breach of § 2.20 of the SPA, under which Schulz represented that the inventory of the Acquired Companies "consists of a quality and quantity usable and, with respect to finished goods, saleable, in the Ordinary Course of Business."[139]

---

[136]    CPHB, ¶281; *Cobalt Operating, LLC v. James Crystal Enters., LLC*, No. 714, VCS, 2007 WL 2142926 (Del. Ch. 2007).
[137]    CPHB, ¶282.
[138]    CPHB, ¶283.
[139]    CPHB, ¶¶284-285, CX-0001, § 2.20.

PCC contends that large amounts of inventory had not been the subject of customer orders in the past three years in the case of WSG and the past two years in the case of Schulz USA.[140]

d.    Damages

108.    PCC contends that it has been damaged by Schulz's breaches of contract. PCC's principal damages contentions are set forth in Part V.C, below.

**B.    Schulz's Position on Liability**

109.    Respondents' first position in defense of Claimants' claims is that Claimants have failed to prove their claims.  In Respondents' estimation, the evidence that Claimants have put forward is legally insufficient to establish every element of Claimants' fraud and breach claims.

1.    Fraudulent Inducement

110.    With respect to Claimants' fraudulent inducement claim, Respondents argue that it fails for multiple, independent reasons, and that, accordingly, Claimants have failed to meet their burden of proof.[141]

111.    First, Respondents contend that Claimants' fraud claim cannot stand where the alleged damages from the fraud "rehash" the same damages that are alleged to flow from their breach of contract claims. Here, Respondents maintain that Claimants seek the same damages based on the same allegations of fake transactions, for both their fraud and breach claims.[142]  Similarly, Respondents argue that Claimants fraud claim cannot stand where a Claimant bootstraps a contract claim into a fraud claim based on the same allegations that underlie the contract claim.

---

[140]    CPHB, ¶¶284-285.
[141]    Respondents' Post-Hearing Brief ("**RPHB**"), ¶121.
[142]    RPHB, ¶¶124-126.

112.    Second, Respondents contend that Claimants' fraud claim must be dismissed because Claimants failed to prove that Respondents intended "to induce Claimants to act on one of the alleged misrepresentations."[143]   Here, Respondents argue that Claimants are limited to alleged misrepresentation that occurred between July 4, 2016 when Schulz, through Fox, first approached PCC, and December 28, 2016, when the Parties signed the SPA.   According to Respondents, misrepresentations made before July 4, 2016 and after December 28, 2016 could not have been made with the intent to induce PCC to enter into the SPA.[144]   Thus, Claimants' reliance on actions taken outside of that time, such as the establishment of EKTRA on June 2016, the "alleged 'destruction of the CRA-OCTG INFOR system'" in 2015, and the alleged forgery of the "Piping Equipment, Horizon and ASYN purchase orders, material test certificates, laboratory reports and storage records under the direction of Luca Schulz" after July 17, 2017 cannot be used to show Respondents' intent.[145]  Respondents also argue that the events in 2016 reflecting Respondents' liquidity difficulties fail to support proof of the intent element because the Acquired Companies' operating losses in 2013 and 2014 were disclosed to PCC, the interest and loan payment deferrals on the Commerzbank loan likewise were disclosed, Dr. Ringstmeier concluded that the conditions requiring an insolvency petition had been alleviated, the bridge loan from Commerzbank was paid off by September 30, 2016, and the trust agreement never became effective.[146]

113.    Third, Respondents contend that any reliance by Claimants on the alleged misrepresentations was not reasonable.   Respondents point to Claimants' representations in the SPA that they relied only on the representations and warranties in the SPA and to the

---

[143]    RPHB, ¶127.

[144]    RPHB, ¶130.

[145]    RPHB, ¶132.

[146]    RPHB, ¶133.

SPA's integration clause.[147]  Respondents dismiss the significance of § 4.5(d), which states that "[n]othing in this Section 4.5 or elsewhere in this Agreement will limit claims or remedies for fraud or willful misconduct or representations or warranties made in any other agreement," by highlighting the words "made in any other agreement."[148]

114.    Respondents also argue that Claimants' due diligence in connection with the transaction was deficient, and thus undermines any claim of reasonable reliance.[149]  As an example, Respondents note Claimants' understanding during the transaction process that the warranted financial statements were not consolidated and Claimants' failure to adjust for intercompany transactions.[150]  Respondents also reproach Claimants for their "failure to conduct their own independent analysis – despite warranting that they did. . . .", alleged failures to understand German GAAP, lack of experience with German family-owned businesses, lack of expertise in the crude oil futures market, and relative lack of "familiarity" with transactions of this size.[151]  In addition, Respondents note Claimants' acknowledgement in Section 4.5(c) that they were not relying on Respondents' estimates and projections and argue that Claimants should be held to that agreement and not permitted to rely on what Claimants allege to be fraudulent projections that Claimants did not endeavor to verify in the due diligence process.[152]

115.    It is therefore Respondents' position that Claimants' allegations within the relevant July to December 2016 timeframe, which may form the basis for their fraud claim, are limited to general statements about the acquired companies, bid and customer lists,

---

[147]    RPHB, ¶135; CX-0001, §§ 4.5(a)-(b) & 10.11.

[148]    RPHB, ¶139;CX-0001, § 4.5(d).

[149]    RPHB, ¶140.

[150]    RPHB ¶¶141-144.

[151]    RPHB, ¶¶145-146.

[152]    RPHB, ¶¶147-149.

estimates and projections, the allegedly fake 47 transactions, and the financial performance of the Acquired Companies, none of which supports Claimants' fraudulent inducement claim.[153]

116.     Respondents further attack Claimants' fraud claim on the basis that it is said to rely on unsupported, unreliable and inference-stacked opinions of Claimants' experts. Here, Respondents contend that the opinions of Messrs. Wördehoff, Kiess, Spencer, and Demuth are based on suppositions rather than facts, with Kiess's and Demuth's opinions said to be based on impermissible inference stacking.[154]

117.     Respondents contend that Wördehoff's opinions are unreliable and unfounded.  More particularly, Respondents maintain that Wördehoff did not have a proper understanding of how the INFOR system was used, did not test the quality, accuracy or completeness of the data set that PCC provided him, and did no more than identify backdated or out-of-sequence orders.[155]

118.     Respondents contend that Kiess's opinions are also unfounded and unreliable. Kiess opined that Respondents "faked . . . 47 . . . customer transactions" and "provided incomplete 'information regarding the financial status of WSG.'"[156]   Respondents first contend that Kiess's analysis is flawed because he did not interview a sufficient number of sales personnel or collect documents from them, and limited those interviews he did conduct to short discussions with Rene Goetzens and Joachim  Wickenkamp.[157]   Respondents also criticize Kiess for having advised van Gemmern not to use the lawyer the Schulz family had

---

[153]     RPHB, ¶151.
[154]     RPHB, ¶¶153, 166 & 184-197.
[155]     RPHB, ¶¶158-159.
[156]     RPHB, ¶160.
[157]     RPHB, ¶162.

recommended to him.[158]  Respondents further maintain that Kiess's conclusion that 47

transactions were fake is undercut by his admission that he is not qualified to draw a legal

conclusion of fraud, yet he nonetheless concludes that the October 2016 INFOR outage is

evidence of fraud.[159]  Respondents also contend that Kiess has engaged in impermissible

inference stacking based on Wördehoff's out-of-sequence analysis, and that his conclusion

that the back-dating was done to "make customer orders look real" is an unfounded opinion

which is undermined by his failure to collect documents from the WSG sales force.[160]  In

addition, Kiess is said to have impermissibly relied on Spencer's "flawed third party

confirmation attempts" and admitted on cross-examination that the lack of a third-party

confirmation of an order does not establish that a transaction was fake.[161]  Finally,

Respondent maintains that Kiess's opinion that sellers provided incomplete information on

the financial condition of WSG is unreliable because Respondents in fact disclosed to PCC

the Commerzbank loan deferrals and because there was in fact no insolvency to be

disclosed.[162]

119.    Respondents next maintain that Spencer's opinions are unfounded and

unreliable.  Spencer undertook a survey of thirty-five customers to attempt to determine

whether or not the customers could confirm transactions with Schulz.  Respondents'

conclusion of unreliability is based on the fact that "Spencer received either no response or

the third-party declined to provide information for twenty-two of Spencer's thirty-five

attempts at third party confirmations."[163]  Respondents also criticize Spencer's work with

---

158    RPHB, ¶164.
159    RPHB, ¶¶165-166.
160    RPHB, ¶168; Kiess-1, ¶77.
161    RPHB, ¶¶169-171.
162    RPHB, ¶¶172-173.
163    RPHB, ¶¶174-175.

respect to the 13 customers who provided information, arguing that Spencer did not "identify the proper contact" or "follow up on information provided."[164]

120.     Finally, Respondents contend that the opinions of Alexander Demuth are unfounded and unreliable and are said by Respondents to have "assumed the 47 transactions were fake at the onset of his investigation.[165]  Respondents maintain that Demuth put forth no significant effort to locate documents that would validate the transactions in question and found the absence of cash receipts to be significant "based on incorrect assumptions about how the Acquired Companies tracked costs and applied cash to invoices."[166]  Respondents further argue that Demuth's INFOR analysis and SUN system analysis amount to impermissible inference stacking.  In the case of his INFOR analysis, Demuth is said to rely "entirely on Wördehoff's unfounded, unreliable and limited opinion" on out-of-sequence orders and to infer manipulation therefrom.[167]  In the case of Demuth's SUN system analysis, Respondents question the reliability of the data set that was analyzed and note that Demuth found certain indications in the SUN system that suggested transactions were not fake, but then classified them as fake after failing to find costs associated with the transactions and the absence of third-party payments in respect of the transactions.  However, Demuth ignored known unallocated costs within SUN that could have related to the transactions in question.[168]

121.     Respondents further criticize Demuth for relying on Spencer's survey, for making unwarranted conclusions in respect of various transactions, for not undertaking a complete analysis but instead relying on "what Claimants wanted him to review," for not

---

[164]     RPHB, ¶176.
[165]     RPHB, ¶179.
[166]     RPHB, ¶¶180-183.
[167]     RPHB, ¶¶184-188.
[168]     RPHB, ¶¶189-193.

himself collecting relevant custodian data, and for not considering "alternative explanations as to why a transaction may be documented differently or entered into the system differently."[169]

122.    In short, for the foregoing reasons, Respondents consider that Claimants have failed to substantiate their claim of fraud in the inducement.  Respondents also assert that Claimants have failed to prove that they have been damaged in any respect.  Respondents' principal contentions on damages are set forth in Part V.D, below.

### 2.    Breach of Warranty

123.    As in the case of their defense to Claimants' fraudulent inducement claim, Respondents' first position is that Claimants have failed to meet their burden to prove every element of a claim for breach of contract under Delaware law.  Claimants' emphasize that the precise language of the representations and warranties in question is critical and that Claimants may not bootstrap their fraud claim into a breach of contract claim.[170]

#### a.    Alleged Breach of Section 2.2.

124.    Respondents maintain that Claimants presented a claim for breach of Section 2.2 for the first time in their Post-Hearing Opening Brief.  In Respondents' estimation, asserting a claim at that juncture of the proceedings is untimely.[171]

#### b.    Alleged Breach of Section 2.4 of the SPA.

125.    Under Section 2.4, Schulz represented and warranted that each of the Acquired Companies "during the past three years, materially complied and is in material compliance with all applicable Laws and Orders. . . .  No Acquired Company is a party to

---

[169]    RPHB, ¶194-204.
[170]    RPHB, ¶¶96-97.
[171]    RPHRB, ¶¶21-23.

any Order that requires further action on the part of such Acquired Company."[172]   In Respondents' view, Claimants have failed to show, with evidence, that any Acquired Company failed to comply with any applicable "Law" or "Order."[173]  Respondents argue that Claimants' reliance on their fraudulent inducement allegations as the basis for this breach claim is impermissible bootstrapping under Delaware law.[174]

### c.    Alleged Breach of Section 2.5 of the SPA

126.    Under Section 2.5, Schulz represented and warranted that the specific financial statements in Exhibit 3 to the SPA were prepared in conformity with GAAP and present fairly the assets, financial position and results of operations of the Acquired Companies.  Respondents assert that this claim fails because Claimants have failed to prove that the disputed transactions are "fake."[175]

### d.    Alleged Breach of Section 2.19 of the SPA

127.    In Section 2.19, Respondents represented and warranted that the accounts receivable of the Acquired Companies "constitute valid claims arising from bona fide transactions . . . [and] are collectible" subject to the "reserve for doubtful accounts reflected in the balance sheet dated as of the Balance Sheet Date."[176]  Respondents contend that Claimants have failed to prove that a receivable that existed as of September 30, 2016 on the balance sheet of an Acquired Company was not collectible.[177]

---

[172]    CX-0001, § 2.4; RPHB ¶98.
[173]    RPHB, ¶98.
[174]    RPHB, ¶99.
[175]    RPHB, ¶100.
[176]    CX-0001, § 2.19.
[177]    RPHB, ¶101.

e.      Alleged Breach of Section 2.20 of the SPA

128.    Respondents argue that Claimants have failed to show, as required by Section 2.20, that any inventory on the balance sheet of an Acquired Company as of the Balance Sheet Date did not exist or was not saleable.

f.      Alleged Breach of Section 2.21 of the SPA

129.    Respondents also dispute Claimants' claim of breach of Section 2.21, pursuant to which Respondents represented that there were no material liabilities "required by GAAP to be set forth in a financial statement," except for obligations incurred in the ordinary course of business since September 30, 2016, that are "accrued or reserved against" in the Financial Statements or that relate to the transaction itself.[178] Respondents' view is that Claimants have failed to bring forth sufficient evidence to establish this claim of breach, and that Claimants' contention that the failure to disclose the bridge loan, the execution of the trust agreement, and the deferral of principal and interest on the Commerzbank syndicated loan does not track the specific language of Section 2.21.

3.      The Relevance of Sections 4.5(a) and (c) of the SPA

130.    Finally, Respondents argue with respect to all of Claimants' claims that Claimants breached their obligation under Section 4.5(a) to conduct their "own independent investigation of the Acquired Companies" and to rely on their "own investigation and analysis in entering into and proceeding with the transactions contemplated" in the SPA.[179] Here, Respondents point to alleged deficiencies in Claimants' due diligence, including their failures to "conduct any independent research or investigation," their reliance "exclusively on market materials prepared by and for the Acquired Companies," their alleged inability to

---

[178]   RPHB, ¶103; CX-0001, § 2.21.
[179]   CX-0001, § 4.5(a).

evaluate "the merits and risks of the transactions contemplated" by the SPA, their lack of oil and gas industry expertise, their failure to appreciate disclosures by Schulz that financial statements were consolidated and did not eliminate intercompany sales, their decision "to ignore the amount of the Acquired Companies' debt," their failure to appreciate the significance of the Acquired Companies' losses in 2013 and 2014, and their lack of familiarity with German GAAP, among other things.[180]

131.    Respondents also maintain that Claimants breached the representation in Section 4.5(c) of the SPA that "each Purchaser is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections, forecasts, plans and budgets furnished to it."    According to Respondents, Claimants' instead relied on estimates and projections supplied by Respondents in breach of Section 4.5(a) of the SPA.[181]

132.    Finally, Respondents contend that Claimants have suffered no damage, and that their breach claims fail for that reason as well.  In all events, Respondents maintain that the cap on the indemnification claims in the SPA of €100 million limits Claimants breach of contract claims accordingly.  Respondents' principal contentions on damages are set forth on Part V.D, below.

## C.    PCC's Position on Damages

133.    PCC claims that it has been damaged by virtue of Schulz's fraud and breaches of representations and warranties.  Instead of acquiring a profitable, market-leading business with excellent prospects and the prospect of synergistic benefits, for which it paid €800 million, PCC claims that, in actuality, it got companies that "had no history of generating positive earnings, were not capable of covering their operating expenses, were riddled with

---

[180]    RPHB, ¶¶107-113.
[181]    RPHB, ¶114.

fraud and had no path to profitability."[182]  In short, PCC contends that the Acquired Companies had zero value.  Alternatively, PCC observes that, at most, the Acquired Companies were worth €157 million, which is the net asset value that PCC entered as of December 31, 2017 as the opening balances on the books of the Acquired Companies.[183]

134.    In support of its damages claim, PCC argues first that Delaware law applies, and that Delaware law allows an out-of-pocket measure of damages.[184]  Under Delaware law, out-of-pocket damages are measured by the difference between the price paid and the "true value" or actual value of the asset purchased.[185]  The actual value of the Acquired Companies is determined as of the closing date.[186]  Here, PCC paid €800 million for the Acquired Companies, so the key question according to PCC is the value of those companies on the closing date.  In determining actual value, Delaware law does not require mathematical certainty, but rather a "responsible estimate."[187]

135.    It is PCC's essential submission that the Acquired Companies had in fact a zero actual value on the Closing Date.  PCC rests its contention on Schulz's negative EBITDA for 2015 and 2016, and parallel evidence that Schulz "was insolvent and avoided bankruptcy only by misrepresenting its financial condition to its principal creditor, Commerzbank."[188]  These misrepresentations to Commerzbank rested on what PCC contends was a fake €32 million receivable from ALSA, the payment of which was delayed, which led Commerzbank to extend an €8 million bridge loan that permitted Schulz to avoid an

---

[182]    CPHB, ¶4.

[183]    CPHB, ¶¶4-5.

[184]    CPHB, ¶¶25-26.

[185]    CPHB, ¶26; *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1076 (Del. 1985); Tr. 1712 (Zmijewski).

[186]    CPHB, ¶27.

[187]    CPHB, ¶32.

[188]    CPHB, ¶36.

obligation to file a bankruptcy petition.[189]  When it came time to repay the bridge loan, with a payment from ALSA, Schulz made the payment with funds from SF Holding.[190]

136.    In addition, to buttress its contention of zero actual value, PCC points to a continuation of the Acquired Companies' liquidity crisis after the closing, as reflected by payments on receivables in the name of Piping Equipment, Horizon Energy and ASYN coming from transaction proceeds through accounts of SF Holding.[191]  Accordingly, Demuth reached the conclusion that "a reasonable buyer would [not] buy a company how shiny the assets may be if they cannot generate sufficient cash flow to cover costs.  They will have no return on the investment, and therefore, the value of this company is zero."[192]

137.    PCC further argues that PCC's opening balance sheet valuation of €157 million does not mean that the Acquired Companies had such a value. Here PCC argues that this value could only be achieved by substantial post-acquisition investment and is therefore not reflective of actual value at the Closing.[193]  In PCC's view, in light of the true state of the Acquired Companies' financial condition and business prospects, there would have been no buyer willing to purchase the Acquired Companies.[194]

138.    As an alternative position, PCC maintains that the actual value could not exceed the €157 million opening balance sheet valuation of the Acquired Companies.  The €157 million value was determined by PCC personnel applying Accounting Standards Codification 805, which requires a buyer to derive an opening balance sheet that "assess[es]

---

[189]    CPHB, ¶¶37-42.
[190]    CPHB, ¶40.
[191]    CPHB, ¶44.
[192]    CPHB, ¶49; Tr. 1083 (Demuth).
[193]    CPHB, ¶¶51-52.
[194]    CPHB, ¶¶54-55.

the fair value of the assets and liabilities purchased as of the purchase date."[195]   PCC determined this figure in light of the evidence of fraud it had discovered by the time this exercise was completed in January 2018.[196]

139.   In support of this €157 million figure as a maximum value of the Acquired Companies, PCC further notes that it is not, in its view, a liquidation value, but rather is a going concern value because the assets were valued on the basis that they would be used in an operating business.[197]   However, in PCC's estimation, no additional value should be ascribed to the Acquired Companies, based on customer relationships,[198] the acquired sales force,[199] the "cool technology" referenced by PCC's counsel,[200] or goodwill.[201]

140.   PCC further claims that Beaton's discounted cash flow and market approach analyses confirm that €157 million is the upper bound on the actual value of the Acquired Companies.  Beaton's discounted cash flow analysis was hampered by the absence of reliable forecasts as of the closing date of the transaction, which led Beaton to use what he considered to be "the best information available," which included actual results for 2017 and 2018 and projections PCC made in January 2019 for fiscal years 2019-2021.[202] Based on these and other inputs (including a 9% discount rate), Beaton's discounted cash flow analysis, which PCC contends is generous to Schulz, produced an upper bound valuation of €221 million.[203]

---

[195]   CPHB, ¶57.
[196]   CPHB, ¶62.
[197]   CPHB, ¶¶68-69.
[198]   CPHB, ¶75.
[199]   CPHB, ¶79.
[200]   CPHB, ¶81.
[201]   CPHB, ¶84.
[202]   CPHB, ¶¶94-95.
[203]   CPHB, ¶¶99-100; Expert Report of Neil Beaton ("**Beaton**"), ¶46; PCC Closing Slides 122-123.

141. Beaton also undertook two market approach valuations, which fell in a range of €17.5 million to €112.2 million for his public company analysis and a range of €52.9 million to €254.5 million for his transaction approach. Beaton identified revenue multiples for guideline public companies and guideline transactions, and the value ranges he determined were based on multiples of the Acquired Companies' actual revenue, with the low valuation point representing the 25th percentile of the company or transaction pool and the high valuation point representing the 75th percentile. Given the Acquired Companies' actual condition, it is PCC's position, based on Beaton's analysis, that a multiple at the low end of the range is appropriate. In all events, valuation at the median results in valuations well below the €157 million opening balance sheet amount, which PCC maintains is the maximum plausible valuation that could be ascribed to the Acquired Companies.[204]

142. Finally, PCC rejects Schulz's contention that determination of the actual value of the Acquired Companies at the closing date must take into account synergies that PCC hoped to achieve from the transaction. First, as a matter of Delaware law, PCC contends that synergies may not be considered when the claimant seeks out-of-pocket damages. Second, PCC's internal synergies analysis is not a reliable valuation basis for the Acquired Companies because that analysis rested on false financial information that Schulz provided.[205]

143. On the issue of what Delaware law says on the question of synergies, PCC points to the rules governing stock appraisal in dissenters' rights actions, where valuation does not take into account value attributable to the fact of the transaction.[206] PCC further

---

[204] CPHB, ¶¶104-110.
[205] CPHB, ¶120.
[206] CPHB, ¶122.

contends that this approach, which is followed in the appraisal context, applies to an out-of-pocket measure of damages as well, based on the decision of the Delaware Supreme Court in *Poole v. N.V. Deli Maatschappij*, where the court analogized the determination of out-of-pocket damages to valuations in stock appraisal proceedings, which exclude consideration of synergies.[207]  Such an approach is further justified, says PCC, because a determination of value based on hoped-for synergies is speculative.[208]  In PCC's view, the value of synergies may be awarded only if, in the specific instance, the synergies are not speculative and even then only to a defrauded buyer, not for the benefit of a defrauding seller.[209]

144.    PCC next argues that its synergies analysis may not be considered as a basis for determining the value of the Acquired Companies because that analysis was based on misrepresentations made by Schulz, and PCC in fact achieved no synergies.[210]  In this regard, PCC dismisses Bergin's $1.7 billion to $2.4 billion valuation based on PCC's expected synergies as not "credible,"[211] and as otherwise flawed.  Thus, PCC contends that Bergin's calculation (i) is based solely on expected synergies and not synergies actually achieved, (ii) is premised on false financial information provided by Schulz, and (iii) fails to take into account the speculative nature of synergies and how rarely they are achieved in practice.[212]

145.    In addition to its claim for out-of-pocket damages, PCC requests punitive damages.  PCC contends that punitive damages are justified because Schulz's conduct was egregious.  PCC requests that punitive damages be awarded in the amount of the costs it has

---

[207]   224 A.2d 260, 263 (D. Del. 1966) (CLA-120); CPHB, ¶124.
[208]   CPHB, ¶125.
[209]   CPHB, ¶128.
[210]   CPHB, ¶131.
[211]   CPHB, ¶136.
[212]   CPHB, ¶¶138-145.

incurred to investigate Schulz's conduct and to undertake the various proceedings associated with it.[213]

## D.     <u>Schulz's Position on Damages</u>

146.     Respondents contend that Claimants have not suffered any compensable out-of-pocket damages and that accordingly their claims must fail. Respondents agree that the proper measure of damages under Delaware law is the purchase price minus the actual value of what Claimants received. It is Respondents' position that the value of the Acquired Companies exceeded the amount of the purchase price.[214]

147.     In support of its position, Respondents maintain, first, that the opinions of Claimants' experts on damages are unfounded and unreliable and, second, that the value of synergies must be considered, which here are said to exceed the purchase price paid by PCC.

148.     With respect to the opinions of Claimants' damages experts, Respondents argue first that Claimants' alternative valuation of the Acquired Companies – €157 million – is a liquidation value, which is an inappropriate measure of business value where the business is not in fact being liquidated.[215] Respondents further argue that Demuth's conclusion that a negative EBITDA necessarily results in no or negative value is erroneous since many companies experiencing negative EBITDA have going concern value so that Demuth's "default to liquidation value" on the basis of negative EBITDA is unsupportable.[216] Respondents further criticize Demuth's "default to liquidation" value on

---

[213]   CPHB, ¶¶287-291.
[214]   RPHB, ¶11.
[215]   RPHB, ¶16.
[216]   RPHB, ¶¶18-19.

the ground that he failed to account for the pay-off of most of the debt of the Acquired Companies at the closing.[217]

149.     Respondents criticize Beaton's analysis on multiple grounds.  First, they contend that Beaton was wrong to consider that the value of the Acquired Companies' goodwill was zero because he relied on the conclusion of PCC personnel to that effect. Respondents point to the fact that PCC's parent company did not take an impairment on its financial statements as evidence that Claimants did not suffer any damages.[218]

150.     Respondents also maintain that Beaton's discounted cash flow analysis is flawed on multiple grounds.  First, they criticize Beaton for using information that was not known as of the closing date, in particular, actual 2017 and 2018 results and projections made in January 2019, for the period 2019-2021.  They also criticize Beaton for not considering actions that PCC took in running the Acquired Companies and/or macro conditions in the industry that may have adversely affected performance, including unfavorable market conditions (*e.g.*, low crude oil prices, low CAPEX spending), PCC's abandonment of Schulz's build-to-stock business model, severe limitations placed by PCC on the use of trade sales by the Acquired Companies, and PCC's adoption of new contract terms that Respondents say upset customer expectations.[219]  Respondents further fault Beaton for attempting to "demonstrate that the 2017 and 2918 diminutions in revenue were in any way caused or connected to any of the alleged pre-Closing conduct by Respondents," and contend that lack of proof of causation is fatal to PCC's claims.[220]

---

[217]    RPHB, ¶¶20-21.

[218]    RPHB, ¶24.

[219]    RPHB, ¶¶26-27, ¶31, ¶34 & ¶36.

[220]    RPHB, ¶¶39-42.

151.     Respondents also take issue with Beaton's market-based analyses.  These criticisms include the alleged inadequacy of Beaton's search criteria to identify comparable companies and Beaton's failure to align the financial statements of the companies in Beaton's analysis with the financial statements of the Acquired Companies.[221]  With respect to his comparable transactions analysis, Respondents argue that Beaton failed to explain the criteria for selection of the transactions he considered which is necessary to be sure that they are in fact comparable.[222]  In addition, Beaton is said to have incorrectly accounted for the pay-off of the Acquired Companies' debt and the correct amount of debt remaining on their books after the closing.[223]

152.     Finally, as to Beaton and Demuth, Respondents argue that each expert's opinions are at odds with the other's, contending that, at the June Hearing, Demuth criticized Beaton's €157 million valuation and PCC's purchase accounting when he testified that the value of the assets should not be considered in any damages evaluation.[224]

153.     Respondents argue next that the value of synergies that are "received by PCC at the time of closing" must be considered in determining the actual value of what PCC obtained by purchasing the Acquired Companies.[225]

154.     In that regard, Respondents contend first that, as a matter of Delaware law, "synergies comprise value conferred to an acquiring company at closing and are included in any calculation of 'actual value' the acquiring company received."[226]  In Respondents' submission, the failure to include synergies in actual value would put the "plaintiff-buyer in a

---

[221]    RPHB, ¶¶43 & 45.
[222]    RPHB, ¶¶49-50.
[223]    RPHB, ¶54.
[224]    RPHB, ¶¶55-56.
[225]    RPHB, ¶59.
[226]    RPHB, ¶62.

*better* position than before the transaction occurred by understating the benefits it received and thus overstating the plaintiff's actual harm."[227]   Respondents dismiss Claimants' legal argument that synergies are not to be considered in measuring a claimant's out-of-pocket loss on the basis that PCC relies on inapposite stock appraisal case law.[228]

155.    Respondents argue next that Dr. Bergin's synergies analysis should be credited because it is based on PCC's own identification of synergies in December 2016 and on PCC's quantification of synergies shortly after the closing.[229]   Respondents reject Claimants' argument that PCC excluded the possibility of obtaining synergies when it determined the €800 million purchase price, contending instead that synergies are nonetheless "part of the actual value a buyer receives. . . ."[230]

156.    To quantify the value of synergies that Respondents contend PCC acquired, Respondents point to an April 6, 2017 document of PCC that quantifies synergies at €200 million.[231]   PCC prepared another synergies analysis dated June 24, 2017, which, although reducing the amount of synergies expected, still quantified substantial synergies expected to be achieved.[232]

157.    Having identified the synergies that Respondents say PCC expected to achieve, Dr. Bergin then valued the cash flows resulting from such synergies by using a discounted cash flow analysis.[233]   Dr. Bergin concluded that the actual value PCC received at

---

[227]    RPHB, ¶62 (emphasis in original).
[228]    RPHB, ¶64.
[229]    RPHB, ¶68.
[230]    RPHB, ¶69.
[231]    RPHB, ¶70; RX-0030.
[232]    RPHB, ¶72; RX-0722.
[233]    RPHB, ¶73.

closing is in the range of €1.7 billion to €2.4 billion.[234] Respondents further note that PCC does not challenge Bergin's discounted cash flow methodology and that Bergin's analysis conforms with the IVSC International Valuation Standards.[235]

158. Respondents dismiss PCC's argument that it did not in fact realize synergies as a result of the transaction on the basis that it is the synergies anticipated at the time of the closing and not the synergies actually achieved that is determinative, because the failure to achieve the hoped-for synergies can be the result of any number of factors.[236] In that regard, Respondents maintain that the failure of PCC to realize synergies is its own fault.[237] In all events, Respondents argue that synergies resulting from PCC's expectation that it could better run the Acquired Companies than Schulz had are said to exceed €800 million based on PCC's April 6, 2017 assessment of Schulz's existing and new capabilities.[238]

159. Finally, Respondents argue that, regardless, Claimants have failed to prove damages with reasonable certainty or damages that flow from the alleged wrongdoing. In support of this argument, Respondents rely on Professor Zmijewski's contention that Demuth's approach is fatally flawed because it is not a "but for" analysis: even if one assumes no fraud, it still produces a damages calculation in favor of PCC.[239]

---

[234]   RPHB, ¶74.
[235]   RPHB, ¶¶76-77.
[236]   RPHB, ¶82.
[237]   RPHB, ¶84.
[238]   RPHB, ¶¶86-91.
[239]   RPHB, ¶93.

# VI.    THE TRIBUNAL'S ANALYSIS

## A.    Overview

160.    The Parties have comprehensively addressed PCC's claims of fraudulent inducement and breach of contract, Schulz's defenses thereto, PCC's quantification of its damages, and Schulz's position that PCC has not suffered any compensable damages.  Their submissions have set forth in detail their respective positions on PCC's claim of fraudulent inducement, by which PCC contends that Schulz presented a fundamentally misleading and dishonest picture of the Acquired Companies on which PCC reasonably relied, to its detriment, in entering into the SPA and purchasing the Acquired Companies, and as to which Schulz contends that PCC failed to substantiate its position on every element of a claim for fraudulent inducement under Delaware law.

161.    Having evaluated all of the arguments and the substantial evidence the Parties have submitted, we conclude, for the reasons set forth below, that Schulz fraudulently induced PCC to purchase the Acquired Companies to PCC's substantial detriment.

162.    Similarly, the Parties have addressed in detail PCC's claims of breach of several representations and warranties in the SPA, in particular Sections 2.2, 2.4, 2.5, 2.15, 2.19, 2.20, and 2.21 and Schulz's defenses thereto.  Having evaluated all of the arguments and the substantial evidence the Parties have submitted, we find that PCC has established breaches of Sections 2.4, 2.5, and 2.15 to its substantial detriment.

163.    With respect to damages, again the Parties have addressed the issue of quantum in substantial detail and the effect of Sections 4.5(d) and 7.1(d)(iii) of the SPA.  We conclude that PCC has suffered damages in the amount of €643 million.

164.    We set forth our analysis of the liability and damages issues below.

## B.    PCC's Fraud Claim

165.    To establish its claim of fraudulent inducement under Delaware law, PCC must prove the following five elements:  (i) Schulz made false representations or failed to disclose facts that Schulz had a duty to disclose; (ii) Schulz knew or believed the representations were false or made the representations with a reckless indifference to the truth; (ii) Schulz intended to induce PCC to act; (iv) PCC acted in justifiable reliance on Schulz's representations; and (v) PCC was injured by its reliance.[240]  Schulz does not contest that PCC has correctly identified the elements of a claim for fraudulent inducement under Delaware law.

166.    PCC further states that it has the burden to prove fraud by a preponderance of the evidence, in other words that its allegations are "more likely than not."[241]  Schulz, likewise, does not take issue with PCC's statement of the standard of proof that PCC must satisfy to make out its claim of fraudulent inducement.  In addition, as a matter of Delaware law, a plaintiff may rely on circumstantial evidence to prove its case.[242]  Schulz has not contested the proposition that fraud may be proved by circumstantial evidence, although it has vigorously contested the quality and quantity of PCC's proof.

167.    Before we address the specific elements of PCC's fraud claim, its evidence, and Schulz's defenses and supporting evidence, we address two threshold issues that affect

---

[240]   *Abry Partners V, L.P. v. F&W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006) (CLA-001); CPHB, ¶148.

[241]   *Agilent Techs., Inc. v. Kirkland*, No. 3512-VCS, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010) (CLA-97); CPHB, ¶149.

[242]   *Cobalt Operating, LLC v. James Crystal Enters., LLC*, NO. 714-VCX, 2007 WL 2142926 at *25 n.54 (Del. Ch. 2007) (CLA-035) ("fraud by its very nature is often difficult to prove and thus may be properly proved by wholly circumstantial evidence") (citation omitted); *Playtext, Inc. v. Columbia Cas.*, No. 88C-MR-233, 1992 WL 179232, at *2 (Del. Super. Ct., July 10, 1992) (CLA-119) ("Where fraud is to be shown by circumstantial evidence, such evidence should be considered in its entirety without giving undue importance to isolated facts, although each circumstance alone may be trivial and unconvincing, the combination of all circumstances considered together may furnish irrefragable and convincing proof of fraud.") (citation omitted).

the scope of the fraud allegations that we may consider and on which PCC may rely.  These

are:  (i) the effect of Section 4.5 of the SPA; and (ii) the time period within which fraudulent

misrepresentations  must  have  been  made  in  order  to  support  a  claim  for  fraudulent

inducement.

1.　　Section 4.5

168.　　Section 4.5 of the SPA contains multiple provisions that bear on PCC's

fraudulent inducement claim.  In Section 4.5(a), PCC "acknowledge[d] that it has concluded

its own independent investigation of the Acquired Companies . . . and is relying on its own

investigation  and  analysis  in  entering  into  and  proceeding  with  the  transactions

contemplated" by the SPA.[243]  Section 4.5(a) goes on to say that PCC "is knowledgeable

about  the  industries  in  which  the  Acquired  Companies . . . operate  and  is  capable  of

evaluating the merits and risks" of the acquisition.[244]

169.　　Section 4.5(b) states that the only representations and warranties, express or

implied, made by Schulz to PCC are the "representations and warranties made in Articles II

and III" of the SPA.  On its face, this provision appears to limit actionable representations

and warranties to those stated in Articles II and III of the SPA.

170.　　In Section 4.5(c), PCC further agreed that "certain estimates, projections and

other  forecasts  for  the  Acquired  Companies'  business  and  certain  plans  and  budget

information" are inherently uncertain and that, accordingly, PCC takes "full responsibility for

---

[243]　　CX-0001, § 4.5(a).
[244]　　CX-0001, § 4.5(a).

making its own evaluation of the adequacy and accuracy of all estimates, projections, forecasts, plans and budgets so furnished to it."[245]

171. The collective effect of these provisions is potentially to narrow the scope of representations made by Respondents that PCC may invoke to assert claims against Schulz. However, Section 4.5(d) makes these provisions inapplicable in the case of fraud or willful misconduct. Section 4.5(d) provides as follows:

> (d) Nothing in this Section 4.5 or elsewhere in this Agreement will limit claims or remedies for fraud or willful misconduct or representations or warranties made in any other agreement.

In an email dated December 16, 2019, the Tribunal requested "the Parties to address with specificity the meaning of Section 4.5(d) of the SPA, with particular attention to the language 'made in any other agreement' and the specific prior words that this phrase modifies."

172. While Claimants did not address, in their Reply to Respondents' Post-Hearing Brief ("**CPHRB**"), the specific question that the Tribunal put to Counsel in its December 16, 2019 email, PCC has maintained throughout these proceedings that Section 4.5(d) makes the limitations in Section 4.5(a)-(c) inapplicable to claims of fraud. In Respondents' Reply to Claimants' Post-Hearing Brief ("**RPHRB**"), Respondents answered the Tribunal's specific question by stating that the phrase "made in any other agreement" modifies "representations or warranties."[246] Respondents nonetheless maintain that Section 4.5(d) does not derogate PCC's representations and acknowledgments in Section 4.5(a)-(c).

173. We read Section 4.5(d) to override PCC's representations and acknowledgments that are found in Section 4.5(a)-(c) in cases of fraud or willful misconduct. We agree with Respondents' position that the phrase "made in any other agreement"

---

[245]   CX-001, § 4.5(c).
[246]   RPHRB, ¶12.

modifies "representations or warranties."  As a result, Section 4.5(d) means that Section 4.5(a)-(c) does not limit claims or remedies for (1) fraud or (2) willful misconduct or (3) representations or warranties made in any other agreement.  The phrase "made in any other agreement" cannot modify "fraud" or "willful misconduct" because "fraud or willful misconduct" are not "made in any other agreement."  Representations and warranties, by contrast, can be "made in any other agreement."  The only plausible reading of Section 4.5(d) is that it establishes three circumstances where the limitations of Section 4.5(a)-(c) do not apply.  Thus, notwithstanding Section 4.5(a)-(c), PCC retains the right to bring claims for fraud based on fraudulent misrepresentations made outside of Articles II and III of the SPA and fraudulent representations reflected in "estimates, projections, forecasts, plans and budgets" that are fraudulent in nature.  This interpretation of Section 4.5(d) does not relieve PCC of its obligation to prove that its reliance on what Schulz told it was reasonable.  Moreover, Section 4.5(a)-(c) remains fully applicable to claims for breach of contract.

## 2.    Relevant Time Period

174.    Respondents take the position that "the only allegations . . . that are relevant to the fraudulent inducement claim are those that occurred between July 4, 2016, when Pulley received the Fox communication, and December 28, 2016 when Claimants signed the SPA.[247]  Respondents make this statement in the context of their argument that Claimants have failed to show intent on the part of Respondents "to induce Claimants to act on one of the alleged misrepresentations."[248]  In Respondents' view, "[t]here can be no intent to induce the alleged misrepresentations that occur after the parties sign an agreement," or "before the parties have started down the path of entering into an agreement."[249]  On this basis,

---

[247]    RPHB, ¶127.
[248]    RPHB, ¶127.
[249]    RPHB, ¶¶128-129.

Respondents seek to exclude consideration, for example, of evidence of the establishment of EKTRA, the integration of the original CRA-OCTG INFOR system into SXP LP's INFOR system in 2015, payments of receivables from an SF Holding account after December 28, 2016, and the claimed forgery of Piping Equipment, Horizon and ASYN purchase orders, material test certificates, laboratory reports and storage records after July 17, 2017.[250]

175.    We consider Respondents' position too restrictive in three respects.  First, we think the relevant period of the transaction includes the period between the signing of the SPA and the Closing of the transaction. The representations made in the SPA that speak as of the Closing date are relevant as would be any other representation made between December 28, 2016 and February 16, 2017 that is fraudulent in nature.[251]

176.    Second, insofar as false transactions, or activities associated with them, occurred outside the timeframe that Respondents advocate, but bear on representations made during the time period of the transaction, they are relevant as well.  So, for example, fictitious transactions that occurred prior to the time period covered by the financial statements in Exhibit 3 of the SPA and rolled forward in the financial statements that were delivered to Claimants are relevant to PCC's fraud claim.  A transaction that is fake and that occurs in one year and thus affects the financial statements in that year has an ongoing effect on the balance sheet in future years.

177.    Third, the creation of EKTRA in June, 2016, payments on certain receivables after December 28, 2016, from an SF Holding account, and the forged purchase orders and other documentation related to Piping Equipment, Horizon and ASYN after July 17, 2017 all bear on Respondents' intent to defraud.  The establishment of EKTRA in June 2016 was

---

[250]    RPHB, ¶132.
[251]    CX-0001, §8.4.

integral to the financial review of SFE that presented a false picture of SFE. This financial review was included in the virtual data room to which PCC was given access and incorporated into WSG's financial statements.[252] The post-signing payment of certain receivables from an SF Holding account and the forged documents that Flöth prepared and presented to PCC after July 17, 2017 were intended to cover-up the fraud that Flöth, Luca Schulz and others had perpetrated. This evidence, even if retrospective in nature, bears on Respondents' intent to induce PCC to sign the SPA and to close the transaction. In short, the fact that events occurred before July 4, 2016 or after the signing and/or closing dates does not make them *ipso facto* irrelevant to Respondents' intent. Each piece of evidence must be evaluated on its own terms.

178.    We turn next to the specific elements of PCC's fraudulent inducement claim and the evidence in support of, and in opposition to, the claim.

### 3.    Whether Respondents Made Fraudulent Misrepresentations and Omissions

179.    We begin with the evidence relevant to the question whether Respondents made false representations and omitted facts that they had a duty to disclose. Our analysis leads us to conclude  that Respondents, through Flöth, Luca Schulz and numerous others throughout the organization, engaged in a pervasive effort to present a fundamentally misleading picture of the financial condition and business of the Acquired Companies. This is not a case where the Respondents have simply breached various contractual representations and warranties and Claimants have merely dressed up a breach of contract claim into a fraud claim by ritualistic  invocation of fraud allegations, but rather a case where

---

[252]    CPHRB, ¶73.

Respondents systematically misled Claimants to sign the SPA and complete the purchase of the Acquired Companies on the basis of materially false information.

180.     We address the details of the fraud allegations below, but we start with the general financial and business position in which Schulz found itself in 2016.  In a nutshell, Schulz was in dire financial condition and facing a serious risk of bankruptcy.  This backdrop provides important context for evaluation of the steps taken by Schulz and the representations made to PCC in furtherance of completing the transaction.

181.     At the time PCC received the Fox communication on July 4, 2016, soliciting PCC's potential interest in an acquisition of the Acquired Companies, Schulz was at severe risk of failure.  As noted above at paragraph 49, Schulz entered into a Syndicated Loan Agreement with Commerzbank as of September 15, 2015.  Schulz's first payment under the facility was due on December 15, 2015, but Schulz was unable to make the payment and therefore requested and obtained a waiver from Commerzbank.  Schulz failed to make any payments under the facility prior to completion of the transaction with PCC, but instead obtained continuing forbearance from Commerzbank throughout 2016.  It was the potential transaction with PCC that, if completed, would give Schulz the wherewithal to repay Commerzbank and other creditors.  In fact at the closing, a substantial portion of the acquisition proceeds, €444 million of the €800 million purchase price, went to repay Commerzbank and other Schulz creditors, including DFB.[253]

182.     Other important facts point to Schulz's precarious financial condition during the acquisition process.  Due to Schulz's failure to make payments to Commerzbank, the bank required Schulz in April 2016 to undergo a going concern analysis pursuant to German accounting rule IDW S 6.  Thereafter, Schulz retained bankruptcy counsel, Dr. Andreas

---

[253]    CX-0001, p. 889.

Ringtsmeier, who opined that, as of June 21, 2016, and again as of July 4, 2016, Schulz was

obligated to file a bankruptcy petition. This obligation was alleviated shortly thereafter when

Commerzbank, on July 7, 2016, extended to Schulz a short-term €8 million line of credit

with a maturity date of September 30, 2016. However, in connection with the extension of

this line of credit, Schulz was required to agree that it would execute a trust agreement that

would authorize the trustees to sell the shares in the Acquired Companies in the event of a

default of its repayment obligation. Given its overall indebtedness to Commerzbank, Schulz

needed to complete a transaction with PCC or risk losing the company for whatever value

could be salvaged by a forced sale, net of amounts owed to Commerzbank (as well as other

creditors). At the same time, Schulz's SXP subsidiary was experiencing serious financial

difficulties of its own, as described at paragraph 58 above.

183. Schulz's difficulties are further reflected in its dealings with DFB. Schulz

obtained financing from DFB that helped it to keep operating by presenting purported

receivables that were not based on authentic customer orders and by presenting

photoshopped documentation to DFB.[254] For example, in November 2015, DFB requested

an explanation about an overdue receivable from Hyundai. Daniel Koelling of WSG asked

Rainer Flöth for advice on how to respond to DFB's request as follows:

> I cannot think of an excuse, but as soon as the [Commerzbank] money is
> available, we have to get rid of this invoice immediately.

> Do you have any ideas for an excuse? Inspection, bad payment morale
> [sic] overall, we've already used everything. I'm afraid they will not
> purchase any more Hyundai receivables.[255]

---

[254] *See*, *supra*, at ¶¶ 56-57.
[255] CX-1415; Second Expert Report of Raphael Kiess ("**Kiess-2**"), ¶82.

Two days later, Koelling assured DFB that payment for Hyundai had been wrongfully delayed over questions concerning technical deficiencies in the products, but that payment was now "on its way."[256]   After DFB  requested further information in December 2015, Koelling wrote to Flöth and Füchtjohann as follows:  "[DFB] is threatening to close the lines and no longer buy[] customers' receivables.  Samsung over 3 million dunning level 4, Hyundai 1.5 million dunning level 5 and Technip 323' dunning level 6 (All invoices fake)."[257]

184.    In April 2016, when DFB requested further information in respect of a WSG customer, Paul Stenhouse of Miti wrote to Flöth and said "We know nothing of this invoice, any clues?"[258]   Thereupon, Flöth forwarded Stenhouse's email to Luca Schulz, Füchtjohann and Koelling with the comment: "Ouch."[259]

185.    Then in May 2016, Füchtjohann wrote to Flöth and Koelling with respect to the DFB financing facility, stating that with respect to the "utilization of the line of $21.3 million, there are about 1.8 million real Factoring invoices."[260]

186.    Schulz's efforts to mislead DFB continued in September 2016 when Füchtjohann, Sontrop and Heinrich created documentation purporting to reflect customer orders for a number of customers, including Marubeni, Hyundai, Larsen & Toubro and Samsung.  When DFB then asked for invoices, Füchtjohann asked Heinrich:  "Do we have to create all of them or do we have them already?"[261]   Heinrich responded:  "Partly we have them, partly we don't.  We will probably need orders, delivery slips, and customer orders as

---

[256]    CX-1416; Kiess-2, ¶83.
[257]    CX-1417; Kiess-2, ¶84.
[258]    CX-1419; CX-1420; Kiess-2, ¶87.
[259]    CX-1419; CX-1420; Kiess-2, ¶88.
[260]    CX-1418; Kiess-2, ¶86.
[261]    CX-1438.

well."[262]   Additional emails are to similar effect.[263]   The evidence makes clear that Schulz

personnel misled DFB to keep their factoring relationship in place and to prevent DFB from

discovering that Schulz had submitted false receivables to obtain financing.

187.   In short, prior to and throughout the acquisition process, Schulz was in

financial distress and faced a severe risk of bankruptcy.   It was the sale of the Acquired

Companies to PCC that had the potential to rescue Schulz from this outcome.

188.   Respondents have contended that Schulz was not obligated to file an

insolvency petition once Commerzbank and Schulz entered into the July 7, 2016 Credit

Facility Agreement.   Respondents further note that Dr. Ringtsmeier concluded that, as a

result of the Credit Facility, the conditions that would have required an insolvency petition

had been alleviated.   We accept that point, but find that it does not detract from the basic fact

that Schulz was at serious risk of failure, and kept afloat only by virtue of the Credit Facility

Agreement and by Commerzbank's forbearance while the sale process went ahead.   Whether

Schulz had a legal obligation to file an insolvency petition as a technical matter of German

law, the fact remains that Schulz was unable to pay its debts and depended on

Commerzbank's forbearance to avoid bankruptcy.   In fact, there is also evidence that

Commerzbank itself, like DFB, was misled by Schulz.   Commerzbank agreed to the Credit

Facility Agreement on the basis of representations from Schulz that it would soon collect on

a large customer receivable, a receivable however whose authenticity was dubious.[264]   When

Schulz repaid the amount due under the Credit Facility Agreement by the September 30,

---

[262]   CX-1438.

[263]   CX-1439-1441; Kiess-2, ¶¶94-99.

[264]   CX-0246; CX-0488; CX-1450; CX-1455; SOC, ¶133.

2016 due date, it used funds from SF Holding rather than from the customer whose payment was supposed to be forthcoming.[265]

189.    It is clear, therefore, that, as of the beginning of discussions with PCC in July 2016, Schulz was functionally insolvent, even if it was not required, as a technical matter of German law, to file an insolvency petition following entry into the July 7, 2016 Credit Facility Agreement and receipt of the updated opinion of Dr. Ringtsmeier (who was not operating with full visibility on Schulz's true financial condition).  Schulz had already been taking inappropriate steps to prop up the company by falsely depicting its financial condition to Commerzbank, DFB, and an eventual purchaser of the Acquired Companies.

190.    As noted above, Respondents' first dealings with PCC in respect of PCC's purchase of the Acquired Companies came with the Fox communication.  This occurred on July 4, 2016 at a time when Schulz had undergone a restructuring analysis pursuant to IDW S 6, had received an opinion from Dr. Ringtsmeier that it was obligated to file an insolvency petition (as of June 2016 and up to the signing of the Credit Facility Agreement), was in default on its Commerzbank loan, and was seeking temporary bridge financing that would obligate it to enter into the trust agreement referenced above.  Notwithstanding the precarious circumstances in which Schulz found itself, the Fox communication described Schulz as profitable with "high margins" and "high cash flow" and as having a "growing market . . . unaffected by current oil & gas price developments."[266]

191.    PCC's interest having been stimulated, there followed a period of due diligence, which included access to the Acquired Companies' financial results, access to a

---

[265]    CX-1450; CX-1455.
[266]    CX-0004; Pulley WS-1, ¶10.

virtual data room, and in person discussions with Schulz representatives.[267]  It is PCC's

essential position that Schulz representatives painted a fundamentally false and misleading

picture of the condition of the Acquired Companies.  Instead of disclosing Schulz's true

financial condition, Schulz depicted financially healthy companies successfully withstanding

depressed oil and gas prices and the corresponding downturn in CAPEX spending in the oil

and gas sector.

192.    A key element of PCC's claim of fraud rests on its contention that the

warranted financial statements attached as Exhibit 3 to the SPA were false, with substantially

overstated revenues and EBITDA  The foundation of that contention rests on the forensic

analysis and expert reports of Wördehoff, Kiess and Demuth.

193.    Wördehoff examined Schulz's INFOR system, which reflected customer

orders and tracked Schulz's progress in fulfilling the orders.  While examining the system,

Wördehoff by happenstance discovered what he described as a "data collision," which

resulted from efforts by Füchtjohann and Sontrop to save the same file for the same customer

on the same date.[268]  As a result, Wördehoff came to understand that the "Create Dates" and

"Modify Dates" shown in INFOR for a particular customer order might not be accurate.[269]

194.    This data collision led Wördehoff to examine all the Create Dates in 2015,

2016, and 2017 and to compare them to internal tracking numbers in the INFOR system.[270]

Wördehoff determined that numerous orders with Create Dates in the period 2014-2016 were

actually created out of chronological sequence between October 2016 and February 2017.[271]

---

[267]    SOC, ¶26.
[268]    SOC ¶102; Wördehoff-1, ¶¶26-27.
[269]    SOC ¶102; Wördehoff-1, ¶¶26-27.
[270]    Wördehoff-1, ¶¶49-53.
[271]    Wördehoff-1, ¶¶52-53.

In effect the customer orders were entered long after the displayed Create Dates and backdated.[272]  The evidence showed many of the backdated orders were entered during an approximate one week time period in October 2016.  Wördehoff concluded from his out-of-sequence analysis as follows:  "That someone subsequently manipulated the system is the only reasonable explanation from these findings . . . these results can only be explained with subsequent modifications of INFOR Create Dates or with entries made while the system was backdated."[273]  The heart of Wördehoff's written and oral testimony then is that Schulz personnel manipulated the INFOR system to enter orders and then backdate them.

195.    Respondents have attacked Wördehoff's opinion on several grounds.  Thus, Respondents criticize Wördehoff for making assumptions about how the INFOR system was used based on conversations Wördehoff had "with two PCC employees who lack any pre-closing personal knowledge and were not day-to-day users of the system after closing."[274] Respondents further criticize Wördehoff's opinions by contending that he did not "test the quality, accuracy, or completeness of the dataset that PCC provided him" and that "his analysis was not based on a statistically reliable sample set of the INFOR system data."[275]

196.    We find Respondents' criticisms unavailing.  In the first place, Wördehoff's opinions cannot be viewed in isolation.  If Claimants' fraud claim rested solely on Wördehoff's conclusion that orders were entered out-of-sequence and if there were some plausible explanation for that condition, then Respondents' criticisms might have some bite.  However, Wördehoff's conclusions are an element of the mosaic of fraud presented by Claimants, and his out-of-sequence analysis is one part of that picture.  That it points toward

---

[272]    Wördehoff-1, ¶¶52-53.
[273]    Wördehoff-1, ¶¶50-53.
[274]    RPHRB, ¶158.
[275]    RPHRB, ¶158

fraud is confirmed by the other substantial evidence that Claimants have submitted. In the case of Wördehoff's analysis of the INFOR outage that occurred in October 2016, many of the backdated order entries occurred during that period and certain of the backdated orders then entered were for substantially greater amounts than previous orders from the same customers.[276] Van Gemmern's testimony confirms the extraordinary nature of the October 2016 outage. While prior outages for maintenance typically lasted one to two hours, the October 2016 outage lasted approximately five days.[277] Following that outage, "most employees were denied access to create lists or reports" from the system.[278] However, van Gemmern did have access to the INFOR system and he observed unexplained sales increases of $15 to $20 million, which included orders that were "extraordinarily high in value."[279] There are also emails that reflect the actions taken by Schulz personnel to manipulate the INFOR system; these actions fit hand-in-glove with Wördehoff's out-of-sequence analysis, and they show consciousness of wrongdoing by Respondents' personnel.[280] The INFOR outage also occurred at a time when the Parties were in the thick of the acquisition process. Respondents' viability depended on the forbearance of Respondents' creditors, and Respondents' ability to extract value from the Acquired Companies depended on consummation of the sale of the Acquired Companies to PCC. At the end of the day, Respondents have proffered no alternative, innocent explanation why Respondents' personnel went into the INFOR system, entered orders, and backdated them, and did so in some instances at values not previously experienced by Schulz.

---

[276] Wördehoff-1, ¶¶57, 117-131; CX-0801.

[277] Van Gemmern WS, ¶10.

[278] Van Gemmern WS, ¶11.

[279] Van Gemmern WS, ¶11.

[280] *E.g.*, CX-0391-0392.

197.    We find Wördehoff's analysis, in context, to be an important and credible building block of PCC's fraud claim.  He showed how the INFOR system was manipulated to enter orders and backdate them.  His conclusion in this regard is validated by a plethora of documentation and testimony that showed WSG personnel taking steps to create orders that were not real customer orders and sending emails to each other reflecting the manipulation. These steps, together with the lengthy INFOR outage that occurred in October 2016, which was vastly different in duration from sporadic INFOR outages experienced in the past,[281] are consistent with, and thus independently validate, Wördehoff's conclusion that orders were entered out of sequence through manipulation of the INFOR system.    Importantly, as mentioned above, Respondents have come forth with no innocent explanation for this activity.  We find Wördehoff's conclusions that Respondents manipulated the INFOR system and entered and backdated orders to be substantiated, reliable, and important indicia of fraud.

198.    Kiess then built on Wördehoff's analysis.    Among other things, Kiess reviewed the email accounts of certain WSG employees and came upon a series of Excel spreadsheets – the Tracking Sheet – that appeared to track customer transactions for which appropriate documentation, including customer purchase orders, order confirmations, purchases of raw materials, invoices, and the like, was lacking.[282]   Based on his forensic work, Kiess concluded that 30 transactions at WSG and 17 transactions at SXP were fake, for a total of 47 transactions.[283]   He reached this conclusion using Wördehoff's out-of-sequence analysis and the Tracking Sheet, plus emails indicating that the INFOR outage in October 2016 was "deliberately setup,"[284]  and the absence of basic documentation that would support

---

[281]    Van Gemmern WS, ¶¶10-11.

[282]    *See* paragraphs 75-76, *supra*.

[283]    Kiess-2, ¶25.

[284]    Kiess-1, ¶79.  *See also* CX-0394 ("So far all OK.  Stupidly, though, the printout shows the person registered in Info[r] as the User!  So better have me or MKennedy as I know the password.")

the authenticity of customer transactions.[285]  In addition, Kiess reviewed the manufacturing records for the 47 transactions in question and found that the records showed that the various steps in the manufacturing process all occurred on the same date and at the same time, whereas the manufacturing records for transactions that are considered to be bona fide show the various manufacturing steps to have occurred at successive dates and times, as one would expect.[286]  Kiess further observed that the presence of the same date and time for successive manufacturing steps in the manufacturing records was shown to be systematic for the 47 transactions he determined were fake, whereas different dates and times were shown in the manufacturing records for those customer orders he considered to be real.

199.    Mr. Kiess found further support for his conclusions that the 30 WSG transactions were fake in the way material test reports ("**MTR's**") were handled.  Kiess interviewed Sebastian Helmann, the head of WSG's quality department, and learned that, for customer orders, an electronic folder is created to store MTR's and related documentation. Mr. Helmann was unable to identify such a folder for any of the 30 WSG transactions that Kiess determined to be fake.  However, at Mr. Kiess's request, Mr. Helmann examined the OS-System data base where all testing documentation is archived by the Quality Department. In that data base, Mr. Helmann discovered 34 MTR's associated with 13 of the 30 WSG transactions in question.  Kiess examined these MTR's and found that all of them have "duplicates addressed to completely other customers."[287]  There were comparable MTR's in

---

[285]   Kiess-1, ¶¶73-94.

[286]   Kiess 2, ¶¶29-30, 32-33.

[287]   Kiess 2, ¶¶34-37.

the SXP data base, which were associated with the SXP transactions Kiess determined to be fake.[288]

200.    In his second expert report, Kiess also examined the €32 million ALSA transaction in detail given the substantial amount in question.  The indicia he examined, which led him to conclude that this transaction was fake, have not been seriously controverted. That evidence includes order documentation related to a project in Abu Dhabi, but no such documentation for the purported €32 million customer order, as well as emails between Heinrich and Flöth allocating the €32 million amount between two Abu Dhabi projects, and emails between Füchtjohann and Heinrich suggesting that invoices be created to be shown to KPMG.[289]

201.    Kiess also contacted a freight carrier and testing laboratory with respect to orders that Flöth claimed were received from ASYN, Horizon Energy and Piping Equipment and learned that neither the freight forwarder nor the testing laboratory had acted in respect of the alleged orders.[290]    In addition, Kiess relied on confirmatory emails showing manipulation by WSG personnel, including for example, emails showing that Stefan Heinrich manually added sales for several customers in 2017.[291]

202.    Respondents level several criticisms at Kiess's analysis, but we do not consider the criticisms directed at his methodology or the thoroughness of his evaluation to affect the overall reasonableness of his conclusions.  We find the criticisms to be minor in nature to the point of quibbling.  One notable example illustrates this point.  Respondents criticized Kiess for conducting a very short interview of Joachim Wickenkamp, the WSG

---

[288]    Kiess-2, ¶36.
[289]    Kiess-2, ¶¶42-54.
[290]    Kiess-1, ¶¶85-88.
[291]    Kiess-1, ¶79.

sales manager for the Mideast.[292]  However, in the brief interaction with Wickenkamp, Kiess got valuable information from him.  With respect to the ALSA order confirmation which has been shown to not represent a real transaction, Wickenkamp responded to Kiess's follow-up email by stating:  "I know of the company ALSA Engineering & Construction Co. LLC in Abu Dhabi, as well as the Rumaitha project, but I'm not aware of the business process attached to your email today."[293]  In her testimony at the hearing, Ms. Rommerskirchen confirmed that someone in Wickenkamp's position would have known of the ALSA order, given its very substantial size, if it were a real order.[294]

203.    The criticism that Kiess did not interview sufficient sales personnel to draw the conclusions he did is off the mark for the further reason that his conclusions rest principally on the substantial documentary and email evidence he reviewed, on the absence of documents that would reflect bona fide transactions, and on Wördehoff's out-of-sequence analysis.  We find Respondents' criticism of Kiess that he has engaged in impermissible inference stacking to be unwarranted.  It was entirely appropriate for him to take into consideration Wördehoff's out-of-sequence analysis as a confirmatory element relevant to determining whether the transactions in question were fake or not.  That analysis is one piece of the puzzle, and while Kiess considers it, he marshals substantial other evidence that points toward fraud.

204.    Respondents also complain that Kiess considered the absence of third-party confirmations with respect to the transactions in question to support his conclusions that the transactions were false.  Both Kiess and James Spencer of the Kreller Group undertook

---

[292]    RPHB, ¶162.
[293]    CX-0604; CX 0604A.
[294]    Tr. 696-697 (Rommerskirchen).

efforts *vis-à-vis* WSG customers to attempt to determine directly from them whether certain of the transactions in question were bona fide. Spencer approached thirty-five third parties, of which twenty-two either failed to respond or declined to provide information. Kiess acknowledged that it is common not to receive responses from third parties who are requested to provide information.[295] We accept Respondents' point that the absence of a response is not evidence one way or the other of the authenticity of a transaction. However, Spencer did manage to get responses from a number of WSG customers who did not have records of purchase orders with WSG that were nonetheless in the WSG database. These included Cunado, Dubai Petroleum Establishment, Larsen & Toubro and Samsung Heavy Industries. In addition, the representative of ASYN, whom he contacted, reported that ASYN "'did not conclude any contracts with' a Schulz entity and that 'we do not possess any documentation regarding' the orders at issue."[296] Respondents are correct to point out that Spencer had a low response rate and that Spencer did not confirm specifically with the individuals he contacted whether they had access to the relevant records.[297] In his second report, Kiess references Spencer's witness statement, but there is no indication of the weight Kiess gave it. He said only that he "considered the . . . results in [his] assessment."[298] We consider the five substantive responses that Spencer received as relevant data points that are consistent with the volume of evidence that indicates fraud. In the circumstances, we give them the weight that their consistency with the other evidence warrants.

205. The other criticisms that Respondents level at Kiess are noted, but they are largely collateral attacks on Kiess's credibility and we do not consider that they detract from his basic conclusion that the transactions in question are not real. Thus, Kiess's interaction

---

[295] Tr. 981 (Kiess). *See also* Tr. 1144 (Demuth).
[296] Witness Statement of James Spencer, ¶11.
[297] RPHB, ¶¶176-178.
[298] Kiess-2, ¶86.

with van Gemmern and his alleged interference "with van Gemmern's attorney-client relationship" overstates what in fact occurred.[299] Van Gemmern at that juncture had not been revealed as the whistleblower, and given the mounting concerns that PCC had with the acquisition, it was not unreasonable to caution van Gemmern that his interests would perhaps not be best served by his using the lawyer proposed by the Schulz family. In all events, Kiess's purported interference with van Gemmern's attorney-client relationship says nothing meaningful about the solidity of Kiess's conclusions.

206.    Respondents further argue that Kiess is "not qualified" to give the opinions he has tendered because Kiess acknowledged in his oral testimony that he is not qualified to opine as a legal matter on fraud. Kiess is not a lawyer so he cannot render an opinion on whether conduct constitutes fraud as a legal matter. However, by his training and experience, he is qualified to opine on whether the transactions in question were fake or not from a forensic perspective.

207.    Finally, Respondents take issue with Kiess's statements that Respondents provided incomplete information regarding the financial status of WSG and contend that Kiess's "opinions regarding insolvency are unreliable."[300] In his first expert report, Kiess stated that WSG was not "able to pay installments and interests to its main lender" and that WSG was assessed as being "insolvent" by Dr. Ringstmeier.[301] We do not interpret this to be an opinion that WSG was insolvent, but rather an observation stating facts related to WSG's financial condition during the acquisition process. There is no dispute that WSG could not pay Commerzbank. There is also no dispute that Dr. Ringtsmeier, the insolvency

---

[299]    RPHB, ¶164.
[300]    RPHB, ¶172.
[301]    Kiess-1, ¶95.

lawyer to whom Kiess referred, at one point, considered WSG obligated to file a bankruptcy petition in the period June through early July 2016, which circumstance, as we have noted, was in Dr. Ringstmeier's opinion alleviated after WSG and Commerzbank entered into the Credit Facility Agreement.

208.    In short, the criticisms of Kiess do not impair his basic conclusion.  As in the case of Wördehoff's out-of-sequence analysis, Respondents have put forward no credible alternative explanation for Kiess's conclusions that is innocent in nature, whereas Kiess's conclusions and the evidence that supports them point to fraud:  (i) his discovery of the Tracking Sheet that reflected the 47 transactions in question; (ii) his reliance on the absence, with respect to these transactions, of the types of documentation that one would expect to see in connection with bona fide transactions; (iii) a variety of emails that showed WSG personnel engaged in inappropriate conduct; (iv) manufacturing records of the 47 transactions which showed implausibly all the manufacturing steps taking place on the same date at the same time; and (v) his inquiries with respect to whether a particular freight carrier or a particular laboratory had records of their work on a particular transaction, all support his conclusion that the 47 transactions were fictitious.

209.    Like Kiess, Demuth also concluded that 30 WSG transactions and 17 SXP transactions on the books of those companies were fictitious.[302]  In his second report, Demuth further concluded that the impact of these transactions was to inflate sales and EBITDA for 2015 and 2016 on the order of €200 million.[303]  Subsequent to Demuth's second report and taking account of certain criticisms made by Respondents' expert, Ms. Anderson, Demuth revised his calculations to account for intercompany eliminations and certain

---

[302]    Demuth-1, ¶¶107-108; Second Expert Report of Alexander Demuth ("**Demuth-2**"), ¶58.
[303]    Demuth-2, ¶61.

calculations with respect to cost of goods sold.[304]  The effect of these adjustments is to lower inflated sales to approximately €170 million and inflated EBITDA to approximately €160 million.[305]

210.    In reaching his conclusion that the financial statements of WSG and SXP incorporated approximately €170 million in sales and €160 million of EBITDA based on fictitious transactions, Demuth examined the transactions reflected on the Tracking Sheet uncovered by Kiess.  He then searched for documentation that reasonably should exist for an ordinary-course business transaction such as purchase orders, invoices and records of cash receipts.  Mr. Demuth also considered Wördehoff's out-of-sequence analysis from the INFOR system, reviewed the identified transactions in WSG's SUN accounting system, and reviewed other relevant documents.[306]

211.    With respect to documentation that one would reasonably expect to find to reflect bona fide transactions, Mr. Demuth evaluated the presence or absence of purchase orders, order confirmations, documentation of costs related to material purchases, production costs, storage and shipping costs, invoices, and cash receipts (including information with respect to the provenance of any cash receipts).  Demuth also interviewed relevant company personnel.[307]  As a result of his investigation, for ordinary course bona fide transactions, Demuth determined that WSG typically had such documentation and company personnel were familiar with the details of the transactions.[308]

---

[304]    Demuth Presentation, Slides 11-14.

[305]    CPHB, ¶¶159-193; Demuth Presentation, Slides 11-14.

[306]    Demuth-1, ¶¶58-60.

[307]    Demuth-1, ¶64.

[308]    Demuth-1, ¶¶62-66.

212. With respect to the 47 transactions Demuth considered to be fake, he received no documents that would suggest authenticity for 27 of the transactions.[309] For the other transactions, most of the types of documents and records that would be associated with a legitimate transaction were also absent.[310]

213. In addition, Demuth took into account Wördehoff's out-of-sequence analysis, and concluded therefrom that backdating of orders in the INFOR system was one indicator that a transaction was fictitious.[311] Demuth also examined data in the SUN accounting system to look for costs and customer payments associated with the suspect transactions.[312] On the basis of this information, and other information detailed in his report, Mr. Demuth prepared two charts reflecting the 47 transactions in question, the presence or absence of certain information, Demuth's evaluation of the effect of the presence or absence of particular information and his conclusion that the 47 transactions in question are fictitious.[313]

214. Respondents attack Demuth's opinions on multiple grounds. They maintain first that Demuth "assumed the 47 transactions were fake at the onset of his investigation," and cite for that point Mr. Demuth's testimony that he "had doubts about the authenticity of this transaction."[314] Respondents then proceed to criticize Demuth's document collection efforts, contending that Demuth did not make "a significant effort to attempt to find external documentation … [by not seeking] documents from the sales force;"[315] "performed his cash analysis based on incorrect assumptions about how the Acquired Companies tracked costs

---

[309] Demuth-1, ¶74.
[310] Demuth-1, ¶¶107-108.
[311] Demuth-1, ¶88.
[312] Demuth-1, ¶¶96-97.
[313] Demuth-1, ¶¶107-108l; Demuth-2, ¶58.
[314] RPHB, ¶179; Tr. 1089 (Demuth).
[315] RPHB, ¶180.

and applied cash to invoices;"[316] relied on Wördehoff's out-of-sequence analysis;[317] and engaged in impermissible inference stacking with respect to his analysis of the SUN accounting system and the absence of third-party confirmations.[318] Respondents level a potpourri of additional criticisms of specific aspects of Demuth's work. These include, for example: Demuth's (i) concluding that a transaction was at risk because "DFB's account of the transaction did not retain the Acquired Companies' order or invoice number;" (ii) not reviewing a sufficient number of real purchase orders to test Wördehoff's analysis; (iii) not giving sufficient weight to indicia that certain transactions were real not fake; (iv) failing to consider that unallocated costs in the SUN system could relate to the transactions at issue; (v) giving too much weight to Spencer's report that "L&T informed Kreller that they did not place" a particular order; and (vi) failing "to consider alternative explanations as to why a transaction may be documented differently or entered into the system differently."[319]

215.     We find Demuth's opinion that the 47 transactions in question are not bona fide to be reliable. Demuth appropriately took into account Wördehoff's out-of-sequence analysis and the Tracking Sheet that Kiess discovered. It is not impermissible inference stacking for one expert to incorporate into his analysis the conclusions and supporting facts of another expert where that other expert's work is sound, as in the case of Wördehoff and Kiess. In addition, Demuth reviewed documents, took into consideration data and the absence of data in the SUN accounting system, searched for business records that can reasonably be expected to be associated with legitimate transactions, and interviewed relevant company personnel. Mr. Demuth then pulled together his factual determinations

---

[316]   RPHB, ¶181.
[317]   RPHB, ¶184.
[318]   RPHB, ¶¶189-197.
[319]   RPHB, ¶¶183, 185, 191-192, 194, 203.

into charts for the WSG transactions and the SXP transactions in question, which identified six categories of information for each transaction and evaluated whether, for each transaction, the specific category of information suggested that the transaction was real, at risk, or fake, or whether a particular factor was not applicable.

216.    The more significant factors that Demuth considered were the absence of validating external documentation, the absence of documentation validating cash receipts, Wördehoff's out-of-sequence analysis, data from the SUN accounting system that showed an absence of costs associated with the 47 transactions in question and whether accounts receivable were settled by third-party payors.    Mr. Demuth also took into account other indicia of fraud such as the financial statement for SFE reviewed by EKTRA and third-party communications that confirmed that certain transactions had not been made by those third parties.    Demuth also considered as a risk factor the absence of a third-party's response to an inquiry whether or not that third party had issued an order to WSG or SXP.    The absence of a third-party response in and of itself does not mean that a transaction is fraudulent, but it also does not suggest the absence of fraud.    It simply does not provide useful information since a third party may decline to respond for any number of reasons.    Giving this factor no particular weight, but taking all of the other information reflected in Demuth's charts into consideration, we find that the charts indicate convincingly that his assessment that the transactions were fake is reasonable.

217.    As in the case of Respondents' criticism of Wördehoff and Kiess, we consider that Demuth's fundamental conclusion, that the 47 transactions in question were fictitious, to be reasonably substantiated.

218.    Respondents' expert, Ms. Anderson, criticized Mr. Demuth's methodology and conclusions, but we find that these criticisms do not meaningfully undermine his basic

opinion.[320]   Criticisms that Demuth did not sufficiently collect documents from the sales force of the Acquired Companies, that he did not sufficiently take into account WSG's centralized cash management function, and that he impermissibly relied on Wördehoff and Kiess, as well as the other criticisms catalogued above that Respondents have made, do not detract from the following central proposition:  that a transaction lacking external customer documentation (such as purchase orders, order confirmations, invoices) and documentation of cash receipts and associated costs, and a transaction that is entered out-of-sequence in the INFOR system and is backdated (including in particular those entries made during the extended INFOR outage in October 2016) strongly suggest fraud.

219.   We consider that the criticisms of the reports and testimony of Messrs. Wördehoff, Kiess and Demuth do not undermine the fundamental conclusions they reach. Our conclusion that Respondents fraudulently induced PCC to enter into the SPA and to complete the transaction does not rest on the opinion of any one of these experts and indeed does not rest solely on the opinions of all three experts.  These opinions are important data points, but they are not the whole story and must be viewed in the context of all the evidence before us, which at bottom is powerful.  This context includes the dire financial condition of WSG in 2015 and 2016, Respondents' need to sell the Acquired Companies to avoid bankruptcy, the creation of false receivables to obtain financing from DFB, the use, going back several years, of Piping Equipment to generate false transactions, indications that fraudulent activity that started on a relatively small scale became progressively more bold as Schulz's financial condition deteriorated and then extended to frantic scrambling by WSG personnel throughout the summer and fall of 2016 to keep WSG afloat and to get the Acquired Companies sold to PCC.  That scrambling included: (i) the extended INFOR

---

[320]   RPHB, ¶¶180-181.

outage in October 2016 during which WSG personnel entered fake orders into the system; (ii) the inclusion of documentation in the virtual data room that misrepresented the financial condition of WSG, as well as the bogus review of SFE's financial statements by EKTRA; (iii) the dissemination to PCC of financial statements that incorporated tens of millions of euros and dollars of fictitious revenue and EBITDA; and (iv) the misrepresentation by Flöth to Pulley on December 21, 2016, only days before the close of the fiscal year, that the Acquired Companies' financial results for 2016 would come very close to meeting projections given to PCC.

220.     Our conclusion that Schulz fraudulently induced PCC to enter into the SPA and to complete the transaction is highlighted by some of the more brazen examples of Schulz's actions to present a false picture of the financial condition of the Acquired Companies:

a.     **ALSA.**  WSG's reported revenue for 2015 included a sale to ALSA in the amount of €32 million.  This sale was entered into the INFOR system out of sequence.  The INFOR system shows a "create" date of October 14, 2014, but the order was in fact entered during the period of the INFOR outage in October 2016.[321]  There are no purchase orders or shipping records for the ALSA order. Joachim Wickenkamp, then WSG's Middle East sales lead, was not aware of the ALSA order.[322]  Payments made in respect of the invoice originated not from ALSA, but from an SF Holding account managed by Flöth and Luca Schulz.[323]  Schulz personnel also forged a bank statement that purported to show that ALSA, and not Schulz SF Holding GmbH, had paid €6,456,000 toward the order.[324]

b.     **Piping Equipment, Horizon and ASYN.**  SXP reported sales in its 2016 results that included purported sales to Piping Equipment Pte Ltd, Horizon Energy LLC and ASYN Atrau.[325]  However, SXP

---

[321]     Wördehoff-1, ¶49; CX-0336--0337.

[322]     Demuth-1, Appendix AD-011; CX-0604.

[323]     Demuth-1, Appendix AD-011; CX-0614.

[324]     Tr. 865-871 (Kiess); *see also* CX 1453-1454.

[325]     Demuth-1, Tables 4 & 17.

employees Fantaziu, Mire and Scallorn, who had among them responsibility for order entry and tracking, did not recognize the transactions. Ms. Fantaziu, whose name appears as the creator of invoices and order confirmations, testified that she did not create them.[326] Ms. Scallorn testified that invoices in unprecedented amounts "suddenly appeared" in INFOR reports that she generated.[327] When Flöth and Luca Schulz were questioned about these transactions by PCC's General Counsel, they produced forged documents to try to justify them.[328]

c. **2015 CRA-OCTG Sales.** On June 15, 2016, SXP's Senior Accountant Dennis Webb submitted to Mr. Hudspeth a preliminary CRA-OCTG balance sheet for 2015 that showed sales of $3.4 million dollars through December 2015.[329] The same day, Flöth emailed Hudspeth a spreadsheet showing a 2015 sales figure of $53.6 million.[330] On December 8, 2016, Hudspeth sent Webb a statement "prepared in Germany" showing sales of $53.6 million and asking Webb to "prepare documents that would substantiate the balance sheet."[331] On December 9, 2016, Flöth sent Hudspeth a sales breakdown for 2015.**[332]** However, there are no purchase orders, order confirmations, invoices, shipping records, or other documentation of these sales.[333] Nor is there any evidence that these are so-called "trade sales" that were funneled through CRA-OCTG.[334]

d. **SFE.** In the virtual data room, Schulz included a 2015 financial statement for SFE, that reported sales of approximately €18.8 million.[335] The SFE financial statement was reviewed by EKTRA. However, Flöth working with the financial controller of SFE established EKTRA on June 22, 2016 to conduct the review of SFE's financial statements, which as noted showed sales of €18.8 million for 2015. SFE's usual accounting firm conducted an audit of SFE, which was not disclosed to PCC and which showed sales of €9.8 million.

---

[326]   Fantaziu WS, ¶¶14-17; Tr. 436 (Fantaziu).

[327]   Witness Statement of Teresa Scallorn ("**Scallorn**"), ¶¶13-15.

[328]   SOC, ¶¶270-275; CX-0377; CX-0381, p. 9; CX-0385.

[329]   CX-0305.

[330]   CX-0302-0303.

[331]   Witness Statement of Dennis Webb ("**Webb**"), ¶18; CX-0132.

[332]   CX-1089.

[333]   Demuth-1, ¶¶115-119; Claimants' Post-Hearing Opening Brief ("**CPHB**"), ¶172.

[334]   CPHB, ¶175.

[335]   CX-0348, at 64-65, 70; Demuth-1, ¶¶110.

e.   **Dubai Petroleum, Larsen & Toubro, and F. Linster & Co.**
     Orders shown in the names of these three companies in the
     respective amounts of $2.3 million, $4.6 million and $4.5 million
     all purport to have been created by Ms. Fantaziu, but she testified
     that she did not create any of these orders.[336]  Ms. Mire testified
     that there is no record that would show that product was
     manufactured at SXP or CRA-OCTG to fill these orders.[337]  Ms.
     Reagan testified that no product shipped from SXP or CRA-OCTG
     in respect of these three orders.[338]  There are no third party
     purchase orders or other documentation associated with these
     orders, which were all created out of sequence and effectively
     backdated.[339]  By contrast, there are internal Schulz communi-
     cations, in the case of the Dubai and Larsen & Toubro orders,
     requesting "letterhead," so that the orders could be created on the
     customers' letterhead, and Wördehoff's out of sequence analysis
     shows that Sontrop, who was not an SXP employee, created the
     orders.[340]  Upon being contacted, Dubai Petroleum and Larsen &
     Toubro both stated that they had not originated these orders.[341]

f.   **Technip.**  This order in the amount of €6,299,589 was created out
     of sequence during the October 2016 INFOR outage.  There is no
     third party documentation such as purchase orders or shipping
     records and the invoices were never paid.[342]  A revealing email
     from Sontrop dated September 22, 2016 states as follows:  "I am
     running into problems with the signatures on the next Technip.
     They all look the same.  Any ideas?  I have no idea how I am
     supposed to do this!"[343]

221.   Also telling is that we have no denial of fraud on the part of Respondents'

individual witnesses, including Flöth and Luca Schulz, each of whom submitted a witness

statement.  While Respondents are free to put Claimants to the test of proving their claim,

Claimants have put forward substantial evidence that has not been directly controverted, but

has been met essentially with the argument that PCC has failed to substantiate its claim.  In

the face of substantial evidence, this is not a compelling position.  In this regard, we note

---

[336]   Fantaziu, ¶¶16, 18 & 20.

[337]   Mire, ¶¶11 & 19.

[338]   Reagan, ¶10.

[339]   Demuth-1, Appendix AD-004, 013 & 017.

[340]   CX-0220-0221; SOC. ¶¶306, 310.

[341]   Spencer WS, ¶11.

[342]   Demuth-1, Appendix AD-012.

[343]   CX-0212-0213.

further that Respondents' expert, Ms. Anderson, had access to Flöth and Luca Schulz and discussed with them document collection efforts to defend against PCC's claims. When asked during her oral testimony multiple times and in multiple different ways whether she had interviewed Flöth and Schulz to determine whether or not the transactions in question were fictitious, Ms. Anderson failed to give a clear answer to a direct question and left the Tribunal with the firm impression that, at the end of the day, she did not ask Flöth or Schulz, transaction-by-transaction, whether the transactions were real or not.[344] Given the thoroughness of Ms. Anderson's written reports in this case and her carefully crafted answers during her oral testimony, we do not consider it to be an oversight on her part not to have interviewed Flöth and Luca Schulz on the core details of the transactions and whether or not they were legitimate.

222. Taking into account all of the evidence, we readily conclude that Respondents fraudulently induced PCC to purchase the Acquired Companies. To be clear, this is not a close case. The evidence strongly points to fraud, and there is little in the record to suggest otherwise. But if further confirmation were needed, Respondents' actions after the sale provide it. To cover their tracks, Flöth and Luca Schulz used proceeds from the sale of the Acquired Companies to pay down some of the "receivables" associated with the fictitious transactions.[345] When the scheme nonetheless began to unravel, after the whistleblower came forward and Flöth and Luca Schulz prevaricated in response to inquiries from PCC's General Counsel, and after PCC hired outside consultants to assist PCC in its investigation, Flöth and Luca Schulz forged documents to try to forestall discovery of the fraud. Throughout the entire period of the transaction and its aftermath, there is a trail of emails that

---

[344]  Tr. 1698-1705 (Anderson).
[345]  *E.g.*, CX-0424.

show convincingly that Respondents were taking steps to present a materially misleading picture of the Acquired Companies and then to cover their tracks.

223.     Respondents' defense to this element of the fraud claim is largely that PCC has failed to substantiate the fraud.  So Respondents, as noted above, leveled various criticisms at Wördehoff, Kiess and Demuth.  It is true that they could have collected more documents, interviewed more sales personnel or better followed up on loose ends.  Demuth made too much of the absence of third-party confirmations with respect to some of the 47 transactions.  That said, experts are not required to present perfect expert reports.  All such reports are subject to one criticism or another.  The question is whether these criticisms nibble around the edges or attack, meaningfully, the core of an expert's conclusion.  We are satisfied that the expert opinions in question stand up and that, together with the other evidence we have referenced, the proof that Respondents made fraudulent misrepresentations is clear and convincing.

4.     Whether Respondents Knew Their Misrepresentations Were False

224.     To establish their fraud claim, Claimants must also prove that Respondents acted with fraudulent intent, that is they knew representations they made to Claimants were false.  As shown above, the fraudulent actions of Respondents' personnel were pervasive. The Tracking Sheet was exchanged among numerous personnel, including Flöth and Luca Schulz.[346]  The introduction of backdated orders into the INFOR system did not happen by accident.  There was an atypical, extended INFOR outage during October 2016 during which many of the backdated orders were entered.  The manipulation of the INFOR system was the subject of emails among Flöth, Füchtjohann, Sontrop and Heinrich.[347]  Flöth saw to the

---

[346]     Kiess-1, [at 5-6], ¶12.
[347]     CPHB, ¶247; CX-0391-0392.

inclusion in the data room of the review by EKTRA of SFE, which was materially false.[348] Flöth and others used Piping Equipment, as Respondents had for several years, to reflect fictitious transactions. The financial statements given to Claimants incorporated revenue and EBITDA from the fake transactions. And on December 21, 2016, only days before the year-end close for 2016, when Flöth had visibility on Respondents' financial performance for almost all of 2016, he told Pulley by email that the Acquired Companies were going to come very close to meeting the projections for all of 2016 that Respondents had given to Claimants.[349] Flöth had to know that this representation was false. The evidence that Respondents' representatives knew that they had painted a fundamentally misleading picture of the Acquired Companies is clear and convincing. Indeed, when there is strong evidence of pervasive fraud, as there is here, a conclusion that the key players acted with the requisite intent is inescapable. This conclusion is further confirmed by Flöth's and Luca Schulz's actions after the closing, including paying down fictitious receivables with the proceeds from the sale of the Acquired Companies[350] and providing forged documents to PCC,[351] which reflect efforts to prevent discovery of the fraud. Such consciousness of wrongdoing after the fact is further evidence, if further evidence were needed, that Respondents' representatives knew precisely what they were doing when they misled PCC. PCC has amply demonstrated that Respondents' representatives knew they were misleading PCC.

5. <u>Whether Respondents Intended for PCC to Act on the Misrepresented Information</u>

225. PCC also marshaled substantial evidence that Respondents intended for PCC to rely on the misrepresentations they made. Respondents presented a fundamentally

---

[348] CX-0906.
[349] Pulley1, ¶20; CX-0019.
[350] CPHB, ¶247(f); CX-0424.
[351] CX-0377, CX-0381, CX-0385.

misleading picture of the Acquired Companies. From the initiation of contact in July 2016, at a time when Schulz was unable to pay its debts and subsisted on the forbearance of Commerzbank, Respondents' representatives took steps with the intent to have PCC purchase the Acquired Companies. These steps have been catalogued above, but in summary they included: (i) manipulation of the INFOR system to incorporate fictitious transactions; (ii) compiling financial statements for 2015 and 2016 that included fictitious sales and EBITDA; (iii) representing that WSG's business was satisfactorily withstanding the downturn in energy sector CAPEX notwithstanding a sharp drop in the worldwide price of crude oil at a time when, in reality, Schulz (a) was unable to repay its debts, (b) depended on the forbearance of Commerzbank and financing from DFB on the basis of fictitious receivables, and (c) needed to complete a sale of the Acquired Companies to PCC to avert either a forced sale of the companies by a trustee or bankruptcy; and (iv) Flöth's false representation to Pulley near year-end 2016 that the Acquired Companies were on track to meet the financial projections that had been given to PCC. This false information was tendered to PCC and true information was withheld from PCC in the expectation that PCC would thereby conclude the transaction. Also, as detailed above, Flöth's and Luca Schulz's post-Closing efforts to forestall discovery of the fraud by using transaction proceeds to pay down fictitious receivables and by tendering forged documents to PCC's General Counsel as discovery of the fraud loomed reflect on their intent that PCC rely on the false picture of the Acquired Companies that had been created so that PCC would complete the transaction.

226. We also find that the false representations in the Acquired Companies' financial statements were of such a magnitude that Respondents necessarily intended for Claimants to rely on them. Based on his analysis, Mr. Demuth concluded that SXP's 2015 Sales (including sales of CRA-OCTG) as warranted in the SPA were overstated by $55.7

million and EBITDA was overstated by $52.8 million.[352]  For WSG's warranted 2015 Sales and EBITDA, Mr. Demuth concluded that Sales were overstated by €44,955,275 and EBITDA by $37.7 million.[353]  For the period ended September 30, 2016, Mr. Demuth found that SXP's Sales (including Sales of CRA-OCTG) were overstated by $39 million and EBITDA as warranted in the SPA, was overstated by $40.4 million.[354]  Mr. Demuth also determined that WSG's consolidated 2016 Sales and EBITDA for the period ended September 30, 2016, as warranted in the SPA, were each overstated by €34.8 million.[355]  While these amounts are less than the €200 million aggregate sales and EBITDA overstatement that Mr. Demuth found in his written reports, they are by any measure very substantial.  In addition, in the weeks immediately prior to the signing of the SPA, Flöth gave Pulley bogus estimates of revenue and EBITDA.  With respect to estimates of revenue and EBITDA that Flöth gave to PCC on December 9 and reconfirmed to PCC on December 21, 2016, revenue and EBITDA for SXP (including sales made by CRA-OCTG) were overstated by $58.7 million and for WSG were overstated by €47.6 million.[356]

227.    In short, the evidence is clear and convincing that Respondents intended for PCC to act on the misrepresented information.

---

[352]  CPHB, ¶¶192-193; Demuth June 26, 2019 Hearing Presentation, ("**Demuth Presentation**") Slide 13; PCC Closing Slide 51.

[353]  CPHB, ¶¶188-189; Demuth Presentation, Slides 11-12.

[354]  CPHB, ¶¶192-193; Demuth Presentation, Slides 11-12.

[355]  CPHB, ¶¶188-189; Demuth Presentation, Slides 11-12.

[356]  CPHB, ¶¶192-193; Demuth Presentation, Slide 13; PCC Closing Slide 51.

6.      Whether PCC Reasonably Relied on Sellers' Misrepresentations

228.    To establish its fraud claim, PCC must also demonstrate that it was reasonable for it to rely on the misrepresentations it alleges.  We have no difficulty in concluding that PCC's reliance was reasonable.

229.    We note first, as a matter of Delaware law, "the purchaser of a business is under no duty to investigate the accuracy of representations made by the seller concerning its profitability and operational affairs[.]"[357]  Thus, PCC was under no obligation to look behind the financial statements that Respondents furnished in connection with the transaction.  Such a rule makes eminent sense.  An acquiring party is entitled to assume that, even though its counterparty is concerned with protecting its own interest, such counterparty acts with a modicum of good faith and certainly does not fraudulently misrepresent the financial condition of the business as Respondents did here.  Unless Parties have reason to believe that the financial statements they are given in a transaction context are fraudulent, they may rely on them.  In this case, in particular, Claimants had no reason to suspect that Respondents were perpetrating a fraud or that, by further due diligence than that which they carried out, they could have uncovered the fraud.

230.    In the context of this transaction, PCC had no red flags to suggest that a fraudulent scheme was afoot.  Indeed, as part of their due diligence, PCC could not have discovered the fraud absent a *deus ex machina*.  Indeed, after PCC had owned the Acquired Companies, it took PCC many months to uncover the fraud, even with the benefit of a whistleblower who came forward after the Closing and with the subsequent hiring of outside consultants.  It was the serendipitous discovery by Wördehoff of a data collision in the INFOR system that led him to the path of uncovering the manipulation of the INFOR system.  It was not until the early Fall of 2017 that PCC concluded that it had been defrauded and

---

[357]    *Craft v. Bariglio*, No. 6050, 1984 WL 8207, at *10 (Del. Ch. Mar. 1, 1984) (CLA-003).

thereupon fired Flöth and Luca Schulz. It is simply unrealistic to consider that PCC could have discovered the true condition of the Acquired Companies in the context of a transaction where Respondents controlled the information available to PCC and there were no warning signals that came to the attention of PCC.

231. Respondents' main attack on PCC's due diligence, and thus of its reasonable reliance, is that PCC did no independent investigation of the oil markets and the effect that low oil prices would have on energy sector CAPEX and thus the business prospects of the Acquired Companies. This criticism falls flat, however. For one thing, low oil prices and reduced CAPEX spending were a matter of public knowledge and discussion. Notwithstanding these market conditions, Respondents touted to PCC that the Acquired Companies were prospering in spite of the challenges in the energy sector. It was precisely the false information that Respondents provided, including the false financial statements and Flöth's false assurance to Pulley at the end of 2016 that the Acquired Companies were on track to make their numbers, that tended to confirm Respondents' general representation that their business was doing well in a down market and enjoyed high profit margins. We conclude that PCC reasonably relied on the representations that Seller made, including, among others, representations that their business was doing well in a down market and thus by definition was not in dire financial condition and dependent on creditor forbearance to continue as a going concern, representations reflected in the financial statements and other financial information given to PCC in connection with the transaction, and representations by Flöth at year-end that the Acquired Companies were on track to make their numbers for 2016.

7.  <u>Whether PCC Suffered Damages as a Result of the Fraud</u>

232.    The final element that PCC must prove to make out its fraud claim is that it was damaged by its reliance on the fraudulent misrepresentations.[358]  Under Delaware law, a plaintiff must prove damages "with a reasonable degree of precision and cannot recover damages that are 'merely speculative or conjectural.'"[359]  We address quantum in Section VI.E below, including Respondents' arguments that the value of the Acquired Companies at Closing exceeded the €800 million purchase price and that Claimants may not both retain the Acquired Companies and recover the purchase price that they paid.  In this section, we address the fact of damage and whether damage to PCC was caused by the fraud.

233.    There is no doubt that PCC agreed to pay €800 million to purchase the Acquired Companies.  That amount is in the range of the indicative price that Respondents first put forward in the Fox communication and was ultimately based on the financial and other information that Respondents provided to PCC.  There is no question that, had PCC known the true state of affairs, it would not have proceeded with the purchase of the Acquired Companies for €800 million.  Mr. Pulley explained in detail the bases on which PCC decided to pay €800 million for the Acquired Companies, including the Financial Statements in Exhibit 3 to the SPA and Flöth's assurance on December 21, 2016 that "we are getting very close to the targeted EBITDA."[360]  In this respect, the damages that PCC suffered – the difference between the purchase price and the value of the Acquired Companies at the Closing – were caused by the misrepresentations insofar as the value of the Acquired Companies was less than the purchase price that PCC paid.  Respondents' arguments that PCC's changes to certain business practices in the Acquired Companies –

---

[358]    *Abry Partners V, L.P. v. F&W Acquisition LLC*, 891 A.d2d 1032 (Del. Ch. 2006).
[359]    *Kronenberg v. Katz*, 872 A.2d 568 (Del. Ch. 2004) (RLA-0196).
[360]    Pulley-1, ¶¶17, 21, 26; CX-0018; CX-0019.

abandonment of build-to-stock, limitations on trade sales, and adoption of new contract terms – are the actual cause of Claimants' losses is unpersuasive.[361]  Those changed business practices were implemented after the Closing and had no effect on whether Claimants suffered loss upon the Closing.

234.    In Part VI.E.1. below, we explain why we reject Respondents' contention that the Acquired Companies were worth more than €800 million at the Closing and why the Acquired Companies were in fact worth less than €800 million paid at the Closing.

### 8.    Respondents' Bootstrapping and Rehash Defenses Under Delaware Law

235.    Respondents raise two serious affirmative defenses under Delaware law to PCC's fraud claim.  Those defenses depend on a comparison of the allegations and evidence as between the fraud claim and the breach of contract claims.  Accordingly, we address the breach claim first and then turn to those two defenses.

## C.    PCC's Contract Claims

236.    As discussed in Part V.A.2., PCC asserts claims for breach of representations and warranties based on the financial statements that Respondents warranted in the SPA, based on Respondents' failure to disclose during the acquisition process the severe financial problems that Respondents were facing, and based on Claimants' contention that inventory on the books of the Acquired Companies was not useable or saleable.  Claimants contend that, as a result, Respondents breached Sections 2.2, 2.4, 2.5, 2.15, 2.19, 2.20 and 2.21 of the SPA.

237.    We note first that Claimants asserted breach of Sections 2.2(b) & (e) by virtue of Schulz's entry into and nondisclosure of the Credit Facility Agreement, the Trust

---

[361]    RPHB, ¶¶34-37.

Agreement and the Amendment Agreement for the first time in their post-hearing brief submitted on December 6, 2019. Accordingly, we deny this claim as untimely, and turn to Claimants' remaining contentions of breach of contract.

238. Under Delaware law, a claim for breach of contract requires proof by a preponderance of the evidence of (i) a contractual obligation, (ii) breach of the obligation, and (iii) resulting damage.[362] There is no dispute that Respondents subscribed to contractual obligations under Sections 2.4, 2.5, 2.15, 2.19, 2.20 and 2.21 of the SPA.

239. We have concluded that the financial statements in Exhibit 3 of the SPA were materially false because they included tens of millions of Euros and Dollars, as the case may be, in fictitious sales and EBITDA.[363] For example, the warranted financial statements showed 2015 sales at CRA-OCTG of $53 million,[364] where in actuality the sales were in the range of $1.64 million through September 15, 2015,[365] and there is no evidence that CRA-OCTG enjoyed substantial sales between September 15, 2015 and December 31, 2015. In the case of SXP, SXP's financial records were altered to add $45 million in sales by SXP to CRA-OCTG, where SXP did not manufacture the product and those sales were included in SXP's warranted 2015 financial statement.[366] In the case of WSG, a €32 million ALSA sale was recorded in WSG's 2015 warranted financial statement, where the evidence has established that there was no supporting documentation for the transaction and that Mr. Wickenkamp, with responsibility for the Middle East, was not aware of the transaction. The evidence showed therefore that the ALSA transaction was fictitious. Similarly, the financial statement of SFE, which was reviewed at Flöth's behest by EKTRA, was

---

[362] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003) (CLA-008).

[363] CPHB, ¶¶270-280; CX-0001, at 276, 290, 295, 311, 356, 394.

[364] CX-001, p. 276.

[365] Witness Statement of Mike Lamb, ¶7.

[366] CPHRB, ¶64.

incorporated into WSG's warranted financial statements. By virtue of these and other fictitious entries, the warranted financial statements were in breach of Section 2.5 of the SPA, under which Respondents represented that the statements in question "have been prepared in conformity with GAAP (as applicable to each Acquired Company) consistently applied and present fairly the net assets, financial position and results of operations of the Acquired Companies as of and for the periods ended on such dates."[367] For the reasons stated above, we reject Respondents' contention that Claimants' have failed "to prove the disputed sales were fake."[368] There is no doubt that the warranted financial statements do not "present fairly . . . the financial position and results of operations of the Acquired Companies . . . ."[369]

240. There was also sufficient evidence that Respondents breached Section 2.19 of the SPA. In that provision, Respondents represented that the "existing accounts receivable and notes receivable of each Acquired Company constitute valid claims arising from bona fide transactions in the Ordinary Course of Business, are collectible (subject to those reserves taken in accordance with GAAP and consistent with past practices) and are not subject to any valid claim for set-off, reduction or rebate."[370] The financial statements included accounts receivable based on those of the 47 transactions in question that apply to the time period covered by the financial statements in Exhibit 3 to the SPA. These include, for example, purported transactions with Piping Equipment ($15.8 million) and Horizon Energy ($12.9 million. The fact that, after the Closing, SF Holding made payments in respect of these receivables is of no moment. These payments were made after the Closing and do not cure

---

[367]   CX-0001, § 2.5(d).
[368]   RPHB, ¶100.
[369]   CX-0001, § 2.5(d).
[370]   CX-0001, § 2.19.

the breach at Closing and, in all events, were made to cover up the fraud and were not bona fide customer payments.

241.    We are also satisfied that Claimants have demonstrated a breach of Section 2.4 of the SPA.  That section provides in pertinent part that "each Acquired Company has, during the past three years, materially complied and is in material compliance with all applicable Laws and Orders."[371]  Respondents contend that Claimants have failed to identify any "Law" or "Order" with which Respondents have not complied.  Claimants cite authority for the proposition that a "repeated pattern of fraud is clear non-compliance with applicable law."[372]  Respondents retort that Claimants are engaged in impermissible bootstrapping in reliance on *Prairie Capital III, L.P. v. Double E. Holding Corp.*,[373] which Claimants in turn distinguish on the basis that the court in *Prairie Capital* held only that a poorly pleaded fraud claim cannot be used to bootstrap a claim for breach of a compliance-with-laws warranty.[374] We address the bootstrapping doctrine in detail below, but suffice it to say for present purposes that it does not defeat Claimants' claim of breach of Section 2.4.  Claimants have a well pleaded, indeed a successful claim, of fraud and are not using a defective fraud claim to back into a breach of contract claim, or a valid fraud claim to back into a defective contract claim.  The decision in *Cobalt* is authority for the proposition that a pattern of fraud meets the requirements of a contractual representation that a seller has operated its business in compliance with "all applicable statutes, regulations and orders."[375]

---

[371]    CX-0001, § 2.4.

[372]    *Cobalt Operating, LLC v. James Crystal Enters., LLC*, No. Civ. A. 714-VCS, 2007 WL 2142926, at *27 (Del. Ch., July 20, 2007) (CLA-035).

[373]    132 A.2d 35 (Del. Ch. 2015).

[374]    CPHRB, ¶61.

[375]    *Cobalt Operating, LLC v. James Crystal Enters., LLC*, No. Civ. A. 714-VCS, 2007 WL 2142926, at *8, 27 (Del. Ch., July 20, 2007) (CLA-035).  *See* CPHRB, ¶61.

242.     Claimants next contend that Respondents' failure to disclose the Credit Facility, the Trust Agreement and the Amendment Agreement also breached both Section 2.5 and Section 2.21.  These sections in tandem required Respondents to disclose "any material liability or obligation required by GAAP to be set forth in a financial statement or in the notes thereto," with exceptions not here relevant.  While the existence of an €8 million loan agreement may not of itself be a material item to a company of the dimensions and in the condition that Schulz represented, here the circumstances are different.  The Credit Facility Agreement was effectively a bridge loan to bide time from July 2016 while the acquisition process went forward.  The loan was, however, paid off by September 30, 2016, so that it was not a liability that had to be shown on the warranted financial statements.  While Section 2.21 does not refer to the defined term "Financial Statements," but rather to a "financial statement," we consider that this must be referring to the financial statements that WSG delivered in connection with the transaction. By virtue of paying off the bridge loan by September 30, 2016, Respondents were not in breach of Sections 2.5 and 2.21.  Claimants have also not established with evidence that the existence of the Amendment Agreement was required to be disclosed where Claimants knew of Respondents' deferral of principal and interest payments on the Commerzbank loan.[376]  Claimants have also failed to establish that the existence of the Trust Agreement is a "material liability or obligation" within the meaning of Section 2.21.  This may have been important information that PCC would like to have known, but there is no proof that the Trust Agreement was a "material liability or obligation" as those terms are used in Section 2.21.  Accordingly, we reject this claim of breach.

243.     Finally, Claimants contend that Respondents breached Section 2.20 pursuant to which Respondents represented that its inventory was useable and saleable. There is no

---

[376]     CX-0001, at 363-65.

doubt that a reasonably substantial amount of inventory had been on hand for three years in the case of WSG and two years in the case of Schulz USA, Inc. Other potential indicia of non-useability and non-saleability include evidence that some of the inventory did not have requisite certifications and that PCC wrote down the value of the inventory in its opening trial balances. While a close call, we consider that Claimants have failed to prove that the inventory was not useable and saleable. We reject the claim of breach of Section 2.20.

244.    Respondents' having breached multiple representations and warranties, we consider that PCC was damaged as a result of Respondents' breaches of those representations and warranties. Again, we address quantum in Part VI.E. below, and note here the fact of PCC's having suffered damage. Putting to one side the fraud claim, and addressing solely the breach claims, it is clear that, if PCC had been given accurate financial statements and if PCC had received accurate information that was not disclosed by virtue of the other breaches that we have found, PCC would not have purchased the Acquired Companies for €800 million. The Parties agree that any recovery of damages for breach of the representations and warranties is subject to an indemnity cap of €100 million. Section 7.1(d)(iii)(D) provides that "[n]o Seller shall have any liability with respect to the payment of Losses to which the Purchaser Indemnified Parties would be entitled to the extent such Losses exceed . . . €100,000,000 for any inaccuracy or breach of the representations or warranties set forth in Article [ ] II . . . ." Thus, to the extent Claimants establish damages for breaches of representations and warranties, Claimants' recovery for the same may not exceed €100 million. Section 7.1(d)(iii) further makes clear that this €100 million cap "does not apply to any claims for fraud or willful misconduct."

D.      **Respondents' Bootstrapping and Rehash Defenses**

245.    Respondents invoke two doctrines recognized in Delaware law as defenses to PCC's claim of fraudulent inducement.  The bootstrapping doctrine precludes a party from using its breach of contract allegations to make out liability for fraud by adding rote allegations of intent to defraud.  Thus, Respondents argue that "[i]f the factual bases for both claims are the same, then the fraud claim must be dismissed."[377]  The key issue then is whether the fraud and breach claims are different or essentially the same.   While the bootstrapping doctrine is directed at "the liability portion of contract and fraud allegations," the rehash doctrine, in Respondents' submission, "covers the damages portion of contract and fraud allegations"[378] and precludes maintenance of a fraud claim where the damages allegations for both claims are essentially the same.  Respondents thus maintain that the fraud claim should be dismissed for the independent reason that it rehashes Claimants' damages allegations for breach of contract.

246.    In their post-hearing opening brief, Respondents note that "'Bootstrapping' and 'rehashing' – are both premised upon Delaware courts' distaste of commercial parties masquerading contract claims as tort claims or tort claims as contract claims," citing *Kushaim v. Tullow Inc.* and *Prairie Capital III, L.P. v. Double E. Holding Corp.*[379]  In *Prairie Capital*, the Court found that the plaintiff bootstrapped its fraud allegations into a breach claim.[380]  In *Kushaim*, plaintiff both bootstrapped its contract claim into a fraud claim by adding a bare allegation that the defendant never intended to comply with its contractual

---

[377]    RPHRB, ¶104.

[378]    RPHB, ¶96.

[379]    RPHB ¶96; 132 A.2d 35, 59 (Del. Ch. 2015) (RLA-0155); No. CV NISC-11-212-PRW, 2016 WL 3594752, at *5-7 (Del. Super. Ct. June 27, 2016) (RLA-0186).

[380]    *Prairie Capital*, 132 A.2d at 59.

obligations and rehashed its contract damages into fraud damages by "replacing only the word 'breaches' with the word 'fraud.'"[381]

247.    We agree with Respondents' central proposition that, for purposes of this case, the bootstrapping and rehash doctrines are intended to prevent taking contract breach and damages allegations and dressing them up as a fraud claim for the same damages where the contract and fraud allegations are materially identical.  Numerous Delaware cases make this clear.  The Court in *EZLinks Golf, LLC v. PCMS Datafit, Inc.* specified that "a fraud claim only survives if it is based on some conduct distinct from that constituting a breach of contract."[382]  This rule bars fraud claims that are "merely a reclad contract claim,"[383] or claims where the fraud claim is "materially identical"[384] to the contract claim, or where the alleged damages for the two claims are "almost identical."[385]

248.    Similarly, where a fraud claim "is a simple reprise" of the contract claim and merely adds a *pro forma* allegation that the defendant "never intended to comply" with its contractual obligations, and where the "fraud damages are a copy-and-paste recitation" of the contract damages, the complaint is subject to dismissal.  It is clear from the Delaware cases that Delaware courts dismiss fraud claims when they recite the same liability allegations as the contract claim, save for adding the necessary buzzwords of "intent" and "fraud" or where the damages allegations are materially identical in the two claims.  The Court in *Cornell Glasgow LLC v. La Grange Properties LLC* summed up the central purposes of these doctrines:

---

[381]    *Kushaim*, 2016 WL 3594752, at 6.

[382]    2017 WL 1312209, at *3 (Del. Super. Ct. 2017) (RLA-153).

[383]    *EZLinks*, 2017 WL 1312209, at *2.

[384]    *EZLinks*, 2017 WL 1312209, at *6.

[385]    *Yu v. SM Nation, LLC*, C.A. No. N17C-07-200 JRJ, 2018 WL 227208, at *16 (Del. Super. Ct. 2018) (RLA-0035).

> "In some instances, the tort claims are justified when facts and circumstances reveal that something more than failed performance was responsible for the breakdown of the contractual relationship. In other instances, the tort claims amount to nothing more than an effort to 'pile on' diaphanous claims of misbehavior on top of contractual breach claims that alone are adequate to redress the 'wrong' that allegedly has been committed. Much like the brawler who brings a big stick to a fist fight, these parties seek to escalate the controversy by injecting tort claims into straightforward breach of contract disputes."[386]

249.     Against this backdrop of the clear purpose of the bootstrapping and rehash doctrines, we evaluate Respondents' defenses. We think it is readily apparent that PCC's fraud claim is not a reclad breach of contract claim. First, the fraud claim is broader than the breach claim. As Respondents have argued, the contract claims must fit within the precise language of the representations and warranties that have been breached. There is, to be sure, overlap in the fraud and breach allegations. For example, both sets of claims allege the materially misleading nature of the financial statements that are in Exhibit 3 of the SPA and that are the subject of Respondents' representations and warranties, but the fraud allegations go well beyond these financial statements. As we have found above, Respondents took steps beyond merely providing materially inaccurate financial statements. They engaged in repeated actions over an extended period of time that were intended to depict the Acquired Companies as successful and readily withstanding the downturn in the oil sector CAPEX market. Apart from information subject to the representations and warranties, Respondents withheld key information that would have put the inflated financial statements in a different light if disclosed, such as the Credit Facility Agreement, and provided false information with respect to its customers, its outstanding bids, and the operations at SXP and CRA-OCTG. Crucially, Flöth told Pulley in December 2016 that the Acquired Companies were on track to meet their year-end numbers when there was no prospect of that happening.

---

[386]     C.A. No. N11C-05-016 JRS CCLD, 2012 WL 2106945, at *1 (RLA-0007).

250.     The fraud claim is further distinguished from the breach claim by the element of intent associated with the fraud claim.  The representations and warranties can be breached without intentional wrongdoing.  The fraud claim, by contrast, requires proof of intent.  Here, as we have found, Respondents engaged in a pervasive scheme to mislead PCC so that PCC would sign the SPA and complete the transaction.  Respondents' actions were intentional in nature:  they manipulated the INFOR system; they created fictitious transactions with actual customers and fictitious transactions with fictitious customers; and they sought to cover up this wrongdoing after the closing in the various ways described above.  In no way, shape or form is the fraud claim an effort to "reclad" the breach claim, or "nothing more than an effort to 'pile on' diaphanous claims of misbehavior."[387]  What we have here is real fraud, not a gussied up claim of breach.  The bootstrapping doctrine is simply inapplicable.

251.     Turning next to the rehash doctrine, that doctrine, like the bootstrapping doctrine, is intended to bar a plaintiff's fraud damages claim that is for all intents and purposes materially identical to that plaintiff's breach of contract damages claim.  Respondents maintain that Claimants' fraud claim is an improper "rehashing" of their breach of contract claim.[388]  In Respondents' submission, "if a plaintiff seeks to bring a fraud claim, it must plead and prove damages that are separate and apart from those it seeks for breach of contract."[389]

---

[387]   *Cornell Glasgow*, 2012 WL 2106945, at *1.

[388]   RPHB, ¶2.

[389]   RPHB, ¶2.

252.    In response, Claimants contend first that the rehashing doctrine does not apply in this case because Delaware law allows pleading in the alternative, that a plaintiff may plead alternative claims of fraud and breach of contract.  That is plainly true as a general proposition, but if it were true in all instances, there would be no reason for a bootstrapping doctrine or a rehashing doctrine, both of which consistent Delaware law plainly recognizes.  Claimants' reliance on *Ashland LLC v. Samuel J. Heyman 1981 Continuing Tr. For Heyman* does not alter that conclusion.[390]  It merely stands for the unexceptional proposition that contract and fraud claims may co-exist if the fraud "allegations go beyond a simple breach of contract claim."[391]

253.    Claimants' second argument for claiming that the rehash doctrine does not apply is that the contractual cap on damages means that it can never recover more than €100 million for its breach of contract claims, whereas it seeks as much as €800 million for its fraudulent inducement claim.

254.    We begin our analysis by emphasizing Respondents' own statement of the purpose behind both the bootstrapping and rehashing doctrines:  they "are both premised upon Delaware courts' distaste of commercial parties masquerading contract claims as tort claims or tort claims as contract claims."[392]  As we have noted above, this is not a case sounding in contract that tacks on *pro forma* allegations of "intent" or "fraud."  This is a case of true and pervasive fraud, where the active participants did not inadvertently stumble into mistakes, but rather took systematic steps to mislead Claimants and then to try to cover their

---

[390]    No. N15C-10-176, 2018, WL 3084975, at *15 (Del. Super. Ct. June 21, 2018) (CLA-029).

[391]    No. N15C-10-176, 2018, WL 3084975, at *15 (Del. Super. Ct. June 21, 2018) (CLA-029).

[392]    RPHB, ¶96.

trail. In that circumstance, application of the rehash doctrine to dismiss a fraud claim must be approached with circumspection.

255.     In the context of this case of clear and convincing fraud, it is significant that there is a contractual cap on contract damages, which on its face differentiates the damages that Claimants may seek for breach of contract and for fraudulent inducement. The difference in potential recovery under the two heads of claim is substantial and serves to distinguish the damages alleged for fraud and the damages alleged for breach. This conclusion is confirmed by the context of the respective claims: the fraud claim is not at bottom a contract claim masquerading as fraud. It is a bona fide fraud claim.

256.     In addition, the Court in *EZLinks*,[393] made an important point that bears on the rehash issue. In applying the rehash doctrine, the court distinguished an earlier case, *JCM Innov. Corp. v. FL. Acq. Holdings, Inc.*,[394] that did not apply the rehash doctrine to bar plaintiff's non-contract claims. In *JCM*, the indemnification provisions in the parties' agreement had the effect of blocking all of *JCM's* contract claims, so that only its fraud and unjust enrichment claims remained. In that circumstance, the court, sensibly, refused to apply the rehash doctrine. While the *EZLinks* court made clear that *JCM* does not stand for the proposition that identical claims in fraud and breach counts are permissible, which conforms to consistent Delaware law, *JCM* impliedly lends support to the notion that a cap on damages can take a plaintiff outside of the ambit of the rehash doctrine. The indemnification limit in this case does not block contract claims altogether, as the indemnification limit did in *JCM*, but it meaningfully limits their scope and thus differentiates between the contract and fraud claims as regards quantum.

---

[393]     *EZLinks*, 2017 WL1312209, at *6.
[394]     2016 WL5793192, at *7-9 (Del. Super. Ct. Sept. 30, 2016) (RLA-0119).

257.    In their post-hearing reply brief, Respondents brought to our attention a recently decided Delaware case which Respondents read to say that a contractual "cap on recoverable breach of contract damages does not alter or distinguish Claimants' pleading of damages" for purposes of the rehash doctrine.[395]

258.    We do not read the *Firmenich* case as Respondents do.  The central issue, indeed the only issue, that the Court discusses in its opinion is whether plaintiff's request for punitive damages in that case obviates application of the rehash doctrine, where the damages allegations for both the fraud and contract claims were otherwise the same.  The presence of a claim for punitive damages did not deter the court from applying the rehash doctrine, an unexceptional decision in line with Delaware case law.  A bare claim for punitive damages associated with a fraud claim is akin to a rote allegation of intent associated with a fraud claim and is an insufficient basis to find that the fraud claim is not a reclad contract claim.  That is the essence of the decision in *Firmenich*.

259.    There is no discussion in the court's opinion on the subject that concerns us -- whether a cap on contractual damages has the potential to preclude application of the rehash doctrine.  Respondents infer such a rule because the Court recites the plaintiff's various prayers for relief, one of which requests "a declaration that Defendants committed fraud and/or engaged in willful misconduct, thus vitiating any cap or limitation on contractual damages."[396]  Respondents seek to conclude from the presence of this request for relief that a contractual cap on damages is not a basis to avoid the rehash doctrine.  This reads too much into the Court's opinion.  For one thing, there is no discussion at all on the question whether a cap on contract damages does or does not block application of the rehash doctrine.  As

---

[395]    *Firmenich Inc. v. Natural Flavors, Inc.*, No. N19C-01-320-MMJ, 2019 WL6522055, at *5-6 (Del. Super. Ct. Oct. 29, 2019) (RLA-0208).

[396]    *Firmenich*, 2019 WL6522055, at *5.

noted above, the little discussion there is in the opinion centers only on the significance of plaintiff's request for punitive damages. Moreover, plaintiff's framing of the request for relief from the cap and the Court's general comment that plaintiff has made no allocation of damages among its claims undermine the inference that Respondents seek to draw. It is the way plaintiff framed its request for relief – to avoid the damages cap – that makes the fraud and contract claims identical. We have the opposite circumstance in this case where all Parties agree that the contract damages are subject to a €100 million cap and where Claimants are seeking €800 million on their fraud claim. The Court's comment that plaintiff has made no allocation among its claims appears to emphasize that the contract damages and fraud damages in *Firmenich* are the same.

260. We conclude that the rehash doctrine does not bar Claimants' fraud claim. This is not a case where contract claims are masquerading as a fraud claim. Claimants' fraud and contract damages contentions are different. Delaware case law has not directly addressed, and thus certainly does not preclude, a conclusion that fraud damages are different from contract damages where there is a contractual cap on contract damages. Allowing PCC's fraud claim to proceed alongside its contract claims, where the contract claims are subject to a contractual cap, is in line with the central purpose of the rehash doctrine (as well as the bootstrapping doctrine) to prevent fraud claims that are merely reclad contract claims. Here, we have a case of true fraud.

**E.     Damages**

261. We now address the quantum of PCC's damages. There is no dispute between the Parties that the proper measure of damages is the difference between the amount paid, €800 million, for the Acquired Companies, and the value of the Acquired Companies on the date of the Closing of the transaction.

262.    There are three measures of damages that the Parties have put before us. Claimants' first position is that the Acquired Companies were effectively worthless on the date of the Closing and the Claimants should be awarded €800 million in damages. Claimants' alternative claim is for €643 million, representing the difference between the price paid and Claimants' alternative formulation of the value of the Acquired Companies at the Closing. The third measure of damages before us is Respondents' analysis that, taking into account synergies that PCC projected to achieve by virtue of the acquisition, the Acquired Companies were in fact worth on the order of between $1.7 and $2.4 billion and that accordingly Claimants' damages are zero. We take up each of these measures in turn starting with Respondents' contention that Claimants suffered zero damages.

1.    Respondents' Synergies Analysis

263.    By virtue of the purchase of the Acquired Companies, Claimants hoped to achieve substantial synergies. In the period before the acquisition, PCC identified "strategic fits and potential synergies related to the merger."[397]  In the period after the acquisition, PCC prepared analyses of synergies, including the "Schulz Review Document" dated April 6, 2017 ("**April 6 Report**"),[398] and an analysis dated June 24, 2017 ("**June 24 Report**").[399]  In addition, in April 2017, after the Closing, PCC instituted a process to evaluate and achieve synergies.[400]  On the basis of the synergies identified in the April 6 and June 24 Reports, Dr. Bergin quantified the value of the synergies to range from $2.4 billion based on the April 6 Report and $1.7 billion based on the June 24 Report.  Accordingly, Dr. Bergin concluded

---

[397]    Second Expert Report of Dr. Richard Bergin ("**Bergin-2**"), ¶50; CX-0002, p. 4.
[398]    RX-0030, pp. 3, 7, 9-11, 14; Bergin-2, ¶50.
[399]    RPHB, ¶74; RX-0722, pp. 8-13; Bergin-2, ¶52.
[400]    Bergin-2, ¶51.

that the Acquired Companies were worth well more than €800 million based on his valuation of the synergies.

264.     The Parties have a sharp dispute on the Delaware law question whether the synergies that Claimants hoped to achieve must be taken into account in determining the actual value of the Acquired Companies at the Closing.  We need not resolve that dispute because we find that Dr. Bergin's analyses are not a reliable contribution to determining the value of the Acquired Companies on the date of the Closing.

265.     Dr. Bergin quantified the value of the synergies based on the two internally prepared PCC reports referenced above.  At the time of the April 6 Report, some six or seven weeks after the Closing, there is no evidence that the person preparing the report had information that Respondents had fraudulently depicted the finances, condition and business prospects of the Acquired Companies.  Thus, we must take as a given that the April 6 Report was prepared on the basis of what Respondents had represented the Acquired Companies to be, which we now know does not conform to reality.  As a result, the synergy analysis in the April 6 Report is unreliable because it does not take account of the true condition of the Acquired Companies and thus cannot serve as a basis to quantify the value of synergies that were supposed to exist.  It is a logical fallacy to build a valuation based on putative synergies of a company whose condition has been misrepresented, and to suppose that such synergies and the resulting valuation have validity as of the Closing.

266.     The June 24 Report stands on a somewhat different footing, but in a way that is even more problematic for Respondents' synergy quantification.  In the June 24 Report, the amount of synergies that PCC was then expecting to achieve was materially lower than in the April 6 Report, and Dr. Bergin's valuation of the synergies dropped from $2.4 billion to $1.7 billion.  By this time, there were beginning indications of fraud and thus rumblings that

problems in the Acquired Companies might be afoot. However, this was early days in what led eventually to the unraveling of the fraud. Van Gemmern had come forward, but his whistleblower complaint was not yet validated. Similarly, it was only in mid-July that Wördehoff discovered the data collision that put him on the path to uncovering the manipulation of the INFOR system. Flöth's efforts to cover up the fraud began to come apart in the summer of 2017 when he was asked for documents to support particular transactions, delayed in producing documents and ultimately turned over documents that were forged. So the amount of synergies expected to be achieved as of the June 24 Report and any valuation based on that figure did not reflect the fraud that had been perpetrated. As of June 24, 2017, there is still no reliable itemization of synergies and thus no reliable valuation of synergies by Dr. Bergin.

267. Dr. Bergin's testimony at the hearing is particularly helpful in demonstrating that the identification of synergies and their valuation cannot be valid when they are based on information that is fraudulent but has not yet been revealed to be fraudulent. Recall that Dr. Bergin's valuation of synergies dropped from $2.4 billion based on the April 6 Report to $1.7 billion based on the June 24 Report. Dr. Bergin testified that, even through the April 6 Report was closest to the date of Closing, he also considered the June 24 Report because he "was aware that there were allegations that were being considered of some fraudulent activity that the company became aware of certainly after the whistleblower, and [he] believe[d] [he had] heard that Mr. Koertge . . . was aware of by May, and [he] believe[d] [Koertge] was part of the team. So it was possible . . . that the quantification in June was making adjustments, the downward adjustment of some 600 million Euro in synergies that happened between the April number and the June number."[401]  Thus, Dr. Bergin has crystallized in his testimony

---

[401]   Transcript, 1895 (Bergin).

the common sense proposition that fraud necessarily affects synergy quantification and valuation. His testimony demonstrates that as fraud allegations were beginning to come to light, the amount and value of the synergies were both dropping sharply. But as of June 24, 2017, PCC still only had suspicions. The proof of the fraud and the dimensions of the fraud came later. These two reports, the April 6 Report and the June 24 Report, do not reflect the scale of the fraud that was later uncovered. These reports are, therefore, unreliable bases to determine the amount of synergies that could reasonably be said to be in view as of the Closing and accordingly the value that synergies could contribute to the <u>actual</u> value of the Acquired Companies at the Closing. We, therefore, put to the side the synergy valuations based on these reports. There is no reliable evidence, opinion or otherwise, to support Respondents' contention that the Acquired Companies were worth more than what PCC paid for them, or that the hoped-for synergies had any value at all.

2. PCC's Claim for €800 Million in Damages

268. PCC claims damages of €800 million on the basis that, in its submission, the Acquired Companies were worth nothing as of the Closing date. In Claimants' view, "as of closing the Acquired Companies had no history of generating positive earnings, were not capable of covering their operating expenses, were riddled with fraud and had no path to profitability."[402] Claimants emphasize the Schulz Group's negative EBITDA for 2015 and 2016, its failure to make any payments on the Commerzbank €325 million loan before the closing, its obtaining creditor forbearance on the basis of fake receivables, its continuation of the Acquired Companies' liquidity challenges after the closing, and PCC's need to inject tens of millions of dollars into the companies to try to make a go of it.[403] To be sure, these conditions all point to a value of the Acquired Companies that was substantially impaired

---

[402] CPHB, ¶4.
[403] CPHB, ¶¶34-45.

and to the evident truth that PCC never would have paid €800 million for these companies had it known the true state of affairs, but they do not mean the value of the Acquired Companies was zero.

269.    There are several key facts that lead us to conclude that the value of the Acquired Companies was not zero at the Closing.  First, PCC acquired, and has retained, operating businesses that have (i) property, plant and equipment, (ii) technology, (iii) some customer base, and (iv) a work force, among other things.  PCC denigrates the value of these attributes, and it is no doubt true that their value is substantially impaired from what PCC thought it was buying, but taken together, including particularly the property, plant, and equipment, they do represent some value.  On the face of it, it is implausible to conclude that these assets have zero value.  In fact, PCC continues to operate these businesses, touts them on the company website, and expects to turn around their fortunes, albeit after considerable additional investment.

270.    We also find meaningful that PCC did not seek to rescind the transaction and recover its purchase price, rather than to seek to recover damages.  We recognize that a decision not to seek rescission can be multifactorial.  The suggestion was made at the hearing that perhaps PCC was too embarrassed to seek rescission, but we do not find that to be persuasive.  In the arbitration case that PCC actually brought, PCC has acknowledged, indeed alleged, that it was defrauded.  It would have had to make comparable allegations in a claim for rescission so that the embarrassment factor is present in either case.  Claimants further argue that an important reason they did not seek rescission is that they expected that the Schulz creditors who were paid off with transaction proceeds would never agree to return funds to PCC.  That is undoubtedly true, but a claim for rescission would be brought against Respondents, not the creditors, and if such a claim were granted, Respondents would be

responsible for returning the €800 million purchase price. That they may be unable to do so does not differentiate their situation from the one PCC faces in this case, that is whether Respondents' have the wherewithal to satisfy the substantial award we make in this case. We are not saying that the failure to seek rescission in and of itself proves the Acquired Companies have some value, but it is a factor, along with the others we mention, that leads us to conclude that the Acquired Companies on the date of the Closing, did not have zero value.

271.    The other factor that leads us to this conclusion is that PCC itself has valued the assets that it bought, after the broad outlines of the fraud had come to light, at €157 million. Nearly a year after the Closing of the transaction, this is the value of the Acquired Companies that PCC itself ascribed to them in their opening trial balances. It is fundamentally inconsistent for PCC to argue that the Acquired Companies have a zero value in the teeth of PCC's own valuation of them at €157 million, a valuation in which PCC was required to derive the fair value of the assets and liabilities purchased as of the closing.[404] Indeed, PCC highlights its experience in conducting such fair value exercises and notes further PCC's retention of an outside valuation expert to assist it, all of which supports the conclusion that the Acquired Companies did not have a zero value at the Closing.[405]

272.    We, therefore, conclude that PCC has failed to establish that the Acquired Companies had a value of zero at the Closing and thus deny PCC's claim for €800 million in damages.

---

[404]    Accounting Standards Codification 805; Witness Statement of Paul Turnes, ¶5; Tr. 989-900 ("**Turnes**").
[405]    CPHB, ¶¶58-64.

3.      PCC's Alternative Claim for €643 Million in Damages

273.    Claimants' position is that, if the Tribunal rejects its claim for €800 million, as we have, we should award it €643 million. This claim is based on the premise that the actual value of the Acquired Companies, as of the Closing, was €157 million. This valuation in turn rests on the purchase accounting exercise that PCC undertook nearly a year after the Closing to value the net assets as of the Closing and the expert report of Neil Beaton. As discussed above, PCC determined that the opening trial balances of the Acquired Companies, taking account of the fraud that had come to light, totaled €157 million. It is PCC's position that it valued the assets on a going concern basis, and not simply as a liquidation value.[406]

274.    In reaching this determination, PCC notes the successive write downs of the Acquired Companies' assets that it took throughout 2017 in preparing their opening trial balances. For example, PCC wrote down, among other things, the intangible value associated with the Acquired Companies' customer relationships from €178 million to zero after it discovered significant irregularities in the sales data Respondents had provided to PCC as well as indications that customers were dissatisfied with Schulz's products and services.[407] In addition, PCC wrote down the value of inventory from €139 million to €30 million on the basis that it determined the acquired inventory to be, in many respects, obsolete and of poor quality, and also found that certain of the quality certifications associated with products in inventory were fraudulent, all of which undermined PCC's confidence in the inventory and led to a substantial write down of its value.[408]

---

[406]    CPHB, ¶57; Tr. 1029-1030 (Turnes); 1260, 1268-1269 (Beaton); Beaton, ¶34.

[407]    CPHB, ¶¶61-62; tr. 994-997 (Turnes); Beaton, ¶30; RX-0928; Tr. 484 (Khetani) ("[w]hat we have found is a customer base that is, frankly, very skeptical about buying from Schulz, based on the reputation we found in the marketplace.").

[408]    CPHB, ¶¶63-64; Tr. 998-999 (Turnes); 263-265 (Freeman). *See also* Beaton, ¶¶25-33 (discussing progressive write downs taken over the course of 2017).

275.    Claimants further contend that a €157 million valuation is not, as Respondents argue, a liquidation value, but rather incorporates a going concern element because the assets were valued on the assumption that "they would be used in an operating business, not sold in liquidation."[409]  Mr. Beaton concluded that "PCC's opening balance sheet analysis reflected tangible asset values based on a going concern premise" and that if the assets were "liquidated their values could be significantly lower."[410]  He rested his conclusion that liquidation value would be less than €157 million, in part, on the report of an independent valuation firm retained by PCC that the value of "Schulz Group's real property . . . would yield a value closer to the land value only."  He also opined that the carrying value of inventory was likely higher than would be the proceeds of a forced liquidation of the inventory.[411]

276.    Respondents dispute Claimants' contention that the actual value of the Acquired Companies as of the Closing was no more than €157 million.  Respondents contend that the value of the Acquired Companies is necessarily higher than the sum of the asset categories on the opening trial balances of the Acquired Companies.[412]  As evidence of the purported higher value of the Acquired Companies, Respondents point to a signed letter of intent from a U.S. company named Carpenter to purchase a majority stake in SXP and to purchase SXP's then 51% interest in CRA-OCTG based on an enterprise value of $420 million.[413]  We do not consider this letter of intent to be probative of the value of the Acquired Companies in any respect.  The proposed transaction was in 2014, and was for different assets than those that PCC purchased.  More importantly, we do not know the

---

[409]    CPHB, ¶69.

[410]    Beaton, ¶34.  *See also* Tr. 1082, (Demuth) ("this value is . . . a fair value assessment, meaning an assessment of a going concern situation, not a liquidation value . . . .").

[411]    Beaton, ¶34.

[412]    RPHRB, ¶45.

[413]    Witness Statement of Rainer Flöth, ¶¶54-55.

financial and other business information that was given to Carpenter and the extent to which it did or did not present an accurate picture of the interests to be purchased in the transaction under discussion. In all events, the transaction never materialized. This activity is not a basis on which to question the value of the Acquired Companies at the Closing.

277.     Respondents also question the integrity of the write downs that PCC took, contending that they were "driven by anticipation of litigation."[414]  We do not find this argument persuasive. It was PCC's position throughout these proceedings, until it made its pre-hearing reply submission on March 15, 2019, that the value of the Acquired Companies was zero and that its damages were €800 million. If anything, the opening trial balance figures tended to undercut PCC's core position on damages. PCC's proposal of an alternative valuation came only in response to Respondents' Statement of Defense, two years after taking the write downs. Moreover, there is no specific evidence in the record showing purported motivation. It is at most a hypothesis, which we do not find to be supported.

278.     Respondents also criticize PCC's alternative damages figure for not ascribing value to PCC's continuing use of the Schulz name and reputation in the promotion of its products, the technology and sales force that PCC acquired in the transaction, and PCC's touting of its receipt of the "API 5 CRA certification" for its CRA-OCTG facility.[415]  We accept that these items could reflect some measure of value that PCC acquired and retains. However, Respondents have put forward no alternative figure or no increment in value to suggest any amount by which the €157 million figure does not already take these attributes into account. For its part, PCC, based on Beaton's analysis, notes that the opening trial balance figures include a going concern element because, if the assets of the Acquired

---

[414]    RPHRB, ¶44.
[415]    RPHRB, ¶¶49-52.

Companies were liquidated, they would likely yield less than the values at which they were carried on the balance sheets of the Acquired Companies.

279.    Under Delaware law, PCC's obligation is to prove "a responsible estimate" of damages.[416]  Proof of damages with mathematical certainty is not required.  "[O]nce the fact of damages is established with reasonable certainty, proof of the amount of damages may be an estimate, uncertain and inexact, because a high degree of certainty unfairly burdens the injured party and benefits the breaching party."[417]  Delaware law embraces the proposition that "as between the plaintiff and the defendant, the perils of . . . uncertainty should be laid at the defendant's door" with respect to damages quantification.[418]  In this case, we consider that €157 million is a "responsible estimate" of the value of the Acquired Companies at the Closing.[419]  We are satisfied that this figure was derived in a normal course fashion by people experienced in undertaking such exercises and with the assistance of outside consultants and encompasses an element of going concern value over and above what would be generated if the assets were sold at liquidation.  While it is possible that Respondents could have proved some very modest increment in value to the €157 million figure based on the attributes they identified, they did not do so.  While not perfect, the €157 million valuation is a "responsible estimate."  This results in damages of €643 million representing the difference between the

---

[416]  *Beard Research, Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch.), *aff'd sub nom., ASDI, Inc. v. Beard Research, Inc.*, 11 A3d 749 (Del. Ch. 2010) (CLA-102).

[417]  *The Guide to Damages in International Arbitration,* p. 87 (Miles & Weiss, "Overview of Principles Reducing Damages") (J. Trenor ed., 3d ed. 2018).

[418]  *Siga Techs. Inc. v. PharmAthene Inc.*, 132 A.2d 1108, 1131 n.13 (Del. Super. Ct. 2018) (CLA-019).

[419]  We do not consider Mr. Beaton's alternative valuations based on his "Income" analysis and his "Market" analysis to affect this conclusion.  Of necessity, by virtue of the circumstances that prevailed in this case due to the fraud – the absence of reliable fraud-free projections of revenue as of the Closing for the period after the Closing – we find the income analysis of no value in reaching our decision on the value of the Acquired Companies.  Beaton's market analysis suffers from a lack of comparability in the transactions on which it is based, and thus we set it aside.

purchase price paid by PCC and the actual value of the Acquired Companies at the date of Closing.[420]

4. Punitive Damages

280. In its Statement of Claim, PCC requested, in addition to compensatory damages of €800 million, punitive damages of €800 million. PCC claimed that punitive damages were justified due to Respondents' "willful, wanton and malicious fraud."[421] Claimants reiterated this request in their Statement of Reply.[422] However in its post-hearing opening brief, PCC revised its claim for punitive damages to seek "only the costs and attorneys' fees it has been forced to incur."[423] Respondents contend that Claimants' request is an effort to recover attorneys' fees to which they are not otherwise entitled.

281. We note, first, that an award of punitive damages is extraordinarily rare in international arbitration, for a number of reasons, not the least of which is the risk of non-enforceability of such an award in civil law jurisdictions. In this case, an award of punitive damages is theoretically possible because Delaware law allows the imposition of punitive damages in a fraud case where "the fraud is gross, oppressive, or aggravated, or where it involves breach of trust or confidence . . . ."[424] However, we consider PCC's request for punitive damages in the amount of its attorneys' fees and costs as a circumvention of its agreement to arbitrate.

---

[420] We note one other issue that was a subject of discussion at the hearing – how to treat the €444 million in debt on the books of the Acquired Companies immediately prior to the Closing, which amount was paid off with transaction proceeds. There was disagreement on whether the €444 million should be subtracted from the various discounted cash flow and transactions-based analyses that Claimants' expert put forward and that Respondents' experts criticized. Because we have rested our damages conclusion on the €157 million opening trial balance figure, we need not resolve that dispute. What the competing viewpoints did not address is whether there is an economic difference between: (i) a purchase price of €800 million and the acquisition of debt free companies; and (ii) a purchase price of €356 million and the acquisition of companies with €444 million in debt. It is possible that an economist analyzing two such transactions would find that one form is more valuable than the other. But no Party made such an argument or presented such an analysis.

[421] SOC, ¶348.

[422] Statement of Reply, ¶167.

[423] CPHB, ¶291.

[424] CPHB, ¶287; *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1076 (Del. 1983).

282.    In the SPA, the Parties agreed to arbitrate under the Commercial Rules.[425]

Rule 47(d) of the Commercial Rules provides as follows:

> R-47.  Scope of Award
>
> (d)    The award of the arbitrator(s) may include:
>
>               *                    *                *
>
> (ii)    an award of attorneys' fees if all parties have requested such an award or it is authorized by law or their arbitration agreement.

Thus, the Parties' agreement allows for an award of attorneys' fees only if all Parties have requested it, if the Parties' arbitration agreement provides for it, or if an award of attorneys' fees is authorized by applicable law.

283.    In this case, not all of the Parties have requested an award of attorneys' fees. The Parties' arbitration agreement does not provide for such an award, and provides only for arbitration under the Commercial Rules, which specify precisely the circumstances in which an award of attorneys' fees may be made.  Nor does Delaware law, which follows the American Rule, authorize fee shifting in the circumstances of this case, where there is no applicable fee shifting statute in Delaware, and where Respondents have not conducted themselves in this arbitration "in bad faith, vexatiously, wantonly or for oppressive reasons."[426]  That is not to say that Respondents' conduct in connection with the underlying transaction was not egregious, but rather to say that Respondents' counsel have conducted themselves in this arbitration proceeding before us professionally, in good faith and with great skill.  Thus, we consider that the Parties' agreement to arbitrate and the way this arbitration has been conducted do not authorize an award of attorneys' fees in this case.

---

[425]   CX-001, § 10.9.

[426]   *Brice v. State Dep't of Correction*, 704 A.2d 1176, 1178 (Del. 1998) (RLA-0211).

Accordingly, we will not award attorneys' fees through the vehicle of a punitive damages award. Recoverable costs are addressed in Part VI.F. below.

5. Interest

284. On December 19, 2019, at the Tribunal's direction. Claimants submitted a document entitled "Specific Relief Requested by Claimants." In that document, Claimants requested prejudgment interest from February 16, 2017 at the rate of 6.25% per annum, which rate is comprised of the Federal Reserve Discount rate plus 5% pursuant to Title 6 of the Delaware Code, Section 2301(d), which in turn references Section 2301(a). Respondents have not specifically addressed the 6.25% rate that Claimants request other than to refer to Rule 47(d)(i) of the Commercial Rules, which provides that the Tribunal may award "interest at such rate and from such date as the arbitrator(s) may deem appropriate."[427]

285. We consider that we are not bound by the Delaware statutory rate for two reasons. First, the Parties agreed to arbitrate under the Commercial Rules, and Rule 47(d)(ii) gives us broad discretion to select an appropriate rate of interest. Second, we conclude that Section 2301(d) on its face is not applicable. Section 2301(d) provides for interest to be added to a final judgment in a "tort action for compensatory damages in the Superior Court or the Court of Common Plus seeking monetary relief for bodily injuries, death or property damage." Plainly, this provision does not apply to cases before an international arbitral tribunal such as this one, but only to cases in the Superior Court or the Court of Common Pleas. In addition, this provision applies to tort claims for bodily injuries, death or property damage, which is not the subject matter of this case. We conclude, therefore, that Section

---

[427] Respondents' Costs Submission, dated January 17, 2020, ¶9.

2301(d) does not apply, that Rule 47(d)(ii) does apply, and that, accordingly, we have broad discretion to select an appropriate rate of interest.

286.    It is a matter of public knowledge that interest rates have prevailed at low levels since February 16, 2017.  The U.S. Prime Rate on that date was 3.75%.  We consider this to be a reasonable rate of interest and direct that this simple rate (not compounded) apply to the amount of this award from February 16, 2017 until the date of payment, without regard to any changes in the Prime Rate after February 16, 2017.

F.    **Costs**

287.    Claimants' Cost Submission seeks both attorneys' fees and costs.  For the reasons stated in Part VI.E.4. above, we decline to award attorneys' fees.

288.    We do award costs in favor of Claimants, but consider that Claimants' original request for costs is too broad and encompasses non-recoverable costs.

289.    In their Reply Costs Submission, dated January 23, 2019, Claimants submitted a revised chart to show costs in the categories of recoverable costs submitted by Respondents, which are in line with costs that are traditionally recoverable in international arbitrations.  Accordingly, we award Claimants costs of €62,302.58 plus administrative fees of the ICDR and arbitrator fees and expenses that are detailed in paragraph 299 below.

*          *          *

290.    Finally, we would like to express our appreciation to the counsel on both sides for the impressive work they did on this case.  Counsel represented their clients with superior skill, at all times acted professionally and in good faith, and were of enormous assistance to the Tribunal in this complex case.

*          *          *

## VII.  DISPOSITIONS AND AWARD

291.    The Tribunal determines and declares that Respondents fraudulently induced Claimants to enter into the SPA and to complete the purchase of the Acquired Companies.

292.    The Tribunal determines and declares that Respondents breached Sections 2.4, 2.5, and 2.19 of the SPA.

293.    The Tribunal determines and declares that Claimants failed to prove that Respondents breached Sections 2.20 and 2.21 of the SPA and accordingly denies those claims.

294.    The Tribunal determines and declares that Claimants' assertion of their claim of breach of Sections 2.2(b) & (e) was untimely and accordingly denies that claim.

295.    The Tribunal awards damages to Claimants in the amount of €643 million in respect of Claimants' fraudulent inducement claim, of which €401,875,000 shall be paid to Precision Castparts Corp. and €241,525,000 shall be paid to PCC Germany Holdings GmbH. Respondents are jointly and severally liable to pay these amounts.

296.    The Tribunal awards damages to Claimants in the amount of €100 million in respect of Respondents' breaches of Sections 2.4, 2.5, and 2.19 of the SPA, of which €62,500,000 are payable to Precision Castparts Corp., €37,500,000 are payable to PCC Germany Holdings GmbH.  These sums are payable by Respondents as follows: €37,500,000 by Schulz Holding; €61,940,000 by Schulz Beteiligungs; and €560,000 by Schulz Verwaltungs.  These damages are subsumed within the amounts payable pursuant to paragraph 295 and are not in addition to those amounts.

297.     Respondents shall pay simple interest on the amounts payable pursuant to paragraphs 295 and 296 at the rate of 3.75% per annum from February 16, 2017 until the date of full payment of the award.

298.     Respondents, jointly and severally, shall reimburse PCC's costs in the amount of €62,302.58, five-eighths of which amount shall be paid to Precision Castparts Corp. and three-eighths of which amount shall be paid to PCC Germany Holdings GmbH.  Respondents shall pay simple interest on this amount at the rate of 3.75% per annum from the date of transmittal of this Final Award to the Parties by the ICDR until such amount is paid in full.

299.     The administrative fees of the ICDR totaling $116,100.00 and the compensation and expenses of the Tribunal totaling $589,834.33 shall be borne by Respondents.  Therefore, Respondents, jointly and severally, shall reimburse Claimants the sum of $411,017.17, representing that portion of said fees, compensation, and expenses in excess of the apportioned costs previously incurred by Claimants in the following manner: five-eighths of this amount shall be paid to Precision Castparts Corp., and three-eighths of this amount shall be paid to PCC Germany Holdings GmbH.  Respondents shall pay simple interest on this amount at the rate of 3.75% per annum from the date of transmittal of this Final Award to the Parties by the ICDR until such amount is paid in full.

300.     This Final Award renders a final decision on the merits of all claims submitted in this arbitration.  All claims not expressly granted in this Final Award are denied.

*          *          *

301.     This Final Award may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

302.     We hereby certify that, for purposes of Article 1 of the New York Convention

of 1958 on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award

was made in New York, New York, USA.

**Place of Arbitration:  New York City**
**Date:  April 9, 2020**

_____
Ms. Jean E. Kalicki, Arbitrator

_____
Dr. Wolfgang Peter, Arbitrator

_____
Mr. Elliot E. Polebaum, Arbitrator/Chair


I, Jean E. Kalicki, do hereby affirm upon my oath as Arbitrator, that I am the individual described in and who executed this instrument, which is our Final Award.

Date: ___April 9, 2020___          _____
Ms. Jean E. Kalicki Arbitrator


I, Dr. Wolfgang Peter, do hereby affirm upon my oath as Arbitrator, that I am the individual described in and who executed this instrument, which is our Final Award.

Date: ___April 9, 2020___          _____
Dr. Wolfgang Peter, Arbitrator


I, Elliot E. Polebaum, do hereby affirm upon my oath as Arbitrator, that I am the individual described in and who executed this instrument, which is our Final Award.

Date: ___April 9, 2020___          _____
Mr. Elliot E. Polebaum, Arbitrator/Chair